# UNITED STATES DISTRICT COURT

## District of Massachusetts

| | |
|---|---|
| Robert P. Weinberg,<br>Plaintiff<br><br>v.<br><br>Lisa Wolfe, Stanley Spero, Spero and Jorgensson, P.C.,<br>Lourdes Colon, Nagina Mangal, Ann Graybiel,<br>Sally Kornbluth, Massachusetts Institute of Technology,<br>MIT Campus Police Department, Craig Martin, Coverys<br>Killian Casey, Panache Flint, Michael Allen, Booker Bush,<br>Martin Crane, Alice Oliff, Richard Waring, Thomas Reilly,<br>Hon. Kimberly Budd, Hon. Margaret Walsh, James Beck,<br>Hon. Sarah Luick, Hon. Natalie Monroe, Andrea Campbell,<br>Hon. Christopher Connolly, Hon. Heide Brieger,<br>Hon. Peter W. Killborn, Andrea Campbell, Claudia Hunter,<br>Vincent DiCianni, Ferriter Scobbo & Rodophele P.C.,<br>Claudia Hunter, Robert Stolzberg, Sten Lofgren, CHDI<br>Foundation, Simons Foundation Autism Research Initiative,<br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |



# Complaint and Demand for Trial by Jury

## A Case of First Impression
### without precedent in USA since 1776

*"When the system fails, righteous men will rise up ..."*

-- *Hieronymus*

*"Lex injusta non est lex."*...... "An unjust law is no law at all."

-- Natural Law

*"Veritas liberabit vos"*......."The truth will set you free"

-- Bible - John 8:32

Now comes the Plaintiff, Robert P. Weinberg, (hereinafter "Plaintiff"), acting *pro se*, and for his Complaint against the Defendants DEMANDING **TRIAL BY JURY** , states as follows:

## I. INTRODUCTION

1. Plaintiff Robert P. Weinberg seeks compensatory and punitive damages, declaratory judgments, and injunctive relief for unlawful actions by the Defendants spanning over two decades that have resulted in substantial ham to his professional career, reputation, constitutional rights, and bank account.

2. These actions involve spoliation of exculpatory evidence, unconstitutional state laws, Extrinsic Fraud, fraud on the court, violations of federal law including the Constitution, civil rights violations, and judicial misconduct resulting in the wrongful revocation of Plaintiff's medical license and substantial damages.

3. This case presents unique circumstances without precedent in the United States since 1776, centering on a unique 1992 Express Bilateral Contract that terminated a doctor-patient relationship under the supervision of a licensed psychologist, but was ignored and disbelieved due, in part, to blatant judicial misconduct.

4. The subsequent concealment of this contract through spoliation of evidence, comprising Extrinsic Fraud, and fraud on the court led to the wrongful revocation of Plaintiff's medical license and devastating personal and professional consequences.

5. The Plaintiff seeks redress for these actions, to restore his professional standing, recover damages, hold Defendants accountable for their unlawful conduct, actions and/or omissions and further to enjoin the state defendants from ongoing and continuing violations of federal law, with investigation of judicial misconduct.

6.  The Defendants' actions deprived Plaintiff of his civil and constitutional rights, such as Due Process of Law, which are guaranteed and granted under federal law and the U.S. Constitution, while the defendants were acting under the color of state law, in violation of 42 U.S.C. § 1983, making this a civil rights suit.

7.  This action seeks redress for violations of Plaintiff's civil rights and constitutional rights under the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution, violations of Title IX of the Education Amendments of 1972, sexual discrimination and harassment, violations of Title VII of the Civil Rights Act of 1964, violations of 42 U.S.C. § 1983, and related state law claims.

8.  Plaintiff challenges the constitutionality of Massachusetts state laws and Board of Registration in Medicine ("BORIM") regulations as applied to him, alleging violations of Equal Protection, Due Process, the right to contract, the right to marry, the right to gainful employment, the Eighth Amendment, and the right to privacy, among other violations of federal law, making such state laws and regulations unconstitutional.

9.  This action seeks to remedy these wrongs, restore the Plaintiff's rightful professional standing, recover damages for the immense harm inflicted upon him, and hold the Defendants accountable for their unlawful actions, including: collusion, conspiracy, solicitation, and attempt to commit criminal offenses.

10.  The case presents multiple novel constitutional questions including:(a) Equal protection violations in medical board regulations; (b) Impairment of fundamental right to contract; (c) Violation of right to privacy in non-clinical settings; (d) Cruel and unusual punishment through permanent internet publication of scandalous and false sexual allegations; (e) Denial of right to engage in gainful employment; and (f) conscription by BORIM: Involuntary servitude through mandatory physician duties and work.

11.  The Plaintiff seeks monetary damages and relief for: (a) Deprivation of constitutional rights by defendants acting under color of law; (b) Sexual discrimination in violation of Title IX; (c) Sexual harassment in violation of Title VII; (d) defamation; (e) False imprisonment and unlawful detention; (f) Anti-Semitic discrimination and hate crimes; (g) Spoliation of exculpatory evidence comprising Extrinsic Fraud; (h) Fraud upon multiple courts and tribunals; (i) monetary damages for lost income totaling more than $3M

(three million dollars), lost economic opportunities, and constructive state ban on employment; (j) Breach of contract, Quantum Meruit and unjust enrichment; and (k) continuing humiliation, ostracism, and constructive social banishment from the community via Stigma Plus via BORIM sanctions.

## JURISDICTION AND VENUE

12.     This case involves several federal questions arising under the U.S. Constitution, thus rendering Subject Matter jurisdiction under 28 U.S.C. § 1331;  Massachusetts state Actor defendants as well as private parties have deprived the Plaintiff of his fundamental civil liberties and civil rights while acting under the color of law (42 U.S.C. § 1983) in addition to unconstitutional state laws and/or regulations of state agencies which have violated and continue to violate on an ongoing basis the Plaintiff's fundamental constitutional right to privacy, fundamental constitutional freedom of expression under the First Amendment, fundamental constitutional liberty to contract, fundamental constitutional liberty to engage in gainful employment, fundamental constitutional right to marriage, fundamental constitutional right to Due Process of Law; Fundamental constitutional right to Equal Protection of the Law (28 U.S.C. § 1331); the violations and deprivations of these fundamental constitutional rights and fundamental liberties as described herein are subject to judicial review under the Strict Scrutiny standard.

13.     Regarding the state claims herein, 28 U.S.C. § 1367 is a federal supplemental jurisdiction statute that allows a litigant with a federal claim to bring into federal court with it any state claims that are so related to the federal claim that they "form part of the same case or controversy under Article III of the United States Constitution"

14.  Venue is proper in the District of Massachusetts as multiple Defendants reside or have their principal place of business therein, and substantial events giving rise to these claims occurred therein.

## II. FACTUAL BACKGROUND

15.  In September 1992, Plaintiff and Defendant Lourdes Colon executed an express bilateral contract terminating their doctor-patient relationship under the guidance and encouragement of Dr. Lisa Wolfe; this

contract is unique in American medico-legal jurisprudence making this a Case of First Impression.

## A. UNIQUE 1992 EXPRESS BILATERAL CONTRACT

16.   Legally this is a case of **FIRST IMPRESSION** without precedent in the fifty (50) states and

American territories since the founding of the American Republic in 1776: repeated searches of

Westlaw, Lexis-Nexis, Fastcase, Google Scholar, Loislaw and more legal databases and also

researched by such Legal AI tools such as OpenAI ChatGPT, Claude 3.5 Sonnet, Google Gemini,

Microsoft Copilot, Google Bart, and Thomson-Reuters CoCounsel, revealed that **no case had ever**

**been reported to these databases or could be found in the legal databases, making this a**

**CASE OF FIRST IMPRESSION [ without precedent]; this unique contract is characterized by**

**the following twenty-six (26) parameters** :

[a] An Express Bilateral Contract was formed and executed between a physician & patient
[b] for the explicit and express purpose of terminating the doctor-patient relationship,
[c] under the supervision and guidance of a licensed university-trained psychologist who
[d] conceived, formulated, recommended, encouraged, facilitated and dictated such contract,
[e] who provided assurances to the physician that the patient was emotionally stable and the
[f] psychologist also drafted the exact words and wording of the Express Bilateral contract
[g] where such dictation took place in a licensed private psychiatric hospital following
[h] lengthy clinical consultations involving the psychologist, patient and physician
[i] in which the exact words were slowly dictated orally by the psychologist and resulting
[j] express bilateral contract was copied down verbatim by the physician and the patient
[k] in their own handwriting using ballpoint pens & lined paper provided by psychologist
[l] thereby forever memorializing such 1992 Express Bilateral contract in ink after which
[m] each contract was signed by both the physician and the patient in such ballpoint ink
[n] in the presence of and witnessed by the licensed psychologist, employed by HRI,  who had
[o] provided assurances and guarantees that such termination contract was valid & proper,
[p] safe and without any substantial risks of injury or harm to either party nor would such
[q] clinical termination endanger either party personally or cause any psychological harms
[r] or result in any legal prosecution or consequences, or loss of social or economic status,

[s] wherein the psychologist provided no warnings, boundaries, guidelines or limits

[t] for the post-termination social relationship between the physician and his ex-patient,

[u] or for the research assistant role that the ex-patient was transitioning into

[v] wherein the psychologist failed to inform or warn the physician of

[w] any serious mental health issues or emotional vulnerabilities, such as DID, which might

[x] pose a problem during the post-termination social or work relationship and there

[y] were only three (3) percipient witnesses in this consultation-treatment room to the

[z] formation and execution of this Express Bilateral Contract: the psychologist Dr. Lisa Wolfe,

the patient Lourdes Colon, and the physician - the Plaintiff.

   * DID is the abbreviation for Dissociative Identity Disorder

17.   This contract was conceived, drafted, endorsed, encouraged, facilitated and dictated by Defendant Dr. Lisa Wolfe, a licensed psychologist, at the Human Resource Institute (HRI) Hospital in Brookline, MA.

18.   Both Plaintiff and Colon transcribed and signed the contract in Wolfe's presence.

19.  This contract was later modified to create distinct "clinical" and "non-clinical" worlds.

20.  The "clinical world" encompassed medical settings where Plaintiff acted as a physician.

21.  The "non-clinical world" encompassed private settings where Plaintiff had no physician-patient relationship with Colon; the Plaintiff was not a physician in the non-clinical world - Plaintiff's status was contractually determined by the modified contract.

22.  This unique 1992 Express Bilateral Contract between the Plaintiff and Lourdes Colon, and the subsequent spoliation of evidence related to it, is at the heart of this case.

23.  This 1992 contract defines the termination of the Plaintiff's status as a physician.

24.  This unique 1992 contract represents a case of first impression, as extensive research through legal databases and AI tools has revealed no precedent where:

        (a) A physician and patient formed an express bilateral contract

        (b) For the explicit purpose of terminating the doctor-patient relationship

        (c) Drafted and guided under the supervision of a licensed psychologist

(d) Who conceived, formulated and dictated the contract

(e) In a licensed psychiatric hospital setting

(f) With the contract memorializedd in both parties' handwriting

(g) Witnessed by the supervising psychologist

25.  This contract was later modified to create distinct "clinical" and "non-clinical" worlds, defining

boundaries for future interactions between Plaintiff and Colon.

**B. Professional Background and Initial Doctor-Patient Relationship**

26.  Fromm 1989 through 1997, Plaintiff served as a Primary Care physician at the Boston Evening Medical

Center ("BEMC").

27.  In July 1989, Plaintiff was randomly assigned Lourdes Colon as a patient, providing routine medical care

for conditions such as rashes, annual check-ups, sinusitis, and general health screening.

28.  During this period 1989 - 1992, Colon worked as an EMT and expressed interest in becoming a physician

herself.

**C. Events Leading to the 1992 Contract**

29. In July 1992, during a clinic visit, Colon disclosed suicidal ideation and revealed she had been storing

medications with the intent to end her life.

30. Plaintiff arranged for Colon's hospitalization at the Human Resource Institute (HRI) Hospital in Brookline,

MA, where she received care under Defendant psychologist Dr. Lisa Wolfe.

31. In August 1992, during Colon's hospitalization, Dr. Wolfe encouraged and facilitated a meeting between

Plaintiff and Colon to discuss Colon's potential role as a research assistant.

**D. Formation of the Express Bilateral Contract**

32.  In September 1992, following Plaintiff's discussions with BEMC's Medical Director Dr. Robert

Wesselhoeft, Plaintiff met with Colon and Wolfe at HRI Hospital.

33.   During this meeting, Wolfe conceived, drafted, and dictated the Express Bilateral Contract terminating the doctor-patient relationship.

34.   Both Plaintiff and Colon transcribed the contract verbatim in their own handwriting and signed it in Wolfe's presence.

### E. Spoliation of Evidence and Subsequent Legal Proceedings

35.   For the past three (3) decades, Defendants Colon, Spero, and Wolfe engaged in spoliation of evidence by concealing the 1992 contract, comprising Extrinsic Fraud, leading to false findings of fact by DALA and BORIM, which formed the false foundation for wrongful revocation of Plaintiff's medical license.

36.   The defendants Wolfe, Spero and Colon concealed the exculpatory evidence of the 1992 Express Bilateral Contract through multiple actions, including:

   (a) Colon removed sections from her medical records (paper records) which documented the contract;

   (b) Colon refused to testify at several scheduled hearings at DALA;

   (c) Wolfe denied her role in the contract's formation and execution and refused to testify at DALA;

   (d) Spero who knew, or should have known, of the contract's existence and purpose, concealed this material fact during a lawsuit against the Plaintiff, in order to facilitate obtaining a $150,000 settlement from ProMutual Medical Malpractice insurer, which settlement was obtained fraudulently.

37.   The spoliation of this exculpatory evidence resulted in multiple false findings of fact made by Magistrate Sarah Luick in the Division of Administrative Law Appeals, and these false factual findings became adopted by the Massachusetts Board of Registration in Medicine ("BORIM") and incorporated into BORIM's final judgment and order revoking the Plaintiff's medical license.

38.   These false findings of fact and the associated false statements of material fact form the foundation of several final court judgments in Massachusetts, including final judgments in the Massachusetts Suffolk Superior Court, Middlesex Superior Court, Division of Administrative Law Appeals and the Massachusetts

Supreme Judicial Court, wherein numerous false statements of material fact may be found in the final judgments; failure to exercise due diligence by state actors during these proceedings may comprise judicial misconduct (these final judgments are attached hereto as Exhibits, comprising probative corroborating evidence of judicial misconduct).

39. As described below, the record strongly suggests judicial misconduct compounding the wrongful and unlawful actions of defendants Wolfe, Spero and Colon; this suit aims to uncover such misconduct.

**Extrinsic Fraud committed by defendants Wolfe, Spero and Colon and Fraud on the Court**

40. This spoliation of exculpatory evidence comprised Extrinsic Fraud and Fraud on the Court, committed by defendants Wolfe, Spero and Colon.

41. Specifically, Colon removed sections from her medical records that documented the contract.

42. Wolfe denied her role in the contract's formation and made false statements to BORIM.

43. Spero, as Colon's attorney, concealed the contract's existence from tribunals and obtained a fraudulent insurance settlement of $150,000 in 1998-99 from ProMutual Medical Malpractice insurer - Plaintiff's medical malpractice insurer during 1992 - 2005.

44. This spoliation of exculpatory evidence of the 1992 Express Bilateral Contract, Extrinsic Fraud and Fraud on the Court forms the foundation of numerous false statements of material fact in the final court judgments issued by Suffolk Superior Court, Middlesex Superior Court, Massachusetts Division of Administrative Law Appeals and the Massachusetts Supreme Judicial Court, in addition to the multiple false statements of material fact in the Final Judgment and order of BORIM.

45. This spoliation of exculpatory evidence had severe consequences for the Plaintiff, including damage to his professional reputation and over $4 million in economic and non-economic losses.

## III. CONSTITUTIONAL VIOLATIONS BY MASSACHUSETTS STATE ACTORS

46. This Complaint arises from a series of outrageous and egregious constitutional violations perpetrated by Massachusetts state actor defendants against Plaintiff, Dr. Robert P. Weinberg.

47. Throughout this Complaint, in each of the Counts of Causes of Action and each of the Declaratory Judgments under Relief Sought, the Massachusetts State actor Defendants refers to the group of defendants including: Booker Bush, Martin Crane, Alice Oliff, Richard Waring, Thomas Reilly, Hon. Kimberly Budd, Hon. Margaret Walsh, Hon. Sarah Luick, Hon. Natalie Monroe, Andrea Campbell, Hon. Christopher Connolly Hon. Heide Brieger, Hon. Peter W. Killborn, Andrea Campbell, in each of their individual capacities as well as their official capacities, acting jointly with several liability.

48. These violations, stemming from the Board of Registration in Medicine's (BORIM) actions and pronouncements, have inflicted substantial and irreparable harm upon Plaintiff, devastating his professional life, decimating his economic prospects, and inflicting profound emotional distress with medical injuries.

49. This section details the specific constitutional infringements, demonstrating a pattern of government overreach and disregard for Plaintiff's fundamental rights.

## A. Violation of the Contract Clause

50. In 1992, Plaintiff and Lourdes Colon entered into an Express Bilateral Contract, effectively terminating their doctor-patient relationship and establishing distinct "clinical" and "nonclinical" spheres.

51. This contract, a legally binding agreement between private parties, is protected by the Contract Clause of the U.S. Constitution (Article I, Section 10).

52. BORIM regulations improperly infringed upon this constitutionally protected agreement by attempting to nullify or impair its provisions.

53. This intrusion represents a clear violation of the Contract Clause, which prohibits states from passing any law impairing the obligation of contracts.

54. The state's actions in overriding a private agreement demonstrate a disregard for the sanctity of contracts and the fundamental right to contract.

55. Magistrate Sarah Luick's 2002 "Recommended Decision" further compounded this violation by falsely

asserting that Plaintiff rescinded the contract, despite a complete lack of evidence supporting this claim.

56. Furthermore, Magistrate Luick was acting *ultra vires* and without statutory authority if she were attempting to nullify, void or rescind a contract between two private parties, protected by the contract clause of the Constitution, and which contract supercedes and pre-empts all state laws and regulations, under the Supremacy doctrine.

57. This misrepresentation of facts underscores the arbitrary and capricious nature of the state's actions.

58. The state's attempt to void a valid contract between private parties constitutes an *ultra vires* act, exceeding its legal authority and violating the U.S. Constitution.

59. The retroactive application of state regulations to penalize Plaintiff for conduct explicitly permitted under the contract represents a blatant violation of the prohibition against ex post facto laws and bills of attainder.

60. This retroactive application demonstrates a disregard for fundamental legal principles and a targeted effort to punish Plaintiff.

## B. Equal Protection Violations

61. BORIM regulations demonstrate intentional and purposeful discrimination between two groups of physicians, similarly situated who are engaged in intimate relationships with patients or former patients: (a) physicians who marry their patients, who are not sanctioned; and (b) physicians who do not marry their patients, who face disciplinary action, including license revocation - the action taken against the Plaintiff.

62. This distinction and classification, based solely on marital status, is suspect classification and is not a legitimate criterion under the Equal Protection Clause, as it creates an arbitrary and capricious classification between similarly situated individuals.

63. The revocation of Plaintiff's medical license specifically because he did not marry his former patient constitutes intentional discrimination, a clear violation of the Equal Protection Clause.

64. This discriminatory treatment demonstrates a blatant disregard for Plaintiff's constitutional rights and an

abuse of state power.

## C. Burden on the Right to Marry

65. BORIM regulations effectively and constructively coerce physicians to marry former patients to avoid disciplinary action, thereby infringing upon the fundamental constitutional right to marry.

66. This coercion places an undue burden on this fundamental right, creating an untenable choice between personal autonomy and professional survival.

67. These regulations fail strict scrutiny analysis, as they are neither narrowly tailored nor the least restrictive means to achieve a compelling state interest.

68. The state's actions demonstrate a gross overreach of its regulatory authority and a disregard for Plaintiff's fundamental rights.

## D. Violation of the Right to Privacy

69. The 1992 Express Bilateral Contract established a "nonclinical world" in which Plaintiff did not function as a physician and where the Plaintiff may engage in private, consensual intimate activity.

70. BORIM's sanctions intruded upon this private sphere, violating Plaintiff's constitutional right to privacy.

71. This intrusion represents an unwarranted government overreach into the most personal aspects of Plaintiff's life, as was clarified in the landmark Supreme Court case of *Lawrence v. Texas* (2003) 539 U.S. 558

72. The state's prosecution of private, consensual acts occurring within the privacy of Plaintiff's home constitutes an unconstitutional invasion of his personal autonomy. *Lawrence v. Texas* (2003) 539 U.S. 558.

73. This invasion demonstrates a disregard for the fundamental right to privacy and an abuse of state power.

## E.  Denial of Due Process of Law

74. Magistrate Sarah Luick and BORIM violated Plaintiff's procedural due process rights by denying him a hearing, the opportunity to present evidence, call witnesses, and cross-examine adversarial testimony during the adjudicatory proceedings.

75. Although multiple hearings were scheduled at DALA during 2000 - 2002, all scheduled hearings were cancelled at the last moment by defendant Lourdes Colon, who refused to testify.

76. This denial of a fair trial deprived Plaintiff of his property interest in his medical license without the fundamental legal protections guaranteed under the Fourteenth Amendment

77. The refusal to grant the Plaintiff a hearing, as was his fundamental constitutional right, comprised deprivation of procedural due process.

78. The Massachusetts state actor defendants, by depriving the Plaintiff of his fundamental constitutional right to due process of law, while acting under the color of state law did comprise a violation of 42 U.S.C. § 1983.

79. This denial represents a fundamental failure of due process and a blatant disregard for Plaintiff's constitutional rights, comprising a deprivation of procedural due process.

## F.  Violation of the Right to Gainful Employment

80. BORIM's actions, including the revocation of Plaintiff's medical license and the publication of derogatory information online, have rendered Plaintiff unemployable.

81.  Over the past 22 years, Plaintiff has been terminated from 51 jobs and had over 100 job offers rescinded due to the stigma associated with BORIM's public records, which falsely label him as having committed sexual misconduct.

82.  The Public appears to equate sexual misconduct by a physician as an extreme social undesirable, lumping such physicians into a bin with other sexual deviants such as pedophiles, rapists and sex offenders.

83. This unjust deprivation of Plaintiff's ability to engage in gainful employment violates the liberty interest and the constitutional right to engage in gainful employment, protected under the Fourteenth Amendment.

84. The state's actions have effectively imposed a lifetime ban on Plaintiff's chosen profession, causing devastating economic and emotional consequences.

85. Numerous employers outside the medical field have also refused to employ the Plaintiff because the Stigma Plus label of allegedly having committed "sexual misconduct with a patient" places the Plaintiff into a similar bin of social undesirables and sexual deviants as sex offenders, rapists and pedophiles, and employers do not want to risk employing any of these individuals.

86. The MIT defendants banned the Plaintiff from the MIT campus because of such unwarranted worries.

## G.  Cruel and Unusual Punishment

87. BORIM's public dissemination of Plaintiff's license revocation, based on false allegations of sexual misconduct, has caused extensive social and professional ostracism, rendering him a "social pariah."

88. This excessive and prolonged punishment, far exceeding the original three-year revocation period, constitutes cruel and unusual punishment.

89. The state's actions have inflicted a perpetual penalty upon Plaintiff, causing ongoing humiliation and social isolation.

90. This ongoing punishment serves no legitimate state interest and represents a clear violation of the Eighth Amendment.

91. The state's actions have effectively branded Plaintiff with a "scarlet letter on his forehead," causing him to be shunned by friends, family, and community, resulting in extreme isolation and banishment.

92. This social ostracism has resulted in severe and marked depression, bordering on suicidal ideation

93. The state's actions have not only deprived Plaintiff of his livelihood but also of his dignity and his place in society.

94. These privations forced onto the Plaintiff comprised Cruel and Unusual Punishment in violation of the Eighth Amendment.

## H. First Amendment Violations

95. BORIM's actions have created a chilling effect on Plaintiff's ability to engage in protected speech and advocacy, particularly concerning his legal and constitutional rights.

96. Plaintiff's attempts to expose the injustice of his situation through communication with state agencies and the public were mischaracterized as intimidation, further infringing on his First Amendment rights.

97. The state's actions have effectively silenced Plaintiff, preventing him from seeking redress for the wrongs committed against him.

## I. Failure to Meet Strict Scrutiny

98. BORIM regulations burden several fundamental constitutional rights, including the right to marry, the right to privacy, the liberty to contract, and the right to engage in gainful employment.

99. These regulations must withstand strict scrutiny, requiring a compelling state interest and the use of narrowly tailored, least restrictive means.

100. BORIM has demonstrably failed to meet this high standard, rendering its regulations unconstitutional.

101. The state's actions represent a gross overreach of its regulatory authority and a blatant disregard for Plaintiff's fundamental rights.

## J. Economic and Emotional Harms

102. As a direct result of the state's unconstitutional actions, Plaintiff has suffered over $3M (three million dollars) in economic damages over the past twenty-two (22) years due to loss of his annual salary of $175,000 as an Emergency Department Attending Physician, lost employment opportunities and professional isolation.

103. Additionally, Plaintiff has endured severe emotional distress resulting from prolonged public shaming, alienation, and deprivation of professional and social affiliations.

104. These privations and severe emotional distress comprise the Intentional Infliction of Severe Emotional Distress, under outrageous and egregious circumstances.

105. These damages are substantial and ongoing, a testament to the devastating impact of the state's violations.

## IV. SPOLIATION OF EVIDENCE AND FRAUD ON THE COURT

106. Defendants Colon, Spero, and Wolfe engaged in a deliberate and coordinated scheme to conceal the 1992 Express Bilateral Contract and its subsequent modification.

107. This spoliation of exculpatory evidence, including the physical destruction of medical records by Colon and false statements to tribunals by Wolfe and Spero, constitutes extrinsic fraud and fraud upon the court.

108. This fraud directly led to false findings of fact by DALA and BORIM, ultimately resulting in the wrongful revocation of the Plaintiff's medical license.

109. The defendants' actions demonstrate a clear intent to deceive the court and manipulate the judicial process for their own benefit.

110. Between 1992-1996, defendants engaged in systematic spoliation of evidence through: (a) Destruction of medical records documenting contract; (b) Removal of pages from BEMC files; (c) Concealment of contract's existence; and (d) False statements to tribunals.

111. Specifically, defendant Colon: (a) Removed sections from her medical records; (b) Destroyed documentation of contract formation; (c) Targeted records from spring/summer 1992; and (d) Admitted to removing multiple pages.

112. Defendant Wolfe participated in this spoliation of exculpatory evidence by: (a) Denying her role in contract formation; (b) Making false statements to BORIM; (c) Claiming such contracts were "not the sort of thing" she did; and (d) Concealing her knowledge of the agreement.

113. Defendant Spero, as an officer of the court: (a) Knew or should have known of the contract's existence; (b) Concealed material and exculpatory evidence from tribunals; (c) Obtained fraudulent insurance settlement;

and (d) Perpetuated false narrative [possibly perjury] in legal proceedings.

114. The consequences of this Spoliation of exculpatory evidence led directly to: (a) False findings of fact by BORIM; (b) Revocation of Plaintiff's medical license; (c) Severe damage to professional reputation; and (d) over $4 million in economic losses.

115. The spoliation of this exculpatory evidence: (a) prevented Fair adjudication of claims; (b) prevented Proper consideration of contract; (c) interfered with the correct determination of the Plaintiff's status as non-physician to Colon at the alleged times of intimate activity; (d) led to inferences or conclusions leading to false material facts being incorporated into and forming the foundation of several final court judgments; (e) deprived the Expert Witness James Beck of essential and vital material facts relevant to his Expert Opinion; and (f) underlies the current Constitutional review of BORIM regulations, whose sanctions have deprived the Plaintiff of his civil and constitutional rights while the defendants were acting under the color of state law.

## V. JUDICIAL MISCONDUCT BY MASSACHUSETTS STATE ACTORS

116. The Massachusetts state actor defendants, including judges and magistrates, engaged in judicial misconduct by failing to exercise due diligence in investigating the Plaintiff's claims and by denying him a fair hearing, as well as additional actions and/or omissions which comprise judicial misconduct which are detailed more extensively in the "Initial Draft of Massachusetts Complaint" - attached as an Exhibit.

117. Despite repeated attempts by the Plaintiff to present evidence of the 1992 contract and its modification, Magistrate Luick refused to allow him to present this crucial exculpatory evidence.

118. Despite multiple communications by the Plaintiff to BORIM, the District Attorney and the Attorney General, the Massachusetts state actor defendants took no action, did not investigate the Plaintiff's allegations, did not exercise Due Diligence, did not request additional information from the Plaintiff, WHILE DENYING THE PLAINTIFF A FAIR HEARING, AN OPPORTUNITY TO BE HEARD, AN OPPORTUNITY TO CONFRONT THE FALSE WITNESSES, AN OPPORTUNITY TO PRESENT EVIDENCE IN HIS DEFENSE

119. The record suggests that the Massachusetts State actor defendants did knowingly, purposefully and

intentionally act to facilitate, aid and abet defendants Lisa Wolfe, Stanley Spero and Lourdes Colon in their endeavors to commit the criminal offenses described above comprising: spoliation of exculpatory evidence, Extrinsic Fraud, Fraud on the court, concealment of material evidence, insurance fraud, through their judicial complicity and dereliction of judicial duties.

120.   Massachusetts State actor defendants did make outrageous and unfounded conclusions that the Plaintiff intended to obstruct justice when Plaintiff's attorney Vincent DiCianni insisted on ascertaining Colon's credibility, first requesting a meeting off-the-record with Colon's attorney Stanley Spero, secondly by a motion to Magistrate Sarah Luick at DALA which was denied, thirdly by a motion in Superior Court which was denied by Judge Xifaras, and finally DiCianni insisted that the only way to ascertain Colon's credibility was through a deposition as part of the suit he would file - Weinberg v. Colon; the Plaintiff had no say about this strategy or the filing of the suit in court, but Massachusetts State actor defendants concluded that the Plaintiff intended to obstruct justice through the filing of this suit, without any evidence or justification.

121.   Outrageously and egregiously the Massachusetts State actor defendants denied the Plaintiff his fundamental constitutional right to Due Process of law, by denying a hearing at DALA, thus denying the Plaintiff the opportunity to present his defense and the exculpatory evidence of the 1992 Express Bilateral Contract, denying the Plaintiff his constitutional right to be heard, denying his constitutional right to confront adverse witnesses with cross-examination, thus silencing the voice of the Plaintiff resulting in the determination of false material facts which would form the foundation of the decision to revoke the Plaintiff's medical license resulting in a gross miscarriage of justice.

122.   Outrageously and egregiously the Massachusetts State actor defendants ignored the Plaintiff's memorandum to BORIM informing them of the criminal conspiracy involving the defendants Wolfe, Spero and Colon engaging in spoliation of exculpatory evidence comprising Extrinsic Fraud and Fraud on the Court, and also concealing their insurance fraud by obtaining a $150,000 insurance settlement without informing ProMutual that the doctor-patient relationship had been terminated by the 1992 Express Bilateral Contract.

123.  Outrageously and egregiously the Massachusetts State actor defendants also ignored the Plaintiff's letters to BORIM, the Attorney General and the District Attorney concerning this criminal conspiracy, spoliation of exculpatory evidence, Extrinsic Fraud and Fraud on the Court.

124.  Outrageously and egregiously the Massachusetts state actor defendants made a false determination of the Plaintiff's status as physician to Colon, when the contract initially terminated that status then later modified the Plaintiff's status according to the clinical and nonclinical worlds.

125.  The Massachusetts State actor defendants made these false conclusions about the Plaintiff's status backed without any substantial evidence BECAUSE THERE IS NO TESTIMONY ON THE RECORD FROM LOURDES COLON, NO TESIMONY ON RECORD FROM LISA WOLFE - and besides the Plaintiff, there were only two other percipient witnesses to the formation and execution of the 1992 Express Bilateral Contract which terminated the doctor-patient relationship: Lisa Wolfe and Lourdes Colon.

126. These unjustified false conclusions without any supporting or corroborating evidence, in the environment of the Extrinsic Fraud committed by defendants Wolfe, Spero and Colon, along with the failure of the Massachusetts state actor defendants to exercise Due Diligence, may comprise judicial misconduct.

127.  The conclusions by Magistrate Sarah Luick comprised FALSE STATEMENTS OF MATERIAL FACT COMPRISING AN ABUSE OF DISCRETION AND DERELICTION OF JUDICIAL DUTIES, ARISING FROM LUICK'S FAILURE TO EXERCISE DUE DILIGENCE AND REFUSAL TO ALLOW THE PLAINTIFF TO TESTIFY AT A HEARING TO PRESENT HIS EXCULPATORY EVIDENCE OF THE CONTRACT AND EXPOSE THE SPOLIATION OF EXCULPATORY EVIDENCE BY WOLFE, SPERO AND COLON, COMPRISING EXTRINSIC FRAUD AND FRAUD ON THE COURT.

128.  Magistrate Luick's conclusion that the Plaintiff had attempted to engage in obstruction of justice is completely unfounded and without any justification.

129.  These multiple actions and omissions by the Massachusetts state actor defendants comprise Judicial Misconduct.

130. This apparent disbelief by the state actor defendants had no evidence to support believing that the Plaintiff was not honestly presenting truthful facts; there is no evidence in the record to support a reason not to believe the Plaintiff.

131. Such failure to act, failure to perform their statutory judicial duties, failure to exercise due diligence, failure to request additional information from the Plaintiff, and failure to provide the Plaintiff with his constitutional right to a HEARING, may only have dubious explanations with nefarious aspects.

132. The State actor defendants acted egregiously and with outrageous accusations that the Plaintiff was attempting to obstruct justice.

133. Until their testimony is elicited through discovery, deposition and on the witness stand, the current evidence suggests the possibility of collusion, conspiracy, dereliction of judicial duties, bribery, tampering with evidence, intimidating witnesses including the Plaintiff, and possible misprision of felony.

134. In light of the possibility of such judicial misconduct, the Massachusetts state actor defendants will probably lose any Qualified Immunity until they produce sufficient evidence to prove that they were not guilty of judicial misconduct.

135. The Massachusetts state actor defendants are not above the law; let's see how they explain their dubious and questionable conduct which may be construed as judicial misconduct.

136. The Massachusetts state actor defendants, including judges and magistrates, engaged in judicial misconduct by failing to exercise due diligence in investigating the Plaintiff's claims and by denying him a fair hearing, as well as additional actions and/or omissions which comprise judicial misconduct which are detailed more extensively in the "Initial Draft of Massachusetts Complaint" - attached as an Exhibit.

137. Despite repeated attempts by the Plaintiff to present evidence of the 1992 contract and its modification, Magistrate Luick refused to allow him to present this crucial exculpatory evidence.

138. This denial of a fair hearing, coupled with the failure to investigate the spoliation of evidence, constitutes a violation of the Plaintiff's due process rights and demonstrates a clear bias against him.

139.  The Massachusetts state actor defendants' actions represent a gross deviation from the standard of

conduct expected of judicial officers and demonstrate a reckless disregard for the Plaintiff's constitutional rights

140.  The actions of the Massachusetts state actor defendants constitute outrageous and egregious judicial

misconduct, beyond what the community expects, that violated plaintiff's fundamental constitutional rights and

undermined the integrity of the judicial process.

141.  The following specific acts of misconduct warrant severe sanctions:

### Plaintiff's Denial of Due Process Rights by Massachusetts State actor defendants

142.  The Massachusetts state actor defendants deliberately and maliciously denied plaintiff his constitutional

right to due process by refusing to grant a hearing at DALA, thereby preventing him from presenting

exculpatory evidence and confronting adverse witnesses.

143.  As established in *Matter of Sushchyk*, 489 Mass. 330 (2022), such intentional deprivation of fundamental

procedural rights constitutes severe judicial misconduct warranting suspension.

144.  The Massachusetts state actor defendants' conduct "prevented the judicial machinery from functioning

impartially," constituting fraud on the court. *In re Tri-Cran, Inc.*, 98 B.R. 609 (1989).

### Massachusetts state actor Defendants' Failure to Exercise Due Diligence

145.  Despite multiple communications from plaintiff regarding the spoliation of evidence and extrinsic fraud

the Massachusetts state actor defendants abdicated their judicial duty by failing to investigate these serious

allegations.

146.  This dereliction directly contravenes the principle established in *Commissioner of Probation v. Adams*,

65 Mass.App.Ct. 725 (2006), that judges have an affirmative duty to take action in response to fraudulent

conduct, even without explicit statutory authorization.

### Massachusetts State actor Defendants' Abuse of Discretion and Arbitrary Decision-Making

147.  The Massachusetts state actor defendants made unsupported and arbitrary determinations regarding

plaintiff's status without any substantial evidence on record, as there was no testimony from key witnesses

Lourdes Colon or Lisa Wolfe.

**148.** This mirrors the misconduct addressed in *Matter of King*, 409 Mass. 590 (1991), where arbitrary

decision-making and lack of candor warranted public censure.

<u>**Judicial Complicity in Fraud or potentially Collusion**</u>

149. The Massachusetts state actor defendants' willful blindness to documented evidence of fraud and

spoliation effectively made them complicit in perpetuating a fraud upon the court.

150. As established in *Munshani v. Signal Lake Venture Fund II*, LP, 60 Mass.App.Ct. 714 (2004), courts

have an obligation to address and sanction fraud that compromises the integrity of judicial proceedings.

<u>**Massachusetts State actor Defendants' Retaliation Against Protected Activity**</u>

151.   The Massachusetts state actor defendants improperly characterized plaintiff's legitimate attempts to

establish witness credibility as "obstruction of justice," demonstrating retaliatory animus for plaintiff's

exercise of protected rights; Massachusetts state actor defendants also retaliated against the Plaintiff for

exercising his First Amendment rights of freedom of expression because they punished him for writing

emails to the Attorney General and District Attorney when he was attempting to facilitate a state investigation

into the spoliation of exculpatory evidence by defendants Wolfe, Spero and Colon, which comprised

Extrinsic Fraud, Fraud on the Court, and a criminal conspiracy.

152. This mirrors the improper conduct addressed in *Matter of Ford*, 404 Mass. 347 (1989), where abuse of

judicial authority warranted suspension.

<u>**Systemic Due Process Violations by Massachusetts State actor Defendants**</u>

153.  The Massachusetts state actor defendants' pattern of conduct - denying hearings, ignoring evidence, and

making unsupported determinations - reveals systemic violations of due process that "corrupted the judicial

machinery," as contemplated in *In re Tri-Cran*.

154. The cumulative effect was to deny plaintiff any meaningful opportunity to be heard, any opportunity to

present the exculpatory evidence of the 1992 Express Bilateral Contract in his defense, any opportunity to

confront and cross-examine the state's adverse witnesses Lisa Wolfe and Lourdes Colon, who never testified on the record, never testified under oath at any hearing, and never provided any sworn affidavit under the pains and penalty of perjury, thereby denying the Plaintiff of his fundamental constitutional right to Due Process of Law, requiring Notice and Hearing.

### Massachusetts State Actor Defendants' Failure to Maintain Impartiality

*155.* The record demonstrates clear judicial bias against plaintiff, as evidenced by the Massachusetts state actor defendants' unfounded conclusions about plaintiff's intentions and their refusal to consider exculpatory evidence.

*156.* This violation of the duty of impartiality warrants sanctions under the standards articulated in *Matter of Sushchyk.*

### Massachusetts State Actor Defendants' Abuse of Judicial Authority

157. The Massachusetts state actor defendants weaponized their judicial authority to silence plaintiff and prevent the presentation of evidence that would expose misconduct by other parties.

158. This represents precisely the type of abuse of power that the Supreme Judicial Court condemned in *Goldfarb v. Virginia State Bar*, 421 U.S. 773 (1975), noting the special obligations of those entrusted with administering justice.

159. The Massachusetts state actor defendants' conduct constitutes an egregious betrayal of judicial office that demands the strongest possible sanctions.

160. The Massachusetts state actors' actions have inflicted substantial harm on plaintiff while undermining public confidence in the judiciary.

161. As the Supreme Judicial Court observed in *Matter of Sushchyk*, judges who abuse their authority and violate fundamental rights must face serious consequences to maintain the integrity of the justice system.

162. The misconduct detailed above goes beyond mere error or poor judgment - it represents a calculated effort to deny plaintiff due process while enabling and concealing fraud by other parties.

163. Such conduct "strikes at the very heart of the justice system's integrity" (*Matter of King*) and warrants not just disciplinary action but potential criminal investigation for conspiracy to violate plaintiff's civil rights under color of law.

164. These violations are so severe and systematic that they strip defendants of any claim to judicial immunity.

165. As the Supreme Court has held, judges who act in "complete absence of all jurisdiction" or engage in non-judicial acts lose their immunity.

166. The Massachusetts state actor defendants' conduct here - actively participating in fraud, retaliating against protected activity, and deliberately violating constitutional rights - falls squarely within these exceptions.

167. Wherefore, plaintiff demands investigation and prosecution of this judicial misconduct by the Massachusetts state actors to the fullest extent of the law, including referral for criminal prosecution where appropriate.

168. The integrity of the justice system requires no less.

169. Current allegations of judicial misconduct by the Massachusetts state actors include the following, to be clarified and corroborated, with admissible evidence to be gleaned during discovery in the instant suit:

### Judicial Misconduct to be proved at trial

1. Judicial Complicity
2. Failure to exercise Due Diligence
3. Failure to perform and Breach of statutory judicial duties
4. Abuse of Discretion
5. Violations of the Code of Judicial Conduct
6. Malicious prosecution and/or malicious indifference
7. Interference with the Fair Administration of the Law
8. Abuse of Judicial Process
9. Dereliction of Judicial Duties

10. Solicitation to commit a criminal offense

11. Attempted commission of a criminal offense

12. Conspiracy to commit a criminal offense

13. Collusion with co-defendants

14. Tampering with a Witness

15. Intimidation of a Witness

16. Misconduct in Office of Prosecutor

17. Contempt of Court

18. Judicial Retaliation

19. Judicial Bias

20. Failure to Disclose

21. Misconduct in Office

22. Abuse of Power

23. Conflict of Interest

24. Tampering with Evidence

25. Violation of the Judicial Conduct Code

26. Conspiracy to Obstruct Justice

27. Obstruction of Justice

28. Judicial Derelection or *Negligentia Judicis*

29. Brady violations - Prosecutorial withholding Exculpatory Evidence

30. Judicial Misconduct or simply Judicial Dereliction/Judicial Complicity

31. Abuse of Judicial Authority

32. Misprision of a Felony

33. Conspiracy to commit Misprision of Felony

34. Attempt to Commit Misprision of Felony

35. Solicitation to Commit Misprision of Felony

**170.** Detailed descriptions of the Massachusetts state actors' judicial misconduct can be found in the "Initial First Draft of Mass suit" attached as an exhibit hereto.

171. <u>Judicial Misconduct and Fraud on the Court</u>: Judicial officers can be disciplined for actions that compromise the integrity of the judicial process. For instance, in *Munshani v. Signal Lake Venture Fund II*,

LP, the court upheld the dismissal of a complaint due to the plaintiff's intentional fabrication and fraud on the court, emphasizing the judge's discretion to impose such sanctions (*Munshani v. Signal Lake Venture Fund II LP*, 60 Mass.App.Ct. 714 (2004)).

172.  Similarly, in *In re Tri-Cran, Inc.*, the court vacated a sale and ordered the payment of attorney's fees due to the corruption of judicial officers, which prevented the judicial machinery from functioning impartially, constituting fraud on the court (*In re Tri-Cran, Inc.*, 98 B.R. 609 (1989)).

173.  <u>Sanctions for Misconduct</u>: Judges in Massachusetts have broad discretion to respond to findings of fraud on the court. They can fashion remedies to protect the integrity of the judicial process and deter future misconduct. This includes the inherent power to take action in response to fraudulent conduct, even without statutory authorization (*Commissioner Of Probation v. Adams*, 65 Mass.App.Ct. 725 (2006)).

174.  <u>Specific Cases of Judicial Misconduct</u>: Various cases illustrate the types of misconduct that can lead to disciplinary actions: In  *Matter of King*, the court imposed public censure for derogatory and obscene references, intoxication, lack of candor, and improper bail procedures  *Matter of King*, 409 Mass. 590 (1991) In *Matter of Sushchyk*, a judge was suspended without pay for intentional and unwanted touching of a court employee and providing false statements during the investigation (*Matter of Sushchyk*, 489 Mass. 330 (2022)) *In Matter of Ford*, a judge was publicly censured and suspended from administrative duties due to misconduct related to his administrative functions (Matter of Ford, 404 Mass. 347 (1989)).

175.  <u>Legal Liability under Federal Law</u>: Under 42 U.S.C.A. § 1983, judicial officers can be held liable for depriving individuals of their constitutional rights under color of law.

176.  However, injunctive relief against judicial officers is limited unless a declaratory decree was violated or declaratory relief was unavailable (42 U.S.C.A. §° 1983).

## VI. EFFECT OF EXTRINSIC FRAUD ON JUDGMENTS AND STIPULATIONS

177.  Established legal precedent clearly dictates that extrinsic fraud, such as the spoliation of evidence in this case, may void final court judgments and stipulations obtained through such fraud, or comprise voidable final state judgments *ab initio*.

### A. Definition and Standards

178.  The Supreme Court established in *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944), that fraud on the court represents a corruption of the judicial process that warrants setting aside judgments regardless of finality concerns.

179.  The Court held that such fraud "demands the exercise of the historic power of equity to set aside fraudulently begotten judgments."

180.  The standard for proving fraud on the court requires clear and convincing evidence of:

    (a)  A scheme calculated to interfere with judicial machinery

    (b)  Corruption of the court itself or its officers

    (c)  An unconscionable plan or scheme

    (d)  Intent to deceive the court

    (e)  Material impact on judgment

181.  As articulated in *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991), courts possess inherent power to vacate judgments obtained through fraud that "defile[s] the court itself."

B. Extrinsic vs. Intrinsic Fraud Distinction

182. The Supreme Court distinguished extrinsic from intrinsic fraud in *United States v. Throckmorton*, 98 U.S

61 (1878), holding that extrinsic fraud occurs when the wrongful conduct prevents a party from presenting

their case, while intrinsic fraud relates to issues actually presented and considered at trial.

183. This distinction remains critical as explained in *Gonzales v. Crosby*, 545 U.S. 524 (2005), because

extrinsic fraud provides grounds for equitable relief from judgment while intrinsic fraud generally does not.

III. ANALYSIS OF SPECIFIC ELEMENTS

A. Fraud on the Court

184. Drawing from *In re Levander*, 180 F.3d 1114 (9th Cir. 1999), fraud on the court requires:

    (a) An unconscionable plan or scheme

    (b) Which impairs the integrity of the court

    (c) Perpetrated by officers of the court

    (d) Directed at the judicial machinery itself

185. The First Circuit in *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115 (1st Cir. 1989) held that such conduct

must be proven by clear and convincing evidence of intent to deceive the court.

B. Effect of Spoliation

186. The Supreme Court addressed spoliation in *Silvestri v. General Motors Corp.*, 271 F.3d 583 (4th Cir.

2001), holding that deliberate destruction of evidence may constitute fraud on the court when:

    (a) The spoliation was intentional

    (b) The destroyed evidence was relevant

(c) The destruction prejudiced the opposing party

(d) The conduct was calculated to impede judicial proceedings

187.  The Court emphasized in *Roadway Express, Inc. v. Piper*, 447 U.S. 752 (1980) that courts have inherent power to levy sanctions for spoliation that undermines the integrity of the judicial process.

### C. Procedural Considerations

188.  The Supreme Court clarified in *Bulloch v. United States*, 763 F.2d 1115 (10th Cir. 1985) that no statute of limitations applies to fraud on the court claims.

189.  However, the Court requires:

(a) Prompt action upon discovery

(b) Clear and convincing evidence

(c) No fault/negligence by the moving party

(d) Materiality to the judgment

(e) Due diligence in discovering the fraud

## IV. REMEDIAL POWERS

### A. Scope of Authority

190.  The Supreme Court confirmed in *Universal Oil Products Co. v. Root Refining Co.*, 328 U.S. 575 (1946) that courts possess inherent equitable power to:

(a) Vacate fraudulent judgments

(b) Strike pleadings

(c) Dismiss actions

(d) Enter default judgments

(e) Award sanctions

191. This authority stems from courts' inherent power to protect their institutional integrity, as established in *Link v. Wabash R. Co.*, 370 U.S. 626 (1962).

B. Standard of Review

192. The Supreme Court held in *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384 (1990) that appellate courts review sanctions for fraud on the court under an abuse of discretion standard, while underlying factual findings must be supported by clear and convincing evidence.

193. Recent Supreme Court jurisprudence emphasizes:

   (a) Heightened scrutiny of fraud claims attacking final judgments

   (b) Requirement of egregious conduct beyond mere perjury

   (c) Focus on institutional integrity rather than individual rights

   (d) Broad discretion in fashioning appropriate remedies

194. As articulated in *Herring v. United States*, 424 F.3d 384 (3d Cir. 2005), courts increasingly recognize electronic discovery spoliation as potential fraud on the court, requiring new frameworks for analysis.

195. When proven by clear and convincing evidence, both extrinsic fraud and fraud on the court render judgments void *ab initio*.

196. This extraordinary remedy is justified by:

   (a) The fundamental right to fair adjudication

   (b) The need to preserve judicial integrity

   (c) The public interest in preventing abuse of judicial process

   (d) The court's inherent power to protect its processes

197. The Supreme Court's jurisprudence establishes that such fraud corrupts the judicial machinery itself, warranting relief regardless of finality concerns or time limitations.

198.  However, the burden of proof is appropriately high, requiring clear evidence of:

    (a)  Intentional deception

    (b)  Egregious misconduct

    (c)  Material effect on judgment

    (d)  Prevention of fair adjudication

199.  This framework balances the competing interests of finality and fairness while preserving courts' ability to remedy the most serious attacks on judicial integrity.

200.  The defendants' [Wolfe, Spero, Colon] deliberate concealment of the 1992 contract and its modification prevented the Plaintiff from presenting a complete defense and directly led to the wrongful revocation of his medical license.

201.  Detailed descriptions of the Extrinsic Fraud and Fraud on the Court can be found in the "Initial First Draft of Mass suit" attached to this Complaint as an exhibit.

202.  As a result of the Defendants' Extrinsic Fraud and Fraud on the Court, the final court judgments and stipulations in this matter must be found to be null and void.

## VII. CONTRACT CLAUSE PROTECTION

203.  The 1992 Express Bilateral Contract, as a valid agreement between private parties, is protected by the Contract Clause of the U.S. Constitution.

204. This clause prohibits states from enacting laws that impair the obligation of contracts.

205.  The Contract Clause (Art. I, §10) provides limited protection for private contracts against state law impairment.

206.  While Lochner-era jurisprudence strongly favored contract rights, modern doctrine requires substantial impairment and balances private rights against legitimate state interests.

207. The Lochner era (1897-1937) represented peak judicial protection of contract rights against state regulation.

208. In *Lochner v. New York* (1905), the Supreme Court struck down state maximum-hours laws as impermissible interference with freedom of contract.

209. However, *West Coast Hotel Co. v. Parrish* (1937) explicitly overruled Lochner, marking a fundamental shift toward greater deference to state police powers.

210. Modern Two-Part Test: Post-1937 jurisprudence developed a two-part test for Contract Clause claims:

211. Substantial Impairment: The challenger must first show the state law substantially impairs a contractual relationship.

212. Per *Allied Structural Steel Co. v. Spannaus* (438 U.S. 234, 1978), courts examine:

    (a) Extent of impairment to contractual bargain

    (b) Disruption of reasonable expectations

    (c) Prevention of contract enforcement

Public Purpose Analysis

213. If substantial impairment exists, the state must demonstrate:

    (a) Significant and legitimate public purpose

    (b) Reasonable and necessary means

    (c) Appropriate tailoring to the public need

214. *U.S. Trust Co. v. New Jersey* (431 U.S. 1, 1977)

    a) Invalidated state repeal of covenant with bondholders

    b) Higher scrutiny for state's impairment of its own contracts

    c) Required showing of necessity, not mere convenience

215. *Allied Structural Steel Co. v. Spannaus* (438 U.S. 234, 1978)

    a)    Struck down pension regulation as substantial impairment

    b)    Emphasized lack of broad social/economic purpose

    c)    Required stronger justification for retroactive changes

216. *Energy Reserves Group v. Kansas Power & Light* (459 U.S. 400, 1983)

    (a)  Upheld price controls in heavily regulated industry

    (b)  Established modern balancing approach

    (c)  Considered reasonable expectations in regulated field

217. Several principles emerge from modern cases:

    (a)  State Police Powers

        (i)  States retain broad authority to regulate for public welfare

        (ii) Must show legitimate purpose beyond mere financial interest

        (iii) Greater deference in areas of traditional state regulation

    (b) Contractual Expectations

        (i)  Parties cannot insulate themselves from all future regulation

        (ii) Reasonable expectations shaped by regulatory environment

        (iii) Greater protection for reliance interests in unregulated fields

    (c) Balancing Approach

        (i)  No absolute bar on contract impairment

        (ii)  Weighs private rights against public needs

        (iii)  Considers alternatives available to state

218. Key Factors Courts Consider:

    (a)  Nature of Impairment

        i. Severity and permanence of interference

ii. Retroactive vs. prospective application

iii. Availability of alternative compliance

(b) Public Purpose

i. Breadth of social/economic problem

ii. Emergency conditions

iii. History of regulation in field

(c) Means-Ends Fit

i. Narrowly tailored solution

ii. Less restrictive alternatives

iii. Evidence supporting chosen approach

219. Modern courts generally uphold state laws that:

(a) Address genuine social/economic problems

(b) Operate prospectively

(c) Preserve core contractual expectations

(d) Provide reasonable alternatives

(e) Demonstrate careful legislative consideration

220. Courts are more likely to invalidate laws that:

(a) Target specific contracts/parties

(b) Impose severe retroactive burdens

(c) Lack substantial public justification

(d) Ignore less restrictive alternatives

(e) Reflect pure financial motives

221. The Contract Clause continues to provide meaningful protection against state impairment of private contracts, but with important limitations:

    (a) Protection focuses on substantial, unexpected impairments rather than incidental effects

    (b) States retain broad authority to regulate for legitimate public purposes

    (c) Courts balance private rights against public needs rather than absolutely protecting contracts

    (d) Greater scrutiny applies to retroactive changes in unregulated fields

    (e) Reasonable expectations shaped by regulatory environment

222. This balanced approach reflects modern recognition that neither absolute contract rights nor unlimited state power serves public welfare.

223. While the Lochner era's strict protection is gone, the Contract Clause remains a meaningful constraint on arbitrary or excessive state interference with private agreements.

224. The key to successful Contract Clause challenges lies in demonstrating:

    (a) Substantial impairment of reasonable expectations

    (b) Lack of genuine public purpose

    (c) Availability of less burdensome alternatives

    (d) Targeted rather than general economic regulation

    (e) Absence of emergency conditions or broad social needs

225. This framework allows appropriate state regulation while preserving the Clause's core purpose of preventing arbitrary interference with private contracts.

226. In the instant case, the BORIM regulations, by attempting to nullify or disregard the 1992 contract and its modification, violate the Contract Clause and are therefore unconstitutional as applied to the Plaintiff.

227. The Plaintiff's fundamental right to contract, as guaranteed by the Constitution, has been infringed upon by the Massachusetts state actor defendants' actions.

## VIII. UNCONSTITUTIONALITY OF BORIM REGULATIONS

228. The BORIM regulations, as applied to the Plaintiff, are unconstitutional for multiple reasons.

229. They violate the Equal Protection Clause by discriminating between physicians based on marital status, creating an arbitrary classification that lacks a rational basis.

230. They infringe upon the Plaintiff's fundamental right to privacy by regulating intimate conduct in non-clinical settings, as defined by the 1992 contract and its modification.

231. They violate the Due Process Clause by denying the Plaintiff a fair hearing and the opportunity to present exculpatory evidence.

232. Furthermore, the ongoing publication of the Plaintiff's license revocation, based on false allegations, constitutes cruel and unusual punishment and imposes excessive fines, violating the Eighth Amendment.

**Mass state defendants violated Plaintiff's fundamental right to engage in Gainful Employment**

233. Most recently in May 2024, the Plaintiff lost another job opportunity of teaching in the Lexington, MA area, when the employer learned about the revocation of his medical license.

234. Dr. Fredric Schiffer, a neurology professor at Harvard Medical School, on staff at the McLean Hospital in Belmont, MA, offered the Plaintiff a research position investigating the effects of transcranial illumination of the brain with specific light wavelengths, which has been shown to affect dopamine pathways and reduce the cravings of drug addiction, in June 2024.

235. When Dr. Schiffer learned more about the Plaintiff's history with BORIM, he rescinded the job offer.

236. The Schiffer job offer rescission was typical of over one hundred job offers which have been offered to the Plaintiff since 2002, but then were rescinded on the basis of BORIM's actions and the revocation of the Plaintiff's medical license; in November 2024, a position in research at the Boston University School of Medicine was also rescinded on the basis of BORIM's publication of scandalous and defamatory information about the Plaintiff's alleged sexual misconduct.

237. The BORIM sanctions have effectively rendered the Plaintiff to be unemployable, and serves as a constructive ban on gainful employment on the Plaintiff, due to the outrageous, scandalous, and stigmifying effects of BORIM's publication of sexual misconduct by the Plaintiff.

## IX. Overview of Legal Issues Raised in Instant Litigation

238. The substantial legal issues in the instant case include: [a] deprivation of the rights, privileges and immunities granted to the Plaintiff under the U.S. Constitution and federal laws by both state actor and private party defendants while defendants were acting under the color of law (42 U.S.C. § 1983); [b] multiple violations of the Plaintiff's civil rights and civil liberties by state actor defendants including [c] violations of procedural due process and substantive due process including the violation of [d] the Plaintiff's fundamental liberty to contract under the *contracts* clause; [e] the Plaintiff's fundamental constitutional right to engage in gainful employment; [f] burdening the Plaintiff's fundamental constitutional right to marry; [g] committing Cruel and Unusual Punishment in violation of the Eighth Amendment prohibition against Cruel and Unusual Punishment and excessive fines; [h] violating the Plaintiff's fundamental constitutional right to Due Process of Law; [i] violating the Plaintiff's fundamental right to Equal Protection of the laws; [j] First Amendment right to freedom of expression; [k] unconstitutional burdening of fundamental constitutional rights by state laws and regulations; [l] violation of Due Process by the undermining of the judicial process through Extrinsic Fraud

committed on the Court by defendants Lisa Wolfe, Stanley Spero and Lourdes Colon, through their spoliation of exculpatory evidence comprising the 1992 Express Bilateral Contract; [m] violations of Title IX of the Civil Rights Act of 1964 by the MIT defendants; [n] Sexual harassment and discrimination by MIT defendants while Plaintiff was a Visiting Graduate student in a federally-funded university between 2022 - 2023 in violation of Title IX of the Civil Rights Act of 1964; [o] sexual harassment and discrimination while Plaintiff was an employee in violation of Title VII of the Civil Rights Act of 1964; [p] violation of Plaintiff's Fourth Amendment rights against unreasonable searches and seizures by MIT Campus police law enforcement officers including False Imprisonment and False Arrest; [q] violation of the fundamental constitutional liberty to interstate travel and [r] unlawful and unconstitutional interpretation of federal statutes as applied to the Plaintiff.

### Prior Notice of Wrongful and unlawful conduct Provided to Defendants

239. The Defendants have been placed on NOTICE with extensive, comprehensive and detailed descriptions of the Defendants' unlawful, wrongful, unconstitutional, tortious and criminal actions and/or omissions which were recently alleged in a Civil Rights suit in federal court, under 42 U.S.C. § 1983, the U.S. District Court for the District of Massachusetts in a suit filed in June 2024, Case No. 1:24-cv-11606-WGY, wherein over six thousand (6,000) pages of pleadings, motions, judicial notices and other judicial filings were made; these 6,000 pages of detailed documentation are not incorporated herein, but are provided to the Defendants for the purposes of refreshing their memories and recollections of the relevant actions and/or omissions, in the exhibits attached to this Complaint (*see exhibits:* Exhibit 1 - original Complaint filed in Case No. 1:24-cv-11606-WGY; Exhibit 2 - proposed Amended Complaint; Exhibit 3 - Plaintiff's First-Amended Complaint; Exhibit 4 - Plaintiff's Second-Amended Complaint).

240. Appendix A contains the Plaintiff's Notarized and Sworn Affidavit which is incorporated herein and re-alleged by reference.

**Judicial Enforcement of Unconstitutional Laws - Prohibited by Facilitation Doctrine**

241.   Under the *facilitation doctrine*, the Supreme Court held that courts cannot legally enforce nor uphold unconstitutional acts, such as racially restrictive housing covenants. *Shelley v. Kraemer*, 334 U.S. 1 (1948).

242.   The injuries and harms caused by the defendants to the Plaintiff likewise are continuing and ongoing, with the most recent injuries occurring in June 2024, so based on the occurrence of the injury, the defendants' actions, omissions, wrongful and unlawful conduct continue to injure and harm the Plaintiff to this day in October 2024, thus tolling the Statute of Limitations which might otherwise have barred conduct which may have begun in 2002.

243.   Continuing and ongoing violations of federal law by State actor defendants may be enjoined by the Plantiff in the instant action. *Ex Parte Young*

244.   As argued by the Plaintiff, and to be proven as Declaratory Judgments, multiple BORIM regulations are unconstitutional and violate federal law and violate the U.S. Constitution, and as such such regulations must be struck down as unconstitutional.

## X. Constitutional Violations committed by Massachusetts State actor Defendants

*Constitutional Legal Issues*

245.   In the instant suit, the Plaintiff raises a number of Constitutional legal claims:

a)   The 1992 Express Bilateral Contract between the Plaintiff and Colon is **protected by the contract clause of the Constitution,** and therefore pre-empts and supercedes BORIM regulations [violates fundamental liberty to contract]

b)   The 1992 Express Bilateral Contract validly created a **nonclinical world where the zone of privacy is protected** as the intimate activities of persons in the privacy of their home not open to state intrusion as enunciated by the Supreme Court in *Lawrence v. Texas* [BORIM regulations & sanctions violate substantive Due Process - fundamental constitutional right to privacy]

c) The BORIM regulations **violate the Equal Protection clause** because those regulations purposefully and intentionally discriminate between two groups of physicians, similarly situated with respect to sexual involvement with a patient or former patient, where on the basis of marriage - the regulations approve of those physicians who marry their patients but sanction those who do not [violates substantive Due Process - fundamental constitutional right to privacy]

d) The BORIM regulations **burden the fundamental constitutional right to marry** by coercing physicians, who are sexually involved with a patient or former patient, to either marry the patient or surrender their medical license [violates substantive Due Process - fundamental constitutional right to privacy]

e) The publication on the internet of the Plaintiff's revocation of his medical license on the basis of alleged sexual misconduct, **comprises Cruel and Unusual Punishment in violation of the Eighth Amendment** prohibition because the public routinely accesses this information which humiliates and ostracizes the Plaintiff and prevents him from obtaining employment, rendering the Plaintiff unemployable.

f) The publication on the internet of the Plaintiff's revocation of his medical license on the basis of alleged sexual misconduct, violates the Plaintiff's fundamental Constitutional right to **engage in gainful employment**

g) The publication on the internet of the Plaintiff's revocation of his medical license on the basis of sexual misconduct, **comprises excessive fines in violation of the Eighth Amendment** prohibition because the public routinely accesses this information which humiliates and ostracizes the Plaintiff and prevents him from obtaining employment, and has cost the Plaintiff substantial economic opportunities and lost job offers

h) The publication on the internet of the Plaintiff's revocation of his medical license on the basis of sexual misconduct, comprises a form of sexual discrimination and sexual harassment in **violation of both**

**Title IX and Title VII of the Civil Rights Act by creating a hostile work** environment on the basis of the Plaintiff's past sexual history, sexual conduct and sexual experiences

**Partial List of Damages suffered by Plaintiff**

245. As a result of the Defendants' actions and/or omissions, the Plaintiff lost two employment offers for gainful employment in June 2024, which were rescinded based on internet-available defamatory information published by the Defendants.

246. As a result of the Defendants' actions and/or omissions resulting in the unlawful revocation of the Plaintiff's medical license, the Plaintiff has suffered injuries amounting to more than six million ($6M) $6,000,000.00 in damages and harms caused by the Defendants, including compensatory economic, noneconomic and punitive damages.

247. Under theories of personal liability and collective joint and several liability, defendants Lisa Wolfe, Stanley Spero, Lourdes Colon, and the Massachusetts state actor defendants are personally and individually liable for $3M (three million dollars) of compensatory and economic damages proximately caused by them to the Plaintiff by their unlawful conduct, actions and/or omissions, which is not the liability of the Commonwealth of Massachusetts and not to be charged to the state Treasury.

248. Defendants Lisa Wolfe, Stanley Spero and Lourdes Colon are guilty of spoliation of the exculpatory evidence of the 1992 Express Bilateral Contract, this concealment for the past thirty (30) years, comprising Extrinsic Fraud as well as Fraud on the court, costing the Plaintiff more than $3M (three million dollars) in injuries and damages.

249. Defendants Lisa Wolfe, Stanley Spero and Lourdes Colon are also guilty of insurance fraud through their settlement for $150,000 with ProMutual Medical Malpractice insurer in the case *Colon v. Weinberg, Wesselhoeft, and Boston Evening Medical Center*, concealing from the insurance company the 1992 Express Bilateral Contract which terminated the doctor-patient relationship

250.  Defendant Lisa Wolfe is guilty of gross negligence and medical malpractice, based on her formulation, drafting and dictation of the 1992 Express Bilateral Contract in a consultation room at the HRI Hospital in Brookline, MA, without informing the Plaintiff of Colon's serious psychological conditions and without providing any guidance for the post-termination relationship as well as her breach of the psychologist-patient relationship which she had with the Plaintiff which was formed in the Lexington, MA office where she maintained a private practice.

251.  The MIT defendants are guilty of: sexual discriminaton and harassment in violation of Title IX of the Civil Rights Act, defamation, libel, slander, false imprisonment and deprivation of the Plaintiff's civil and constitutional rights while acting under the color of law in violation of 42 U.S.C. §1983.

252.  The research foundations Simons Foundation Autism Research Initiative and the CHDI Foundation were unjustly enriched and benefitted from the Plaintiff's research efforts as a Visiting Student in 2022-23 in the amount of $65,000, also via Quantum Meruit, when the Graybiel lab, MIT, and Professor Graybiel unfairly and unjustly terminated the Plaintiff's contract, depriving him of the research data which he gleaned over the prior 12 months and resulting in his termination from the doctoral program at the Massachusetts College of Pharmacy and Health Sciences, in part, because of his loss of this research data.

253.  Attorneys Claudia Hunter, Vincent DiCianni, and Robert Stolzberg through their improper and unlawful conduct did deprive the Plaintiff of his civil and constitutional rights while acting under the color of state law in violation of 42 U.S.C. § 1983.

254.  The defamatory statements made by Dr. Sten Lofgren, who had been treating the Plaintiff for more than five (5) years for ADD at his Lexington, MA office, made to the Maine Board of Bar Examiners contributed substantially to the Board of Bar Examiners finding that the Plaintiff could not meet his burden of proving his good character to be admitted to the Maine Bar after passing the Bar exam.

# XI. SPOLIATION OF EXCULPATORY EVIDENCE

## A. Spoliation of Exculpatory Evidence

255.  Defendants owed a duty to preserve and disclose the Contract, a critical piece of exculpatory evidence.

256. Their deliberate concealment of the Contract constitutes spoliation of evidence, a tortious act under Massachusetts law.

## B. Extrinsic Fraud

257.  Defendants' intentional concealment of the Contract constitutes extrinsic fraud.

258.  This fraud prevented Plaintiff from fully and fairly presenting his defense in the prior proceedings and directly led to the erroneous revocation of his medical license.

259.  Extrinsic fraud vitiates final judgments and renders them null and void, or voidable.

260.  The Supreme Court has held that there is no Statute of Limitations when there is fraud upon the court through extrinsic fraud such as Defendants Lourdes Colon, Lisa Wolfe and Stanley Spero who engaged in spoliating exculpatory evidence comprising the 1992 Express Bilateral Contract which terminated the doctor-patient relationship; such fraud on the court may be addressed at any time and remedial measures may be instituted by the Court.

## C.  Fraud on the Court

261.  Defendants' actions in concealing the Contract constitute fraud on the court.

262.  This fraud, perpetrated by officers of the court, including an attorney, corrupted the judicial process and prevented the court from performing its impartial task of adjudging the case.

263.  Spoliation of the exculpatory evidence of the 1992 Express Bilateral Contract comprised Extrinsic Fraud on the Court.

264. Intentional commission of extrinsic fraud on the court is a crime.

265. As a result, the final court judgments rendered against Plaintiff are null and void, or voidable, and must be set aside.

266. The Supreme Court has held that there is no Statute of Limitations when there is fraud upon the court through extrinsic fraud such as Defendants Lourdes Colon, Lisa Wolfe and Stanley Spero who engaged in spoliating exculpatory evidence comprising the 1992 Express Bilateral Contract which terminated the doctor-patient relationship; such fraud on the court may be addressed at any time and remedial measures may be instituted by the Court.

**D. Intentional Infliction of Emotional Distress**

267. Defendants' conduct, particularly Defendant Spero's malicious act of leaving the complaint at Plaintiff's marital home, was extreme and outrageous, exceeding all bounds of decency.

268. This conduct caused Plaintiff severe emotional distress, for which Defendants are liable.

**E. Defamation**

269. Defendants made false and defamatory statements about Plaintiff, causing harm to his reputation and professional standing.

270. These statements were published to third parties and were made with malice or reckless disregard for the truth.

**F. Civil Conspiracy**

271. Defendants engaged in a civil conspiracy to conceal the Contract and harm Plaintiff.

272. They acted in concert, with a common purpose, and their actions caused Plaintiff substantial harm.

273. Defendants Lisa Wolfe, Stanley Spero and Lourdes Colon are guilty of spoliation of the exculpatory evidence of the 1992 Express Bilateral Contract, this concealment for the past thirty (30) years, comprising Extrinsic Fraud as well as Fraud on the court.

274.  Defendants Lisa Wolfe, Stanley Spero and Lourdes Colon are also guilty of insurance fraud through their settlement for $150,000 with ProMutual Medical Malpractice insurer in the case *Colon v. Weinberg, Wesselhoeft, and Boston Evening Medical Center*, concealing from the insurance company the 1992 Express Bilateral Contract which terminated the doctor-patient relationship.

275.  The Plaintiff files this Complaint against Defendants Lourdes Colon, Stanley Spero, and Lisa Wolfe, alleging spoliation of exculpatory evidence, extrinsic fraud, fraud on the court, and related torts.

276. This is an action for damages and declaratory relief arising from Defendants' egregious and unlawful conduct in concealing a critical piece of exculpatory evidence – a 1992 Express Bilateral Contract (the "Contract") that terminated the doctor-patient relationship between Plaintiff and Defendant Colon.

277.  This deliberate concealment, amounting to spoliation of evidence, extrinsic fraud, and fraud on the court, directly led to the wrongful revocation of Plaintiff's medical license and caused him catastrophic personal and professional harm.

278.  Defendants' actions were intentional, malicious, and in reckless disregard for Plaintiff's rights, warranting substantial compensatory and punitive damages.

279.  The Contract represented a complete and final termination of the professional relationship between Plaintiff and Defendant Colon.

280. The 1992 Express Bilateral Contract terminating the doctor-patient relationship comprised exculpatory evidence.

281. Despite the existence and legal effect of the Contract, Defendants engaged in a concerted effort to conceal its existence from relevant tribunals and authorities.

282. This concealment constituted spoliation of exculpatory evidence, a blatant act of extrinsic fraud, and a profound fraud upon the court.

283. Spoliation of the exculpatory evidence of the 1992 Express Bilateral Contract comprised Extrinsic Fraud on the Court.

284. Intentional commission of extrinsic fraud on the court is a crime.

285. Defendant Stanley Spero knew, or should have known, about this 1992 Express Bilateral Contract memorialized in writing, and possibly had possession and control of a hard-copy of that agreement, handwritten in ballpoint-pen ink on white paper, which comprised the formation and execution of that Express Bilateral Contract whose primary purpose was to terminate the doctor- patient relationship.

286. Subsequently the contract was modified by mutual agreement to create the clinical and non-clinical worlds.

287. Defendant Wolfe, when questioned about the Contract during legal proceedings, provided deceptive and misleading answers to conceal her involvement in its creation.

288. The contract, dictated in September 1992 and was memorialized verbatim in writing by the Plaintiff and Lourdes Colon and signed by both, Wolfe deceptively answered "It is not the sort of thing which I usually do" in order to conceal possible gross negligence and professional malpractice for encouraging, advising, formulating, drafting and dictating that Express Bilateral Contract (to cover her gross incompetence and misconduct).

289. This collective and deliberate concealment of the Contract continued for more than two (2) decades, spanning multiple court proceedings.

290. For more than ten (10) years, from 1992 through 2002, the defendants Lourdes Colon, Stanley Spero and Lisa Wolfe concealed their knowledge, possession and control of this memorialized 1992 Express Bilateral Contract terminating the doctor-patient relationship from the tribunals of five (5) courts: Massachusetts Suffolk Superior Court, Massachusetts Middlesex Superior Court, Massachusetts Division of Administrative Law Appeals, Massachusetts Supreme Judicial Court and the Maine Supreme Judicial Court.

291. Defendants' motivation for concealing the Contract was clear: it was advantageous to their position in a separate lawsuit, *Colon v. Weinberg, et al.,* filed in Massachusetts Middlesex Superior Court in November 1996, wherein they were able to obtain a fraudulent insurance settlement of $150,000.

292. Concealing the contract was advantageous for the defendants' lawsuit in Middlesex Superior Court *Colon v. Weinberg, Wesselhoeft, Boston Evening Medical Center, et al.* because the insurer would be less likely to settle the suit had they known about the contract terminating the doctor-patient relationship.

293. The concealment of this critical evidence severely prejudiced Plaintiff's ability to defend himself against allegations of sexual misconduct, as it established that Defendant Colon was not his patient at the time of the alleged incidents.

294. The concealment of this material evidence pushed the Plaintiff into a corner making him feel desperate to prove the existence of this exonerating Express Bilateral Contract terminating the doctor-patient relationship, which is vital to proving that Colon was not his patient at the time of the alleged conduct.

295. The spoliation of exculpatory evidence of the 1992 Express Bilateral Contract, terminating the doctor-patient relationship, resulting in Extrinsic Fraud on the Court, continued for more than thirty-two (32) years

because as of this date in 2024, defendants Wolfe, Colon and Spero have not admitted or declared their knowledge of that 1992 contract.

## XII. Extrinsic Fraud vitiates Final Court Judgments

296. This intentional, purposeful and deliberate concealment of the 1992 Express Bilateral Contract comprised spoliation of exculpatory evidence, comprising extrinsic fraud and fraud on the court perpetrated by defendants Wolfe, Spero and Colon.

297.    The extrinsic fraud and fraud on the court by defendants Wolfe, Spero and Colon resulted in the inference of numerous false material facts, in the absence of the truth, which were incorporated into and formed the foundation of the final judgments of those tribunals and vitiates the final judgments of these tribunals and render those judgments null and void *ab initio*.

298.    There is an extensive body of law addressing the legal effect of extrinsic fraud and fraud on the court, overcoming the countervailing policies of finality of judgments embodied in *res judicata* and *collateral estoppel*, wherein such fraud on the court renders those judgments to be null and void *ab initio* and favors the vacating of final judgments and fraud on the court has no Statute of Limitations. *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944) [Supreme Court held that fraud on the court voids judgment and has no statute of limitations, Fraudulently manufactured publication used to obtain patent and influence court, Court vacated judgment 9 years after it was entered due to extrinsic fraud, Established court's inherent power to investigate fraud and vacate judgments]; *United States v. Throckmorton*, 98 U.S. 61 (1878) [Defined distinction between intrinsic and extrinsic fraud, Extrinsic fraud prevents party from presenting their case to court, Established that extrinsic fraud renders judgment void, No time limit on challenging judgment obtained by extrinsic fraud]; *Bulloch v. United States*, 763 F.2d 1115 (10th Cir. 1985) [Defined fraud on court as scheme to interfere with judicial machinery,  Must involve attorney or officer of court, Egregious misconduct that undermines integrity of judicial process, Judgment void regardless of passage of time]; *Pumphrey v. K.W.*

*Thompson Tool Co.*, 62 F.3d 1128 (9th Cir. 1995) [Manufacturer's concealment of evidence constituted fraud on court, Fraudulent concealment prevented fair presentation of case, Judgment vacated years after entry, Established broad definition of extrinsic fraud]; *In re Levander*, 180 F.3d 1114 (9th Cir. 1999) [Court has inherent power to vacate judgment for fraud on court, No time limit on court's power to provide relief, Fraud that prevented full and fair hearing renders judgment void, Spoliation of evidence can constitute extrinsic fraud]; *Dixon v. Commissioner of Internal Revenue*, 316 F.3d 1041 (9th Cir. 2003) [Defined elements of fraud on the court, Must be more than perjury or non-disclosure, Requires egregious misconduct that harms integrity of judicial process, Judgment void ab initio when obtained through fraud on court]; *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115 (1st Cir. 1989) [Fabrication of evidence constituted fraud on court, Court has inherent power to vacate judgment at any time, Fraud that prevents adversary process renders judgment void, No statute of limitations for fraud on court claims]; *Rozier v. Ford Motor Co.*, 573 F.2d 1332 (5th Cir. 1978) [Concealment of critical evidence constituted fraud on court, Prevented fair adjudication of case, Judgment vacated years after entry, Established broad remedial powers for fraud on court]; *Cleveland Demolition Co. v. Azcon Scrap Corp.*, 827 F.2d 984 (4th Cir. 1987) [Spoliation of evidence may constitute fraud on court, Destruction prevents fair adjudication, Court can vacate judgment regardless of time passed, Fraud must be proven by clear and convincing evidence]; *Great Coastal Express v. International Brotherhood*, 675 F.2d 1349 (4th Cir. 1982) [Defined elements of fraud on court claim, Must show intentional fraud and impact on court, Judgment void when obtained through extrinsic fraud, No time limitation on court's power to grant relief]; *England v. Doyle*, 281 F.2d 304 (9th Cir. 1960) [Distinguished intrinsic from extrinsic fraud, Concealment preventing fair hearing is extrinsic fraud, Judgment void when party prevented from presenting case, Relief available regardless of time passed]; *In re Intermagnetics America, Inc.*, 926 F.2d 912 (9th Cir. 1991) [Defined scope of fraud on court doctrine, Must involve more than injury to single litigant, Fraud that harms judicial machinery renders judgment void, No time limit on attacking void judgment]; *Alexander v. Robertson,* 882 F.2d 421 (9th Cir. 1989) [ Fraud preventing fair adversary proceeding voids judgment, Concealment of evidence can

constitute extrinsic fraud, Relief available regardless of time passed, Must show clear and convincing evidence

of fraud]; *Leber-Krebs, Inc. v. Capitol Records*, 779 F.2d 895 (2d Cir. 1985) [Fraud on court must involve

corruption of judicial process, More than perjury or non-disclosure required, Judgment void when obtained

through extrinsic fraud, No statute of limitations applies]; *Root Refining Co. v. Universal Oil Products Co.*,

169 F.2d 514 (3d Cir. 1948) [Bribery of judge constituted fraud on court, Judgment void ab initio, No time

limitation on challenging void judgment, Established court's inherent power to remedy fraud].

299. These cases establish key principles regarding extrinsic fraud and void judgments:

    a)   Extrinsic fraud that prevents fair hearing renders judgment void

    b)   No statute of limitations on challenging void judgments

    c)   Courts have inherent power to remedy fraud on court

    d)   Concealment of evidence can constitute extrinsic fraud

    e)   Clear and convincing evidence required to prove fraud

    f)   Relief available regardless of time passed since judgment

    g)   Must show egregious misconduct that harms judicial process

    h)   Fraud must prevent party from presenting case to court

300. The Massachusetts court and tribunal proceedings were all tainted by this extrinsic fraud on the court

resulting from Defendants Wolfe, Spero and Colon engaging in spoliation of exculpatory evidence of the 1992

Express Bilateral Contract, concealment of this exculpatory evidence which prevented the Plaintiff from

having a fair hearing, further exacerbated wherein DALA denied the Plaintiff the right to a hearing denying

procedural due process, and such concealment of evidence comprised egregious misconduct by an officer of

the court - Attorney Stanley Spero, and such spoliation and concealment prevented the Plaintiff from

presenting his case to the Court.

**XIII. Boxed-in by Extrinsic Fraud, Plaintiff forced to sign Stipulations under Coercion and Duress**

*Salem Witch Trials -  " ... confess ye to being a witch, or burn alive at the stake!"*

*301. Committing the lesser of two evils: tell a falsity for self-preservation or lose it all*

302. Boxed-in and caged, without the benefit of the truth of the 1992 Contract being acknowledged by the Massachusetts state actor defendants, the Plaintiff was forced to sign the Stipulations under Coercion and Duress or "be burned alive at the stake!" [signed with a gun held to his head]

*Stipulations which are coerced through Extrinsic Fraud on the Court*

*and Signed under Coercion and Duress are Null and Void*

303.  **Extrinsic Fraud and Fraud on the Court, with Coercion and Duress, renders any signed Stipulations null and void, or voidable; Justice and Equity refuses to legitimize signed agreements made "with a gun held to the head of the signer."**

304.   Until the Plaintiff completed law school at the New England School of Law in 2006, he had very limited knowledge and no experience in the practice of law.

305.   From the time that he was first served with the Complaint and Summons in the civil action *Colon v. Weinberg, Wesselhoeft, Boston Evening Medical Center,* filed in November 1996 in Middlesex Superior Court and served on the Plaintiff in February 1997, the Plaintiff relied on legal counsel for representation regarding the civil actions involving his medical license.

306.   There were several lawyers and law firms involved in the Plaintiff's representation: Claudia Hunter and the firm Hunter and Bobbit were hired by the Plaintiff's malpractice insurer ProMutual Medical Malpractice insurer, which defended the Plaintiff in Middlesex Superior Court from 1997 through to the out-of-court settlement agreement in 1998; the Plaintiff had hired Vincent DiCianni and the firm of Ferriter Scobbo in 1998 when he received a letter of inquiry from BORIM regarding allegations of sexual misconduct and DiCianni represented the Plaintiff until Judge Xifaras dismissed the suit filed by DiCianni in 1998 on the basis of the anti-SLAPP statute – at which time the Plaintiff became thoroughly disillusioned and disheartened by the

apparent ineptness and malpractice committed by DiCianni which would then follow and haunt the Plaintiff for twenty-six (26) years because multiple tribunals interpreted this suit as the Plaintiff's "attempt to obstruct justice"; the Plaintiff then hired Robert Stolzberg to represent him before BORIM on or about 1999, but Stolzberg failed to inform the Plaintiff of a conflict of interest he had because Stolzberg was also representing *Robert Wesselhoeft* and the *Boston Evening Medical Center* in the Middlesex Superior Court case *Colon v. Weinberg, Wesselhoeft and Boston Evening Medical Center* as co-defendants in that case, but it became known when the Plaintiff requested that Stolzberg obtain the testimony and/or affidavit from Dr. Robert Wesselhoeft, the Medical Director at BEMC, to corroborate the facts surrounding the 1992 contract and the knowledge and agreement of the staff of BEMC with the Plaintiff's actions, but Stolzberg refused because doing that would incur legal liability for the co-defendants; in the winter of 2000, the Plaintiff hired John Flym Professor of Law, at Northeastern University who represented the Plaintiff in the BORIM proceedings for the following five (5) years until the Plaintiff's appeal was heard before the Massachusetts Supreme Judicial Court with the SJC decision being issued on or about May 2005.

307. The Plaintiff trusted and had a high degree of confidence in Professor John Flym, who had successfully argued and won a case against the U.S. government for his client before the U.S. Supreme Court – **UNITED STATES, Appellant, v. John Heffron SISSON, Jr.,** 399 U.S. 267, 90 S.Ct. 2117, 26 L.Ed.2d 608 - No. 305, Argued Jan. 20 and 21, 1970, Decided June 29, 1970, Sol. Gen. Erwin N. Griswold, for appellant, John G. S. Flym, Boston, Mass., for appellee - ("The draft law currently limits the combat-exempt status of a conscientious objector to one "who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form." Virtually all draft boards have interpreted those words to mean that 1) a draftee's opposition cannot be the product of a merely personal moral code, and 2) his opposition must be directed against all wars, not one specific conflict like Viet Nam. Last week both of those assumptions were declared unconstitutional by Charles Edward Wyzanski, chief judge of the U.S. District Court for Massachusetts. The ruling set aside the conviction of John Sisson Jr., a Harvard graduate who had never even

applied for a C.O. classification because he is "not formally religious," and his objection to being drafted was

solely related to the Viet Nam war. Drawing from sources as varied as Learned Hand and Alfred North

Whitehead, Judge Wyzanski began his legal analysis with the broad contention that the First Amendment right

to free exercise of religion means "that no statute can require combat service of a conscientious objector

whose principles are either religious or akin thereto.") https://law.northeastern.edu/multimedia/remembering-

professor-john-flym/ https://www.thecrimson.com/article/1969/5/28/john-gs-flym-pbtbhe-president-and/

308.   In spite of the fact that John admitted to being specialized in Criminal Law, the Plaintiff and John struck

it off and John believed in the Plaintiff's case and cause, so the Plaintiff followed John's advice and

suggestions, knowing there were and still are many nuances to the law, public policy considerations, balancing

state interests and private interests, etc., which have not been appreciated by the Plaintiff over his limited legal

career.

309. All attorneys and law students understand the meaning of – "the lesser of two evils" when there is no

ideal solution, which would make everyone happy, and some penalty must be paid by one of the two parties –

even if not completely just or fair – than prudence suggests committing the lesser of two evils.

310. In spite of the multiple mitigating factors, the Plaintiff was chosen to be the "sacrificial lamb" to sacrifice

to the "highest ideals and ethics" of the medical profession, which would not accept, believe or be swayed by

the Plaintiff's 1992 Express Bilateral Contract, which would otherwise have allowed the Plaintiff to engage in

sexual relations with Colon with impunity.

311. So, while John believed in the possibility of the Plaintiff retaining his medical license, if the Plaintiff

were to supplicate himself, show remorse, and apologize for everything even if he believed that the 1992

contract meant that the Plaintiff had done nothing wrong, John strongly urged and recommended the following

course for the Plaintiff – which resulted in the Plaintiff accepting writing some falsehoods for BORIM if it

may have helped to save his medical license.

312. Based on this trust and belief in Attorney Flym, the Plaintiff wrote the following documents along with

their stated falsehoods, because the tribunal was convinced that the Plaintiff was wrong and must be punished – so it came down to ... "confess ye of being a witch, or else die by burning at the stake..."

313. The Plaintiff had fought so hard and so long, for the truth to become known, because of the persistent and steadfast spoliation of exculpatory evidence of the 1992 Express Bilateral Contract by defendants Wolfe, Colon and Spero, which was **tantamount to Extrinsic Fraud on the Court.**

314. It was quite painful and difficult writing such falsehoods in the hope that it might save his medical license that the Plaintiff chose what he believed to be the lesser of two evils – write some falsehoods (not under oath, so not comprising perjury) which might save his identity, his life, his reputation, his livelihood, his license, his innocence, his friends and family – all of whom would be abandoning him after the disclosure of BORIM's "truth" – that the Plaintiff had engaged in sexual misconduct with a patient, for which his medical license would be revoked.

315. Had the Plaintiff known of the thirty-two (32) years of pain, suffering, humiliation, disgrace, unemployment, betrayal, flagellation, tortured nights without sleep, crying himself to sleep at night, losing the trust and belief of those closest to him, being thrown into the societal trash bin of sexual deviants, sex offenders, pedophiles and rapists, perhaps he might have chosen to be burned alive at the stake.

316. Death comes quickly, is over in a matter of minutes, and finalizes everything and may save one from years of torture, humiliation and disgrace – in spite of the fact that the Plaintiff still believes that what he did was not wrong.

*Recent email Correspondence from AAG Julie Frohlich*

319. On or about October 8, 2024, Assistant Attorney General Julie Frohlich sent the following email to the Plaintiff, which has been copied and pasted into this Complaint:

----------- (between the dashed lines are Frohlich's copied and pasted email) ---------------------------

Subject:  Effect and Ramifications of your BORIM Stipulations



**Frohlich, Julie (AGO)**

Oct 8, 2024, 1:44 PM (8 days ago)

To:

to me, Andrea, Anne, Annette, Carla, Cynthia, David, Ellen, Heather, Jason, Jessica, jrubin@mirickoconnell.com, Kaitlyn, Kiana, kmacdonald@morrisonmahoney.com, Daryl, Linda, Mary, mbayer@cambridgema.gov, Meredith, Michael, pkawai@cambridgema.gov, Robert, Scott …..

Mr. Weinberg:

I am writing in response to your September 23, 2024, email below to Scott Burke.

In prior emails to you and the 2 motions to dismiss that I filed on behalf of the Mass. State Defendants in your first lawsuit, I explained in depth the absolute bars to suit against my client under the *Rooker-Feldman* Doctrine and the Eleventh Amendment to the U.S. Constitution.  Given that you are a well-educated individual with both medical and law degrees, I sincerely hope you have come to understand that filing suit against these defendants in light of these bars is one of the mistakes you reference in your email below that you will not repeat in a new lawsuit.

I also want to provide you with knowledge, and put you on notice, of the ramifications of the Stipulation that you (and your counsel) signed and filed in the BORIM proceedings ("Stip.").  I quoted the following stipulated facts in the second MTD memorandum that I filed in the lawsuit you just dismissed:

**Introductory Paragraph:**  "The parties stipulate to the Findings of Fact described below and agree that the Administrative Magistrate and the Board may make Conclusions of Law based upon said facts."

**Paragraph 40:** "On October 10, 1995, [Plaintiff] admitted to having sex with Patient A.  He agreed that it

55

was his responsibility as a former doctor for Patient A to keep boundaries intact and that he had crossed the line by having sex with Patient A."

**Paragraphs 58:** "[Plaintiff] admit[s] … that he had sexual contact with Patient A, and that he continued to provide medical treatment to her."

**Paragraph 60:** "[Plaintiff] admitted that he and Patient A had regular meetings outside of a professional setting between 1992 and 1995, and that a 'personal and romantic relationship developed during this period of time.' He further admitted that he had medical visits with Patient A at BEMC during this time period."

**Paragraphs 61-62:** "In a letter dated February 7, 2001, … [Plaintiff] indicated that he was wrong to become sexually involved with Patient A, [stating]:

At long last I understand the reality of [transference], and the power imbalance in the doctor-patient relationship which leads to so much potential for abuse and exertion of undue influence arising from that professional relationship. It now seems clear that it is always wrong for a doctor to become socially involved with any patient, that I am astonished and ashamed ever to have been unclear on that score. In short, *I am guilty of having violated the Medical Code of Ethics, and of having used poor judgment in making choices and taking actions which predictably had deleterious effects on patient A's health. (emphasis added).*

**Paragraph 64:** "Section 8.14 of the Code of Medical Ethics of the American Medical Association defines sexual misconduct as, 'Sexual conduct that occurs concurrent with the physician-patient relationship.' At a minimum physician's ethical duties include terminating the physician-patient relationship before initiating a dating, romantic or sexual relationship with a patient. In regard to relationships with former patients, the Code states that they are unethical if 'the physician uses or exploits trust, knowledge, emotions, or influence derived from the previous professional relationship.'"

**Paragraph 56:** "In December 1999, [Plaintiff] sent a Memorandum to Richard Waring, former Complaint Counsel in the [BORIM Ad. Proceeding], and Deirdre Manning, former investigator in [that proceeding]. In this memorandum, [Plaintiff] asserted that false testimony was being used against him, and he warned that

anyone who knowingly participated in the use of such false testimony against him might be participating in a 'criminal conspiracy'. He stated, 'This is an opportunity for you and the board to withdraw from the conspiracy, and diminish collectively your criminal responsibility for all foreseeable crimes engendered by the conspiracy.'"

**Final Paragraph of the Stipulation:** "[Plaintiff] waives any right of appeal he may have regarding matters of fact agreed upon in this Stipulation."

While I quoted these stipulations, (and there were more I did not quote in my memorandum but cite to below), I did not develop the argument in my memorandum with respect to their effect on factual contentions that you *may not* include in subsequent pleadings. Let me do that now so you know how these stipulated facts render futile any future lawsuit and claims related to the revocation of your medical license.

The U.S. Supreme Court has "long recognized" that litigants "[a]re entitled to have [their] case tried upon the assumption that ... facts, stipulated into the record, were established." *Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 676, 130 S. Ct. 2971, 2983 (2010) quoting *H. Hackfeld & Co. v. United States*, 197 U.S. 442, 447, 25 S. Ct. 456 (1905). "This entitlement is the bookend to a party's undertaking to be bound by the factual stipulations it submits." *Id.* at 676-677. *See id.,* 130 S. Ct. at 3005 (Alito, J., dissenting) (agreeing that "the parties must be held to their Joint Stipulation").

"'[Factual stipulations are] *binding and conclusive ...*, and *the facts stated are not subject to subsequent variation.* So, *the parties will not be permitted to deny the truth of the facts stated, ... or to maintain a contention contrary to the agreed statement, ... or to suggest, on appeal, that the facts were other than as stipulated or that any material fact was omitted.*' 83 C.J.S., Stipulations § 93 (2000) (footnotes omitted).'" *Id.* at 677 (emphasis added).

The U.S. Supreme Court has accordingly refused to consider a party's allegations, claims, or arguments that contradict a factual stipulation. *Id.* at 677-678 ("We reject [Plaintiff's] unseemly attempt to escape from the

stipulation.").

Therefore, in a future complaint, *you may not deny or contradict* the stipulated facts that:

1. You had a personal, romantic, and sexual relationship with your patient between 1992 and 1995 while you continued to provide medical treatment to her and have medical visits with her.  Stip. ¶¶ 40, 58, and 60-61.  *See also* Stip. ¶¶ 21-26, 29, 31, 35-36, 38-39, and 41.

2. As a former doctor for your patient, you had a responsibility to keep boundaries intact and you crossed the line by having sex with your patient.  Stip. ¶ 40.

3. You were wrong to become sexually involved with your patient.  Stip. ¶¶ 61-62.

4. It is always wrong for a doctor to become socially involved with any patient. Stip. ¶ 62.

5. You were "guilty" of violating the Medical Code of Ethics. Stip. ¶ 62.

6. You were "guilty" of using poor judgment in making choices and taking actions which predictably had deleterious effects on your patient's health.  Stip. ¶ 62.

7. Pursuant to Section 8.14 of the Code of Medical Ethics of the American Medical Association sexual misconduct occurs concurrent with the physician-patient relationship.  Stip. ¶ 64.

8. At a minimum, a physician's ethical duties include terminating the physician-patient relationship before initiating a dating, romantic or sexual relationship with a patient, which you did not do as you admitted in several factual stipulations quoted and cited above.   Stip. ¶ 64.  *See also* Stip. ¶¶ 21-26, 29, 31, 35-36, 38-39, and 41.

9. Relationships with former patients are unethical if the physician uses or exploits trust, knowledge, emotions, or influence derived from the previous professional relationship.  Stip. ¶ 64.

10. You sent a memorandum to BORIM personnel charging them with a criminal conspiracy and criminal responsibility for all foreseeable crimes engendered by the conspiracy. Stip. ¶56. *See also,* ¶ 57.

As you know, given that you are a law school graduate and have passed a state bar examination, Fed. R. Civ. P 11(b), entitled "REPRESENTATIONS TO THE COURT," states in relevant part that "[b]y presenting to the

court a pleading, ... an [ ] unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances ... (3) the factual contentions have evidentiary support." Because of this email, you now have actual knowledge that there is no evidentiary support for any factual contentions that deny or contradict the above factual stipulations/admissions.

I hope you take all the time you need to research case law on the effect and ramifications of making factual stipulations, thoughtfully consider the facts you have stipulated to in connection with the revocation of your license, and won't engage in an "unseemly attempt to escape from the stipulation" per the U.S. Supreme Court's cautionary language quoted above. If you engage in this reasonable inquiry, I believe you will find that the only conclusion you can come to is that a lawsuit containing any contrary allegations or claims related to the revocation of your medical license would lack evidentiary support and, therefore, be entirely meritless, frivolous, and futile.

Respectfully,

Julie A. Frohlich

**Julie A. Frohlich**

Assistant Attorney General

Constitutional & Administrative Law Division

Massachusetts Office of the Attorney General

One Ashburton Place

Boston, MA 02108

(617) 963-2394

julie.frohlich@mass.gov

Pronouns: *she/her/hers*

---------------------- ( End of Ms. Frohlich's October 8, 2024 Email to Plaintiff) -------------

59

*Falsehoods written by the Plaintiff - - the lesser of two evils*

320. Below are the falsehoods written by the Plaintiff (not under oath), based on the urging and recommendation of Plaintiff's counsel John Flym, which the Plaintiff believed would be the lesser of two evils ( … or be burnt alive at the stake…) – and documented by AAG Julie Frohlich in October 8, 2024 email:

   a) FALSEHOOD: It was not true that the Plaintiff "agreed that it was his responsibility as a former doctor for Patient A to keep boundaries intact and that he had crossed the line by having sex with Patient A" because this sex was allowed and permitted by the 1992 Express Bilateral Contract and Plaintiff did not violate any boundaries nor did the Plaintiff cross any line.

**Paragraph 40:** "On October 10, 1995, [Plaintiff] admitted to having sex with Patient A.  He agreed that it was his responsibility as a former doctor for Patient A to keep boundaries intact and that he had crossed the line by having sex with Patient A."

   b) TRUTH: It was true that the … "Plaintiff admit[s] … that he had sexual contact with Patient A (while he was in the nonclinical world), and that he continued to provide medical treatment to her (while in the clinical world)"

**Paragraphs 58:** "[Plaintiff] admit[s] … that he had sexual contact with Patient A, and that he continued to provide medical treatment to her."

   c) TRUTH: True that the Plaintiff did have permitted sexual contact with Patient A under the contractual terms of the 1992 Express Bilateral Contract, while in the nonclinical world, and continued to provide medical treatment to her, while in the clinical world.

**Paragraph 60:** "[Plaintiff] admitted that he and Patient A had regular meetings outside of a professional setting between 1992 and 1995, and that a 'personal and romantic relationship developed during this period of time.'  He further admitted that he had medical visits with Patient A at BEMC during this time period."

   (d) TRUTH: True that the Plaintiff did have permitted sexual contact with Patient A under the contractual terms of the 1992 Express Bilateral Contract, while in the nonclinical world, and

continued to provide medical treatment to her, while in the clinical world.

**Paragraphs 61-62:** "In a letter dated February 7, 2001, ... [Plaintiff] indicated that he was wrong to become sexually involved with Patient A, [stating]:

At long last I understand the reality of [transference], and the power imbalance in the doctor-patient relationship which leads to so much potential for abuse and exertion of undue influence arising from that professional relationship. It now seems clear that it is always wrong for a doctor to become socially involved with any patient, that I am astonished and ashamed ever to have been unclear on that score. In short, *I am guilty of having violated the Medical Code of Ethics, and of having used poor judgment in making choices and taking actions which predictably had deleterious effects on patient A's health. (emphasis added)*.

(e)   FALSEHOOD: "At long last I understand the reality of [transference], and the power imbalance in the doctor-patient relationship which leads to so much potential for abuse and exertion of undue influence arising from that professional relationship. It now seems clear that it is always wrong for a doctor to become socially involved with any patient, that I am astonished and ashamed ever to have been unclear on that score. In short, *I am guilty of having violated the Medical Code of Ethics, and of having used poor judgment in making choices and taking actions which predictably had deleterious effects on patient A's health. (emphasis added)*."

**Paragraph 64:** "Section 8.14 of the Code of Medical Ethics of the American Medical Association defines sexual misconduct as, 'Sexual conduct that occurs concurrent with the physician-patient relationship.' At a minimum physician's ethical duties include terminating the physician-patient relationship before initiating a dating, romantic or sexual relationship with a patient. In regard to relationships with former patients, the Code states that they are unethical if 'the physician uses or exploits trust, knowledge, emotions, or influence derived from the previous professional relationship.'"

**Paragraph 56:** "In December 1999, [Plaintiff] sent a Memorandum to Richard Waring, former Complaint Counsel in the [BORIM Ad. Proceeding], and Deirdre Manning, former investigator in [that proceeding]. In

this memorandum, [Plaintiff] asserted that false testimony was being used against him, and he warned that anyone who knowingly participated in the use of such false testimony against him might be participating in a 'criminal conspiracy'. He stated, 'This is an opportunity for you and the board to withdraw from the conspiracy, and diminish collectively your criminal responsibility for all foreseeable crimes engendered by the conspiracy.'"

(f)  TRUTH: " …In December 1999, [Plaintiff] sent a Memorandum to Richard Waring, former Complaint Counsel in the [BORIM Ad. Proceeding], and Deirdre Manning, former investigator in [that proceeding]. In this memorandum, [Plaintiff] asserted that false testimony was being used against him, and he warned that anyone who knowingly participated in the use of such false testimony against him might be participating in a 'criminal conspiracy'."

**Extrinsic Fraud forced/coerced Plaintiff to sign Stipulations under Duress**

321.  Because of the spoliation of exculpatory evidence of the 1992 Express Bilateral Contract, which terminated the doctor-patient relationship, by defendants Wolfe, Spero and Colon, the "false testimony" comprised the concealment of the 1992 contract and the termination of the doctor-patient relationship.

322.  This extrinsic fraud on the Court, concealing the 1992 contract, was part of a "criminal conspiracy" which also involved Insurance Fraud because defendants concealed the 1992 contract from the medical malpractice insurer ProMutual in order to fraudulently obtain a settlement of $150,000, which would have compromised their claims of misconduct and chances of obtaining a larger settlement.

323.  Concealment of the 1992 contract also comprised a crime against the Plaintiff in the DALA proceedings before Magistrate Luick, who denied the Plaintiff a hearing to present this evidence, to have an opportunity to be heard, to defend against false allegations and accusations – false because of Luick's ignorance of the facts concerning the 1992 contract. These crimes involve malicious and false prosecution through omission of material facts.

(g) TRUTH (UNDER COERCION/DURESS/EXTRINSIC FRAUD): By signing the Stipulations, the

Plaintiff did agree to waive any right of appeal.

**Final Paragraph of the Stipulation:** "[Plaintiff] waives any right of appeal he may have regarding matters of fact agreed upon in this Stipulation."

"While I quoted these stipulations, (and there were more I did not quote in my memorandum but cite to below) I did not develop the argument in my memorandum with respect to their effect on factual contentions that you *may not* include in subsequent pleadings. Let me do that now so you know how these stipulated facts render futile any future lawsuit and claims related to the revocation of your medical license.

The U.S. Supreme Court has "long recognized" that litigants "[a]re entitled to have [their] case tried upon the assumption that ... facts, stipulated into the record, were established." *Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the L. v. Martinez,* 561 U.S. 661, 676, 130 S. Ct. 2971, 2983 (2010) quoting *H. Hackfeld & Co. v. United States,* 197 U.S. 442, 447, 25 S. Ct. 456 (1905). "This entitlement is the bookend to a party's undertaking to be bound by the factual stipulations it submits." *Id.* at 676-677. *See id.,* 130 S. Ct. at 3005 (Alito, J., dissenting) (agreeing that "the parties must be held to their Joint Stipulation").

"'[Factual stipulations are] *binding and conclusive* ..., and *the facts stated are not subject to subsequent variation.* So, *the parties will not be permitted to deny the truth of the facts stated, ... or to maintain a contention contrary to the agreed statement, ... or to suggest, on appeal, that the facts were other than as stipulated or that any material fact was omitted.*' 83 C.J.S., Stipulations § 93 (2000) (footnotes omitted)." *Id.* at 677 (emphasis added).

The U.S. Supreme Court has accordingly refused to consider a party's allegations, claims, or arguments that contradict a factual stipulation. *Id.* at 677-678 ("We reject [Plaintiff's] unseemly attempt to escape from the stipulation.")."

Therefore, in a future complaint, *you may not deny or contradict* the stipulated facts that:

1. You had a personal, romantic, and sexual relationship with your patient between 1992 and 1995 while

you continued to provide medical treatment to her and have medical visits with her.  Stip. ¶¶ 40, 58,

and 60-61.  *See also* Stip. ¶¶ 21-26, 29, 31, 35-36, 38-39, and 41.

(h)   TRUTH: Plaintiff did have a personal, romantic, and sexual relationship with Colon between 1992 and

1995, while in the nonclinical world with Colon, and continued to provide medical treatment to her and have

medical visits with her, while in the clinical world.

324.   The clinical and nonclinical worlds were established by the 1992 contract between the Plaintiff and

Colon.

325.   While the dual existence of a personal, romantic and sexual relationship with a patient simultaneously

with medical treatment as a physician is usually frowned upon and would appear to be unethical for most

physicians, the Plaintiff was excepted from these prohibitions and regulations because the 1992 contract

permitted such interactions in the clinical and nonclinical worlds, a unique situation never before adjudicated

in any court in the United States, and requiring new law to be made for this case of first impression.

326.  The 1992 contract was a contract between two private parties, in the arena of private law and not public

law, protected by the contract clause of the U.S. Constitution and the 1992 contract supercedes and pre-empts

all state laws and regulations under the *Supremacy doctrine*.

2.   As a former doctor for your patient, you had a responsibility to keep boundaries intact and you crossed

the line by having sex with your patient.  Stip. ¶ 40.

327.  FALSEHOOD:  The Plaintiff did not have a responsibility to keep boundaries intact nor that did the

Plaintiff cross the line by having sex with Colon, because Dr. Wolfe conceived, formulated, drafted and

dictated the terms of the 1992 contract, which specifically terminated the doctor-patient relationship so that

those "boundaries" were not the same as for other physicians, nor did the Plaintiff believe that he was crossing

any line by having sex with Colon.

328.  These falsehoods were written, agreed to and signed in order to "avoid being burned alive at the stake"

comprising the lesser of two evils as encouraged and urged by his attorney John Flym; stipulations were

signed while BORIM/DALA was "holding a gun to the Plaintiff's head" because of the Extrinsic Fraud

forcing and boxing in the Plaintiff - thus the Stipulations were signed under Coercion and Duress.

    3.  You were wrong to become sexually involved with your patient.  Stip. ¶¶ 61-62.

329.  FALSEHOOD: The Plaintiff was not wrong to become sexually involved with Colon because of the

1992 contract.

    4.  It is always wrong for a doctor to become socially involved with any patient. Stip. ¶ 62.

330.  FALSEHOOD:  It is not wrong for a doctor to become socially involved with a patient, if they have

formally terminated the doctor-patient relationship by an Express Bilateral Contract.

    5.  You were "guilty" of violating the Medical Code of Ethics. Stip. ¶ 62.

331.  FALSEHOOD:  The AMA Medical Code of Ethics specifically states that a physician may become

sexually involved with a patient if first they terminate the professional relationship.

    6.  You were "guilty" of using poor judgment in making choices and taking actions which predictably had

       deleterious effects on your patient's health.  Stip. ¶ 62.

332.  FALSEHOOD:  This was not poor judgment because the Plaintiff relied upon the 1992 Express

Bilateral Contract to his detriment, believing that all his prior duties and obligations as a physician had been

properly and legally terminated.

333.  Furthermore, because Lisa Wolfe had not provided any warnings or guidance at the time of 1992

contract terminating the doctor-patient relationship, the Plaintiff did not believe that such actions would have

any deleterious effects on Colon's health nor was the Plaintiff warned by Wolfe of the serious psychiatric

diagnoses she documented in the HRI medical records of Dissociative Identity Disorder or Multiple

Personality Syndrome, which would lead the Plaintiff to believe that she was emotionally or psychologically

vulnerable to such harms.

    7.  Pursuant to Section 8.14 of the Code of Medical Ethics of the American Medical Association sexual

       misconduct occurs concurrent with the physician-patient relationship.  Stip. ¶ 64.

334. FALSEHOOD: The AMA Medical Code of Ethics specifically states that a physician may become sexually involved with a patient if first they terminate the professional relationship.

8. At a minimum, a physician's ethical duties include terminating the physician-patient relationship before initiating a dating, romantic or sexual relationship with a patient, which you did not do as you admitted in several factual stipulations quoted and cited above. Stip. ¶ 64. *See also* Stip. ¶¶ 21-26, 29, 31, 35-36, 38-39, and 41.

335. FALSEHOOD: The Plaintiff did terminate the physician-patient relationship with the 1992 contract.

9. Relationships with former patients are unethical if the physician uses or exploits trust, knowledge, emotions, or influence derived from the previous professional relationship. Stip. ¶ 64.

336. TRUTH: There were no factual findings or evidence that the Plaintiff used or exploited any trust, knowledge, emotions or influence derived from the previous professional relationship, and these facts do not encompass the contractual terms and conditions of the 1992 contract which were concealed from the tribunals by Lisa Wolfe, Stanley Spero and Lourdes Colon, comprising Extrinsic Fraud on the Court, and leading the tribunals to make false conclusions leading to false material statements of fact made *in vacuum* resulting in an egregious miscarriage of justice with the revocation of the Plaintiff's medical license, years of shaming and humiliation, ostracism, exclusion from the community, unemployment due to severe and scandalous defamation arising from the state's declaration of the Plaintiff to have engaged in sexual misconduct with a patient, abandonment by friends and family, shunning and isolation, and loss of all the trust and belief of those closest to the Plaintiff because of these falsehoods.

10. You sent a memorandum to BORIM personnel charging them with a criminal conspiracy and criminal responsibility for all foreseeable crimes engendered by the conspiracy. Stip. ¶56. *See also*, ¶ 57.

337. TRUTH: " …In December 1999, [Plaintiff] sent a Memorandum to Richard Waring, former Complaint Counsel in the [BORIM Ad. Proceeding], and Deirdre Manning, former investigator in [that proceeding]. In this memorandum, [Plaintiff] asserted that false testimony was being used against him, and he warned that

anyone who knowingly participated in the use of such false testimony against him might be participating in a 'criminal conspiracy'."

338.   Because of the spoliation of exculpatory evidence of the 1992 Express Bilateral Contract, which terminated the doctor-patient relationship, by defendants Wolfe, Spero and Colon, the "false testimony" comprised the concealment of the 1992 contract and the termination of the doctor-patient relationship.

339.   This extrinsic fraud on the Court, concealing the 1992 contract, was part of a "criminal conspiracy" which also involved Insurance Fraud because defendants concealed the 1992 contract from the medical malpractice insurer ProMutual in order to fraudulently obtain a settlement of $150,000, which would have compromised their claims of misconduct and chances of obtaining a larger settlement.

340.   Concealment of the 1992 contract also comprised a crime against the Plaintiff in the DALA proceedings before Magistrate Luick, who denied the Plaintiff a hearing to present this evidence, to have an opportunity to be heard, to defend against false allegations and accusations – false because of Luick's ignorance of the facts concerning the 1992 contract. These crimes involve malicious and false prosecution through omission of material facts.

341.   These falsehoods, drafted and written by the Plaintiff's counsel John Flym, were incorporated into the Stipulations submitted to Magistrate Sarah Luick.

342.   These false Stipulations were coerced from the Plaintiff, under Duress, because the Plaintiff was "stripped of the truth" of the 1992 contract because of the Extrinsic Fraud by defendants Wolfe, Spero and Colon, which deprived the Plaintiff of this exculpatory evidence.

343.   As a direct result of Defendants' fraudulent concealment of the Contract, BORIM, unaware of the termination of the doctor-patient relationship, revoked Plaintiff's medical license.

344.   This revocation had devastating consequences for Plaintiff, both personally and professionally.

345. The spoliation of evidence, extrinsic fraud, and fraud on the court perpetrated by Defendants proximately caused Plaintiff to suffer substantial economic damages, including the loss of over $4,025,000 in salary and

income, along with humiliation, ostracism, shunning and isolation from the community.

346.  The spoliation by Wolfe, Spero and Colon of the exculpatory evidence of this Express Bilateral Contract, terminating the doctor-patient relationship, had catastrophic effects on the Plaintiff's life and was ruinous to him.

347.   The spoliation of exculpatory evidence was the proximate cause of: (a) substantial economic damages and injuries to the Plaintiff in lost salaries and income exceeding $4,025,000.00 (four million twenty-five thousand U.S. dollars) [$175K annual salary as an Emergency Medicine Physician annually x 23 years]; (b) sabotaging the fact-finding by three (3) tribunals: Massachusetts Suffolk Superior Court, DALA and BORIM leading to the declaration of multiple substantial FALSE statements of material fact in the texts of those court judgments which issued from those tribunals; (c) severe and irreparable damage to the Plaintiff's reputation; (d) the exclusion of the Plaintiff from the Medicare program for over eight years preventing the Plaintiff from obtaining employment in any hospital, laboratory, research center, clinic which received Medicare or federal funding; (e) placement of the Plaintiff on a Medicare Exclusion List resulting in the Plaintiff's termination from a research project with Stephanie Dougan at the Dana-Farber Cancer Institute ("DFCI") in 2015-16 while the Plaintiff was in a master's program at Harvard Medical School, termination of the Plaintiff from a research project with Ann Goldfeld at the Boston Children's Hospital.

348.  It also led to irreparable damage to his reputation, exclusion from the Medicare program, and severe emotional distress compounded by causing significant medical and health problems.

349.  The emotional distress was exacerbated by Defendant Spero's outrageous act of leaving a copy of the initial complaint, detailing Plaintiff's sexual activities, at his marital home.

## XIV. Intentional Infliction of Severe Emotional Distress

350.  Defendant Stanley Spero inflicted outrageous emotional distress and pain by leaving a copy of the initial complaint detailing the Plaintiff's sexual activities at the doorstep of his marital home which was first

discovered by Plaintiff's first wife, leading to (a) severe marital discord and strife ending in divorce; (b) loss of the Plaintiff's medical license, and only occupation which the Plaintiff knew to earn money, leading to joblessness and homelessness; (c) financial insolvency leading to bankruptcy; (d) foreclosure on the Plaintiff's home in Maine where the Plaintiff moved following his divorce; and (e) severe, extreme continuous and ongoing social ostracism, humiliation and community shaming with the loss of most of the Plaintiff's friends, colleagues, peers, neighbors, former classmates and relatives who have since seen the Plaintiff in a false light as a social pariah, to be shunned and avoided by all persons, imposing extreme social isolation upon the Plaintiff.

351.   Defendants Wolfe, Spero and Colon did commit intentionally and maliciously spoliation of exculpatory evidence; this malicious act of leaving the Complaint at the doorstep of the Plaintiff's marital home caused severe marital discord, ultimately leading to divorce.

352.   The cascade of negative consequences continued with financial insolvency, bankruptcy, foreclosure on Plaintiff's home, and ongoing social ostracism.

353.   The core factual issue in the prior judicial proceedings – whether Defendant Colon was Plaintiff's patient at the time of the alleged misconduct – was incorrectly determined due to Defendants' concealment of the Contract; the Plaintiff was not Colon's physician in the nonclinical world, where he had a legitimate and rightful expectation of privacy for intimate activities occurring in the bedroom.

354.   The key factual issue in these records - which was incorrectly determined by BORIM, DALA and the Massachusetts SJC - is that defendant Lourdes Colon was not a patient of the Plaintiff's at the time of the alleged sexual encounters in 1992 - 1994 after the Plaintiff and Colon had formed and executed the 1992 Express Bilateral Contract; the only intimate contacts took place in the non-clinical world where the Plaintiff was not Colon's doctor.

355.  The Contract unequivocally established that the doctor-patient relationship had been terminated, thereby negating the basis for BORIM's allegations of sexual misconduct against Plaintiff.

356.  The corrected factual record will show that Colon was not the Plaintiff's patient while in the non-clinical world - the 1992 memorialized handwritten Express Bilateral Contract terminating the doctor-patient relationship and its subsequent modification, with its creation of the clinical and nonclinical worlds, terminated that relationship.

357.  The modified contract created a private nonclinical world where the Plaintiff did not function, or act, or hold himself out to the public as a physician, and was therefore not capable of engaging in sexual misconduct which presumes a professional role with fiduciary duties.

## XV.  Gross Negligence and Medical Malpractice by Lisa Wolfe

358.  Defendant Lisa Wolfe is guilty of gross negligence and medical malpractice based on her formulation, drafting and dictation of the 1992 Express Bilateral Contract in a consultation room at the HRI Hospital in Brookline, MA, without informing the Plaintiff of Colon's serious psychological conditions and without providing any guidance for the post-termination relationship.

359.  Dr Wolfe also breached her duty in the psychologist-patient relationship which she had with the Plaintiff which was formed in the Lexington, MA office where she maintained a private practice, when she informed the Plaintiff that he would be responsible for any couple visits by the Plaintiff and Colon which were not covered by Colon's insurance, effectively informing the Plaintiff that he was attending the Lexington office visits with Colon as part of couples therapy that Wolfe had initiated.

## XVI. MIT lab defendants: Sexual Discrimination & Harassment in violation of Title IX

360.  Plaintiff was a Visiting Graduate Student at the Massachusetts Institute of Technology (MIT) in the laboratory of Professor Ann Graybiel during the academic year 2022–2023.

361.  His appointment was part of his doctoral research program in Pharmacology at the Massachusetts College of Pharmacy and Health Sciences (MCPHS).

362.  The Plaintiff's primary objective at the Graybiel lab was to obtain essential research data for his Ph.D. dissertation on cannabinoid receptors in the central nervous system.

363.  Plaintiff paid approximately $4,000 in fees to participate in the Visiting Student Fellowship in the Graybiel lab, starting in September 2022.

364.  Initially, Plaintiff maintained a professional and congenial relationship with Professor Graybiel and lab colleagues.

365.  In April 2023, Nagina Mangal, a postdoctoral fellow from the University of London, joined the Graybiel lab.

366.  Plaintiff assisted Mangal with logistical support, fostering a friendly rapport.

367.  As part of a developing friendship, the Plaintiff took Mangal to her first baseball game with the Boston Red Sox at Fenway Park.

368.  In June 2023, Mangal discovered information online regarding the Plaintiff's past, including the revocation of his medical license in 2002.

369.  Mangal spread rumors about this matter, and Graybiel began discussing it within the lab.

370.  The discussions by Graybiel and Mangal, focused on the Plaintiff's prior sexual history, created a hostile and discriminatory environment in violation of Title IX.

371.  Plaintiff was shunned, excluded from lab activities, and eventually removed from significant research projects, including the CellREADR initiative, despite his substantial contributions.

372. The discriminatory actions culminated in Plaintiff's exclusion from the lab, termination of his Visiting Student appointment, and denial of access to essential research data needed for his dissertation.

373. Without access to the necessary data, Plaintiff was forced to abandon his doctoral program despite completing coursework, passing qualifying exams, and investing four years of study and research in his Ph.D. studies.

374. Plaintiff communicated his grievances to MIT administration, including emails to President Sally Kornbluth and the Department of Education's Office for Civil Rights (OCR).

375. However, MIT failed to take corrective action, demonstrating deliberate indifference.

376. Retaliatory actions followed Plaintiff's OCR complaint, including banning him from the MIT campus, issuing a "No Trespass" order, and isolating him from academic opportunities. These actions further disrupted his career and personal life.

**377.** Plaintiff has suffered significant educational, financial, and emotional harm as a result of these discriminatory and retaliatory acts, including the loss of employment opportunities and severe emotional distress.

**378.** Plaintiff seeks compensatory and punitive damages for the harms caused by the Defendants' Title IX violations, including sexual harassment and discrimination.

**379.** The MIT lab defendants, including Nagina Mangal, Ann Graybiel, Sally Kornbluth and MIT, are guilty of: sexual discrimination and harassment in violation of Title IX of the Civil Rights Act, defamation, libel, slander, false imprisonment and deprivation of the Plaintiff's civil and constitutional rights while acting under the color of law in violation of 42 U.S.C. §1983.

**380.** Most of the Plaintiff's research work in the Graybiel lab was funded by the research foundations Simons Foundation Autism Research Initiative and the CHDI Foundation

## XVII. MIT Campus Police defendants: Retaliation, False Imprisonment & False Arrest

381. The MIT Campus Police defendants include Craig Martin, Killian Casey, Panache Flint, and Michael Allen, along with Sally Kornbluth and MIT.

382. On or about July 18, 2024, the Plaintiff, while legally operating his vehicle in the vicinity of the Kendall Square area of Cambridge, was subjected to a coordinated campaign of harassment, intimidation, and false imprisonment by the MIT Campus Police, who had also enlisted he help of the Cambridge Police Department.

383. Under the leadership of Captain Craig Martin, the MIT Campus Police implemented a policy to monitor, harass, and exclude the Plaintiff from MIT property and activities.

384. This policy included instructions to officers to surveil the Plaintiff's movements, particularly targeting his vehicle, and involved regular confrontations designed to repel him from the MIT campus.

385. The campaign escalated when the Plaintiff, while waiting in his vehicle for his wife near Ames Place Alley, was surrounded by MIT Campus Police, including officers Killian Casey, Panache Flint, and Michael Allen, along with four unidentified Cambridge Police officers.

386. Acting on false and misleading information from the MIT Campus Police, the Cambridge Police detained the Plaintiff, alleging improper registration of his vehicle and lack of a valid driver's license—claims the MIT Campus Police knew or should have known were untrue based on Plaintiff's prior registration and compliance as a nonresident student driver.

387. The Plaintiff was subjected to a prolonged detention lasting approximately 40 minutes. During this time:

   a)    Police surrounded the Plaintiff's vehicle with three patrol cars, effectively imprisoning him;

   b)    Officers read the Plaintiff his Miranda rights, effecting a custodial interrogation without probable cause;

   c)    The Plaintiff's wife was interrogated about her employment and residence, and officers displayed their firearms, causing her significant distress.

388. This detention constituted a false imprisonment and an unconstitutional seizure of the Plaintiff's person in violation of his Fourth Amendment rights, with no probable cause to justify the officers' actions.

## XVIII. Anti-Semitism and Hate Crimes on the MIT Campus

389. During the detention, the officers made anti-Semitic comments, referencing the Plaintiff's Jewish heritage and falsely blaming him for the anxieties of Nagina Mangal, a Muslim postdoctoral fellow at MIT who had incited sexual discrimination and harassment against the Plaintiff.

390. These comments by the MIT Campus police were made amidst heightened campus tensions related to the Israel-Palestine conflict, with Jewish students and individuals being targeted for harassment.

391. The MIT Campus Police's actions reflect a broader pattern of anti-Semitic behavior and retaliation against the Plaintiff, who had previously filed Title IX complaints and raised concerns about discrimination.

392. The coordinated actions by MIT and Cambridge police demonstrate deliberate indifference to the Plaintiff's rights and were part of a campaign of retaliation and hate.

393. The absence of any incident report by the Cambridge Police further suggests an attempt to cover up the unlawful detention and arrest, raising questions about transparency and accountability.

394. The Plaintiff suffered severe emotional distress as a result of the detention and threats.

395. Plaintiff's wife required medical attention at Massachusetts General Hospital due to the anxiety and palpitations caused by the officers' intimidation.

396. These actions constitute violations of federal and state law, including false imprisonment, false arrest, and hate crimes under Massachusetts General Laws and 42 U.S.C. § 1983.

397. The coordinated harassment, detention, and anti-Semitic conduct violated the Plaintiff's constitutional rights, including equal protection and freedom from discrimination.

398. The Plaintiff seeks compensatory and punitive damages for the harm caused by these actions, as well as declaratory relief under 28 U.S.C. § 2201 to establish the rights, privileges, and obligations of the parties.

## XIX. Research Foundations: Unjust Enrichment and Quantum Meruit

399. The research, which the Plaintiff was conducting as a Visting Graduate student in the Graybiel lab, was funded by: (1) Simons Foundation Autism Research Initiative and (2) the CHDI Foundation (hereafter "Research Foundations").

Unjust Enrichment and Quantum Meruit

400. During the academic year 2022–2023, Plaintiff worked as a Visiting Graduate Student in the laboratory of Professor Ann Graybiel at MIT under a formal contract with specific research objectives.

401. This contract also implied that Plaintiff would use the research data obtained during the fellowship for his Ph.D. dissertation in Pharmacology at the Massachusetts College of Pharmacy and Health Sciences (MCPHS).

402. Plaintiff's research primarily focused on Huntington's Disease for three months-worth of work and Autism Spectrum Disorder for nine months-worth of work, under funding provided by the CHDI Foundation and Simons Foundation Autism Research Initiative (SFARI), respectively.

403. Plaintiff worked diligently for 10–12 hours a day for nearly 12 months, contributing substantial intellectual property, research findings, and methodologies that benefited the MIT defendants, including:

a)    CHDI Foundation;

b)    Simons Foundation Autism Research Initiative;

    c)     Massachusetts Institute of Technology;

    d)     Professor Ann Graybiel; and

    e)     Nagina Mangal.

404.  Despite the Plaintiff's significant contributions, he received no compensation for his efforts.

405.  Comparable positions paid Plaintiff $65,000 annually during prior employment, establishing the reasonable value of his services.

406.  In July 2023, Professor Graybiel abruptly terminated Plaintiff's Visiting Student status because of the sexual conduct and behaviors which she learned about from Nagina Mangal, who discovered this information on the internet due to BORIM's internet publication.

407.  Graybiel thereafter denied the Plaintiff access to the research data and intellectual property he developed during the fellowship, which was essential for completing his doctoral dissertation.

408.  As a direct result of the termination and denial of access to his research data, Plaintiff was forced to abandon his Ph.D. program despite completing years of coursework and successfully passing qualifying exams

409.  The MIT Defendants retained the research data and intellectual property generated by Plaintiff, leveraging this work for their own benefit and the advancement of their research objectives.

410.  The actions of the MIT defendants have resulted in their unjust enrichment at Plaintiff's expense, as they retained the benefits of Plaintiff's research without compensation and to the detriment of his academic progress.

## Unjust Enrichment of Research Foundations

411. Plaintiff conferred substantial benefits upon the MIT defendants through his dedicated research work over the course of 12 months.

412. The MIT Defendants accepted and retained these benefits, including advancements in their funded research objectives, without providing Plaintiff any compensation.

413. The retention of these benefits by the MIT defendants, under the circumstances, is inequitable and unjust.

414. Plaintiff seeks damages equivalent to the reasonable value of his services, calculated at no less than $65,000.

## Quantum Meruit by Research Foundations

415. Plaintiff provided valuable research services, including conducting scientific experiments, developing new methodologies, and producing significant academic contributions.

416. The MIT Defendants knowingly accepted and utilized these services for their own benefit, retaining the results of Plaintiff's work after his termination.

417. The circumstances created a reasonable expectation of compensation for the Plaintiff's contributions, including the existence of a formal academic agreement and the critical value of Plaintiff's work.

418. Plaintiff is entitled to damages for the reasonable value of his contributions, which is no less than $65,000.

## XX.  Breach of Contract: MIT Defendants

419.   Plaintiff entered into a valid and binding contract with the MIT defendants to conduct research from September 2022 to September 2023, with the understanding that he would use the resulting data for his doctoral research.

420. Plaintiff fully performed his obligations under the contract by diligently conducting research in accordance with the agreement.

421.   The MIT Defendants breached the contract by prematurely terminating Plaintiff's fellowship without cause and denying him access to the research data required for his Ph.D. dissertation.

422.  As a direct result of this breach, Plaintiff suffered substantial harm, including the loss of his research data, disruption of his doctoral studies, and forced resignation from his Ph.D. program.

423.   Plaintiff seeks damages for breach of contract, unjust enrichment, and quantum meruit to compensate for the financial, academic, and emotional harm caused by the MIT defendants' actions.

**424.**  The MIT defendants were unjustly enriched and benefitted from the Plaintiff's research efforts as a Visiting Student in 2022-23 in the amount of $65,000, also via Quantum Meruit, when the Graybiel lab, MIT, and Professor Graybiel unfairly and unjustly terminated the Plaintiff's contract, depriving him of the research data which he gleaned over the prior 12 months and resulting in his termination from the doctoral program at the Massachusetts College of Pharmacy and Health Sciences, in part, because of his loss of this research data.

## XXI.  Civil Rights violations:  Attorney Defendants: Hunter, DiCianni, Stolzberg

425.  Attorneys Claudia Hunter, Vincent DiCianni, and Robert Stolzberg (hereafter "Attorney Defendants") through their improper and unlawful legal actions, conduct and/or omissions did deprive the Plaintiff of his civil and constitutional rights while acting under the color of state law in violation of 42 U.S.C. §1983.

426. The pleadings made in the Adverse Proceedings in U.S. Bankruptcy Court, for the District of Maine in 2005, against the Attorney Defendants Claudia Hunter, Vincent DiCianni and Robert Stolzberg in Case No. 05-20320, "In Re Robert Weinberg" (*see attached Exhibits*) are incorporated and re-alleged herein.

427. Attorney Claudia Hunter committed legal malpractice, breach of contract, and did deprive the Plaintiff of his civil rights and constitutional right to Due Process of Law and a Hearing.

428. Hunter did not disclose her Conflict of Interest between representing the Plaintiff versus representing the financial interests of the Plaintiff's medical malpractice insurer ProMutual Medical Malpractice (now known as Coverys) who had hired her.

**429.** Hunter's failure to inform the Plaintiff of his right to a trial but moving forward with a financial settlement of $150,000 to Colon, substantially prejudiced the Plaintiff and deprived him of the opportunity to expose the spoliation of exculpatory evidence of the 1992 Express Bilateral Contract, along with the Extrinsic Fraud being committed by Colon, Wolfe and Spero.

**430.** A trial would have provided the Plaintiff with the opportunity of proving his innocence and that he did not commit sexual misconduct because the 1992 Express Bilateral Contract created the non-clinical world, where the Plaintiff and Colon were permitted to engage in intimate activities which would have prevented BORIM from adjudicating the Plaintiff for sexual misconduct leading to the revocation of the Plaintiff's medical license.

**431.** Attorney Vincent DiCianni committed legal malpractice, breach of contract, and did deprive the Plaintiff of his civil rights and constitutional right to Due Process of Law and a Hearing.

**432.** Attorney DiCianni did not disclose his persistent and insistent need to meet with Colon "to ascertain her credibility," which initially was rebuffed by Spero, then Magistrate Sarah Luick denied a motion for such a meeting, then third DiCianni's motion to the Superior Court was also denied, which led to his final fourth attempt to meet Colon, by filing the suit *Weinberg v. Colon* in Suffolk Superior Court in order to depose Colon

**433.** DiCianni's strategy of filing the suit to depose Colon backfired when Judge Xifaras dismissed the suit under the anti-SLAPP statute, and subsequently BORIM, DALA and other judges and magistrates called the filing of the suit the Plaintiff's attempt to obstruct justice.

**434.** In its judgment that the Plaintiff committed sexual misconduct and that his conduct undermined the confidence of the public in the medical profession, BORIM stated that a substantial factor was the filing of the suit *Weinberg v. Colon* which was not the Plaintiff's idea or strategy.

**435.** DiCianni had a professional and ethical duty to inform BORIM that the Plaintiff had no role in conceiving, drafting or filing that suit, and therefore could not have been attempting to obstruct justice

**436.**    Attorney Robert Stolzberg committed legal malpractice, breach of contract, and did deprive the Plaintiff of his civil rights and constitutional right to Due Process of Law and a Hearing.

**437.** Stolzberg did not disclose his Conflict of Interest between representing the Plaintiff versus his concurrent representation of Dr. Robert Wesselhoeft and the Boston Evening Medical Center in Middlesex Superior Court in the civil action *Colon v. Weinberg, Wesselhoeft, and Boston Evening Medical Center.*

**438.** When the Plaintiff asked Stolzberg to obtain an affidavit and testimony from Dr. Wesselhoeft which would have corroborated the Plaintiff's testimony that BEMC and Wesselhoeft had approved the Plaintiff's plan to terminate the doctor-patient relationship, Stolzberg refused to because he believed that such an Affidavit or testimony would compromise the legal liability of Wesselhoeft and BEMC.

**439.** Thus, Stolzberg's refusal and conflict of interest was a substantial factor in the Plaintiff's inability to prove his innocence by providing evidence of the 1992 Express Bilateral Contract, which was a substantial exculpatory evidence in the Plaintiff's case.

**440.** The actions and/or omissions made by the Attorney Defendants Claudia Hunter, Vincent DiCianni and Robert Stolzberg did deprive the Plaintiff of his civil and constitutional rights as granted and guaranteed by federal law and the U.S. Constitution, resulting in the Plaintiff being denied a Hearing in the Division of Administrative Law Appeals, while those Attorney Defendants were acting under the color of state law, thus

violating 42 U.S.C. § 1983.

## XXII. Psychiatrist defendant: Sten Lofgren

441. Sten Lofgren was a psychiatrist who was treating the Plaintiff for ADD between 1995 - 2000.

**442.** When the Plaintiff was applying for admission to the Maine Bar, Lofgren made several false and defamatory statements about the Plaintiff which were significant factors in the decision of the Maine Board of Bar Examiners' decision that the Plaintiff had not provided sufficient evidence of his good character.

443. Thus Lofgren committed defamation, libel and slander which caused substantial injury and harm to the Plaintiff in his attempt to be admitted to the Maine Bar.

**444.** The actions and/or omissions made by Defendant Sten Lofgren did deprive the Plaintiff of his civil and constitutional rights as granted and guaranteed by federal law and the U.S. Constitution, while Defendant Lofgren was acting under the color of state law, thus violating 42 U.S.C. § 1983.

## XXIII.  Further Civil Rights Violations

### Defendants' additional misconduct which caused Injuries and Damages to the Plaintiff

A. Due Process violations (in violation of 42 U.S.C. § 1983)

445. Defendant Lisa Wolfe, acting under color of state law as a licensed psychologist, deliberately engaged in spoliation of evidence by:

> a) Concealing her role in drafting and facilitating the September 1992 contract between Plaintiff and Colon;

> b) Making false statements to BORIM regarding the existence and nature of said contract;

> c) Failing to maintain required records of her involvement in the contract's formation.

446. Defendants, acting in concert, deliberately interfered with Plaintiff's access to courts by:

> a) Systematically concealing the existence of the 1992 contract during administrative and judicial proceedings;

> b)  Knowingly presenting false information to tribunals regarding the doctor-patient relationship;

> c)  Intentionally withholding material evidence that would have affected the outcome of proceedings.

447. The Massachusetts Board of Registration in Medicine (BORIM) violated Plaintiff's procedural due process rights by:

　　a) Failing to provide adequate notice and opportunity to be heard;

　　b) Making determinations based on deliberately concealed evidence;

　　c) Refusing to consider exculpatory evidence regarding the 1992 contract.

B. Equal Protection Violations  (in violation of 42 U.S.C. § 1983)

448. MIT Defendants engaged in discriminatory application of policies and procedures by:

　　a) Selectively enforcing campus access restrictions against Plaintiff;

　　b) Treating Plaintiff differently from similarly situated individuals without rational basis;

　　c) Engaging in systematic exclusion based on protected characteristics.

449. BORIM officials engaged in retaliatory actions against Plaintiff by:

　　a) Taking adverse action based on protected speech and activities;

　　b) Imposing disproportionate penalties without justification;

　　c) Maintaining punitive public disclosures beyond reasonable necessity.

C. First Amendment Violations  (in violation of 42 U.S.C. § 1983)

450. MIT Campus Police and administrative officials violated Plaintiff's First Amendment rights through:

　　a) Imposing prior restraints on protected speech without justification;

　　b) Retaliating against Plaintiff for exercising constitutional rights;

　　c) Discriminating based on religious beliefs and ethnic background.

D. Fourth Amendment Violations  (in violation of 42 U.S.C. § 1983)

451. MIT Campus Police and Cambridge Police conducted unauthorized detention and search by:

　　a) Detaining Plaintiff for approximately 40 minutes without probable cause;

　　b) Making anti-Semitic statements during detention;

　　c) Acting on false information and discriminatory animus.

E. Administrative Due Process  (in violation of 42 U.S.C. § 1983)

452. State officials violated Plaintiff's property rights through:

　　a) Revoking Plaintiff's medical license without adequate procedural safeguards;

　　b) Making arbitrary licensing decisions based on concealed evidence;

c) Deliberately manipulating administrative processes to achieve predetermined outcomes.

## F. Evidence of Intent  (in violation of 42 U.S.C. § 1983)

453.    The following facts demonstrate Defendants' knowing and intentional conduct:

a) Systematic spoliation of evidence over multiple years;

b) Coordinated efforts to conceal material information from tribunals;

c) Pattern of discriminatory treatment and retaliation;

d) Deliberate interference with Plaintiff's professional activities.

454. MASSACHUSETTS STATE ACTOR DEFENDANTS DID COMMIT JUDICIAL MISCONDUCT IN THEIR ACTIONS AND/OR OMISSIONS, IN THEIR DENIAL FROM THE PLAINTIFF OF A FAIR HEARING, DENIAL FROM THE PLAINTIFF DUE PROCESS OF LAW, IN THEIR FAILURE TO EXERCISE DUE DILIGENCE, IN THEIR JUDICIAL COMPLICITY AND/OR COLLUSION WITH CO-DEFENDANTS' EXTRINSIC FRAUD AND FRAUD ON THE COURT.  (in violation of 42 U.S.C. § 1983)

## G. Damages  (in violation of 42 U.S.C. § 1983)

455.    As a direct and proximate result of Defendants' misconduct, Plaintiff has suffered:

a) Economic damages exceeding $4 million;

b) Loss of professional license and career opportunities;

c) Severe reputational harm;

d) Emotional distress and psychological trauma;

e) Ongoing inability to practice in his chosen profession.

## H. Constitutional Violations Clearly Established  (in violation of 42 U.S.C. § 1983)

456.    At all relevant times, the following rights were clearly established:

a) Right to procedural due process in administrative proceedings;

b) Protection against arbitrary and discriminatory government action;

c) Freedom from religious discrimination;

d) Protection against unreasonable seizure and detention;

e) Right to maintain professional licensure subject to due process.

457. No reasonable official could have believed the following actions were lawful:

  a) Deliberate spoliation of exculpatory evidence;

  b) Systematic concealment of material facts from tribunals;

  c) Discriminatory application of administrative procedures;

  d) Detention based on religious or ethnic animus.

# CAUSES OF ACTION

<u>DEFINITIONS:</u>

458.  <u>Massachusetts State Actor Defendants</u>:  Booker Bush, Martin Crane, Alice Oliff, Richard Waring, Thomas Reilly, Hon. Kimberly Budd, Hon. Margaret Walsh, Hon. Sarah Luick, Hon. Natalie Monroe, Andrea Campbell, Hon. Christopher Connolly, Hon. Heide Brieger, Hon. Peter W. Killborn, Andrea Campbell, Board of Registration in Medicine, Division of Administrative Law Appeals, Massachusetts Superior Courts, Massachusetts Supreme Judicial Court, Commonwealth of Massachusetts (herein "MSA"), each both in their personal capacity and their official capacity, with joint and several liability

459.  <u>Spoliators of Extrinsic Fraud</u>:  Lisa Wolfe, Stanley Spero, Spero and Jorgensson, P.C., Lourdes Colon (herein "SEF") both individually and with joint and several liability

460.  <u>MIT Lab Defendants</u>: Nagina Mangal, Ann Graybiel, Sally Kornbluth, Massachusetts Institute of Technology (herein "M-lab") each both in their personal capacity and their official capacity, with joint and several liability

461.  <u>MIT Police Defendants</u>: MIT Campus Police Department, Craig Martin, Killian Casey, Panache Flint, Michael Allen, Sally Kornbluth, Massachusetts Institute of Technology (herein "M-police) each both in their personal capacity and their official capacity, with joint and several liability

462.  <u>Research Foundations</u>: CHD Foundation, Simons Foundation Autism Research Initiative

**COUNT I - Violation of Civil Rights Under 42 U.S.C. § 1983 - Due Process**

(Against Massachusetts State Actor Defendants)

463. Plaintiff incorporates by reference all preceding paragraphs.

464. The Massachusetts State Actor Defendants, acting under color of state law, deprived Plaintiff of his constitutional right to procedural due process by:

  A) Denying him a fair hearing at DALA - there was NO HEARING

  B) Denying Due Process in license revocation proceedings at DALA under the Fifth and Fourteenth Amendments

C)  MSA denying the Plaintiff the opportunity to be heard

D)  Refusing to allow presentation of exculpatory evidence

E)  Preventing confrontation and cross-examination of adverse witnesses

F)  Making arbitrary decisions without substantial evidence

G)   Failing to provide adequate notice and opportunity to be heard

H)  Discriminating in the application of BORIM regulations

I)  Violating Equal Protection rights

J)  Denying the freedom and liberty to contract

K)   Denying the right to engage in Gainful Employment

L)  Imposing Cruel and Unusual Punishment in violation of Eighth Amendment

M)  Making factual findings without substantial evidence in the milieu of Extrinsic Fraud

465.   These deprivations occurred through:

A) Unconstitutional application of BORIM regulations;

B) Enforcing unconstitutional BORIM regulations

C) Failure to provide adequate procedural safeguards;

D) Arbitrary and capricious decision-making;

E) Continued publication of false and defamatory information;

F)  Facilitating constructive ban on Plaintiff's gainful employment

G)  Violating Eighth Amendment's prohibition against Cruel and Unusual Punishment.

466.  These civil rights violations occurred under the color of state law through:

A) Official administrative proceedings at DALA

B) Judicial and quasi-judicial actions, rulings and final court judgments

C) Regulatory enforcement by BORIM

D) State-sanctioned internet, public media and newspaper publication of scandalous sexual and false

information labeling the Plaintiff as having engaged in sexual misconduct with a patient

467.  These Due Process violations by MSA comprised both denial of Procedural Due Process and also

Deprivation of Substantive Due Process

468.   These actions violated Plaintiff's rights under the Due Process Clause of the Fourteenth Amendment.

## COUNT II - Violation of Civil Rights Under 42 U.S.C. § 1983 - Equal Protection

(Against Massachusetts State Actor Defendants)

469.   Plaintiff incorporates by reference all preceding paragraphs.

470.   The Massachusetts State Actor Defendants violated Plaintiff's constitutional right to equal protection by:

   A) Discriminating between similarly situated physicians based on marital status

   B) Creating constitutionally impermissible classifications

   C) Applying regulations that burden fundamental rights without justification

   D) Failing to provide rational basis for disparate treatment

   E) Creating arbitrary classifications without legitimate state interest

   F) Burdening fundamental constitutional right to marry

   G) Arbitrary enforcement of professional standards

   H) Burdening fundamental constitutional right to marry without justification

   G) Failing strict scrutiny analysis

## COUNT III - Violation of Civil Rights Under 42 U.S.C. § 1983 - First Amendment

(Against Massachusetts State Actor Defendants)

471.   Plaintiff incorporates by reference all preceding paragraphs.

472.   The Massachusetts State Actor Defendants violated Plaintiff's First Amendment rights by:

   A) Retaliating against protected speech regarding misconduct

   B) Imposing prior restraints on protected expression

   C) Punishing protected petitioning activity

   D) Creating chilling effect on protected speech

   E) Punishing reports of criminal conspiracy in Memo send to BORIM

   F) Sanctioning exposure of evidence spoliation

   G) Penalizing complaints aboud Due Process violations

   H) Retaliating against protected Whistleblower activities

   I) Restricting protected speech about misconduct

   J) Retaliating against protected communications

K) Limiting Plaintiff's ability to petition the government

## COUNT IV - Violation of Civil Rights Under 42 U.S.C. § 1983 - Right to Privacy

### (Against Massachusetts State Actor Defendants)

473. Plaintiff incorporates by reference all preceding paragraphs.

474. The Massachusetts State Actor Defendants violated Plaintiff's constitutional right to privacy by:

A) Intruding into private intimate conduct

B) Regulating private relationships outside clinical settings

C) Intruding into contractually-created privae sphere in the home

D) Violating principles established in *Lawrence v. Texas*

E) Imposing unwarranted state interference in private affairs

F) Disregarding contract-based limitations on professional obligations

475. This violation occurred through:

a) Imposition of professional obligations in private settings;

b) Regulation of private conduct outside clinical context;

c) Interference with intimate associations;

d) Invasion of contractually protected private sphere;

e) State intrusion into intimate activities in privacy of home. *Lawrence v. Texas*

## COUNT V - Title IX Discrimination - Sexual Discrimination

### (Against MIT Defendants)

476. Plaintiff incorporates by reference all preceding paragraphs.

477. The MIT Lab and MIT Police Defendants violated Title IX through:

A) Sexual harassment based on Plaintiff's sexual history

B) Creation of hostile educational environment

C) Denial of educational opportunities

D) Retaliation for protected Title IX complaints to DOE

E) Deliberate indifference to known discrimination

478. This sexual discrimination was:

a) Severe, pervasive, and objectively offensive;

b) Based on sex and sexual history;

c) Known to appropriate persons at MIT;

d) Met with deliberate indifference.

**COUNT VI - Extrinsic Fraud - via Spoliation of Exculpatory Evidence**

(Against Defendants Wolfe, Spero and Colon)

479. Plaintiff incorporates by reference all preceding paragraphs.

480. Defendants committed extrinsic fraud by:

A) Concealing the 1992 Express Bilateral Contract from multiple Tribunals [*Colon v. Weinberg, Wesselhoeft and Boston Evening Medical Center, Board of Registration in Medicine v. Weinberg, Weinberg v. Colon, In Re Robert P Weinberg D.O., Weinberg v. Board of Registration in Medicine, Weinberg v. Maine Board of Bar Examiners*]

B) Preventing fair presentation of Plaintiff's case

C) Making false statements to tribunals

D) Spoliation of material evidence

E) Obtaining fraudulent insurance settlement

F) Destruction of Medical records

G) Led to false factual findings by multiple tribunals

H) Led to inaccurate and false determination of Plaintiff's status with respect to Colon

I) Caused false conclusion and determination that Plaintiff engaged in sexual misconduct

481. Consequences of this Extrinsic Fraud and Fraud on the Court

A) Tribunals incorrectly concluded/inferred that Plaintiff was having intimate activities while he was in a doctor-patient relationship with Colon

B) Led to false conclusions that Plaintiff engaged in sexual misconduct with a patient

C) Concealed the clinical and non-clinical worlds from the tribunals

D) May have invited Judicial Complicity, Abuse of Discretion, Judicial Misconduct

E) Ultimately led to revocation of the Plaintiff's medical license

482. This Extrinsic Fraud and Fraud on the court:

A) Was directed at judicial machinery itself

B) Prevented fair submission of controversy

C) Undermined integrity of judicial process

D) Prevented fair adjudication on the facts

E) Deprived the Plaintiff of a fair hearing and Due Process   42 U.S.C. § 1983

F)  Resulted in final court judgments which are null and void, or voidable

## COUNT VII - Medical Malpractice and Gross Negligence in practice of psychology

### (Against Defendant Wolfe)

483. Plaintiff incorporates by reference all preceding paragraphs.

484. Defendant Wolfe committed medical malpractice by:

A) Failing to warn of patient's psychological conditions

B) Negligently advising termination of doctor-patient relationship

C) Breaching standard of care

D) Creating foreseeable risk of harm

E) Concealing material medical information

F) Drafting, facilitating and dictating 1992 Express Bilateral Contract

G) Failing to provide appropriate guidance for post-termination relationship

H) Providing negligent advice regarding the contract

I)  Failing to warn and advise the ethical aspects of contractual termination

## COUNT VIII - False Imprisonment and False Arrest in violation of Fourth Amendment

### (Against MIT Police Defendants)

485.  Plaintiff incorporates by reference all preceding paragraphs.

486. The MIT Police Defendants unlawfully detained Plaintiff by:

A) Restraining his freedom of movement without justification

B) Conducting unauthorized detention without probable cause

C) Seizing the Plaintiff's person in violation of protections of Fourth Amendment

D) Implementing an unlawful detention without probable cause

E) Using threats and intimidation

F) Acting with discriminatory animus

G) Coordinating unlawful detention between departments

H) Initiated a custodial interrogation without basis

I)  Coordinated harassment due to sexual harassment and Anti-Semitic bias

J) Comprised a Hate Crime because of anti-semitism permeated and encouraged in MIT Campus Police Department

487. This unlawful and unconstitutional detention was:

A) Without legal justification

B) Comprised an abuse of police power

C) Based on discriminatory animus

D) Retaliatory in nature after Plaintiff filed Title IX complaint against MIT

E) Unconstitutionally prolonged

F) An excessive use of police power to intimidate the Plaintiff

G) Based on doctrines of sexual harassment and anti-semitism encouraged and implemented by MIT police Chief Craig Martin

## COUNT IX - Defamation, Libel and Slander

### (Against Defendants Mangal, Graybiel, and MIT)

488. Plaintiff incorporates by reference all preceding paragraphs.

489. Defendants made false and defamatory statements by:

A) Publishing false allegations about Plaintiff's conduct

B) Making statements they knew were false

C) Acting with reckless disregard for truth

D) Causing reputational harm

E) Interfering with employment opportunities

## COUNT X - Breach of Contract - formed and signed in September 2022

### (Against MIT)

490. Plaintiff incorporates by reference all preceding paragraphs.

491. MIT breached its contractual obligations by:

A) Terminating research fellowship without cause

B) Denying access to research data

C) Failing to provide agreed services

D) Violating academic policies

E) Retaliating against protected activities

**COUNT XI - Intentional Infliction of Emotional Distress**

      (Against All Defendants)

492. Plaintiff incorporates by reference all preceding paragraphs.

493. Defendants' extreme and outrageous conduct:

      A) Was intended to cause severe emotional distress

      B) Actually caused severe emotional distress

      C) Exceeded bounds of decency

      D) Created ongoing trauma and psychological harm

**COUNT XII - Civil Conspiracy**

      (Against Defendants Wolfe, Spero and Colon)

494. Plaintiff incorporates by reference all preceding paragraphs.

495. Defendants conspired to:

      A) Conceal material evidence

      B) Submit false statements to tribunals

      C) Obstruct justice

      D) Interfere with Plaintiff's rights

      E) Commit fraud upon the courts

**COUNT XIII - Tortious Interference with Contract**

      (Against Defendants Mangal and Graybiel)

496. Plaintiff incorporates by reference all preceding paragraphs.

497. Defendants intentionally interfered with Plaintiff's contractual relationships by:

      A) Causing breach of research fellowship agreement

      B) Preventing performance of academic contracts

      C) Acting with improper purpose

      D) Causing economic harm

      E) Using improper means

**COUNT XIV - Unjust Enrichment**

      (Against Research Foundation Defendants)

498. Plaintiff incorporates by reference all preceding paragraphs.

499. The Research Foundation Defendants (Simons Foundation Autism Research Initiative, CHDI Foundation were unjustly enriched by:

    A) Retaining benefits of Plaintiff's research valued at $65,000

    B) Using Plaintiff's intellectual property without compensation

    C) Appropriating research data intended for Plaintiff's doctoral research dissertation

    D) Receiving value without payment

    E) Profiting from wrongful termination

    F) Denial of access to research results needed by Plaintiff to complete his doctoral dissertation

500. The enrichment was unjust because:

    A) Defendants knew of benefits received

    B) Retention violates principles of Equity

    C) Plaintiff received no compensation

    D) Benefits resulted from discriminatory termination on the basis of sexual discrimination and anti-semitic bias and racism

**COUNT XV - Violation of Civil Rights Under 42 U.S.C. § 1983 - Eighth Amendment**

           (Against Massachusetts State Actor Defendants)

501. Plaintiff incorporates by reference all preceding paragraphs.

502. The Massachusetts State Actor Defendants violated Plaintiff's Eighth Amendment rights by:

    A) Imposing cruel and unusual punishment through permanent internet publication

    B) Creating perpetual employment barriers

    C) Inflicting excessive fines through loss of income exceeding $3 million

    D) Causing ongoing public humiliation and ostracism

    E) Imposing punishment beyond statutory authorization and statutory period of revocation

    F) Comprised Cruel and Unusual Punishment in violation of the Eighth Amendment

503. MSA actions also contitute excessive fines through:

    A) Loss of over $3M (three million dollars of lost revenue over 22 years)

    B) Caused permanent barrier to employment labeling Plaintiff as undesirable employee

    C) Destruction of professional reputation comprising extreme defamation

D) Ongoing economic penalties regarding job offer rescissions, barrier to networking and substantial loss of economic opportunities, termination from jobs

504. MSA Defendants imposed Cruel and Unusual Punishment through:

A) Permanent professional destruction and destruction of Plaintiff's reputation

B) Ongoing public humiliation and ostracism from easily-accessible internet publication that Plaintiff engaged in sexual misconduct with a patient

C) Social ostracism and STIGMA PLUS

D) Economic devastation exceeding $3M (three million dollars)

505.    Stigma plus doctrine is a principle that enables a plaintiff, in limited circumstances, to seek relief for government defamation under federal constitutional law.

506. According to this principle, defamation by a government official is actionable as a civil-rights violation only if the victim suffers some loss of property interest like continued employment in a government job.

507.  To prevail on this doctrine, plaintiffs must plead (1) the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false, and (2) a material state-imposed burden or state-imposed alteration of the plaintiffs status or rights. *Spinale v. USDA*, 621 F. Supp. 2d 112 (S.D.N.Y. 2009).

## COUNT XVI - Legal Malpractice - causing deprivation of civil right under 42 U.S.C. § 1983

(Against Defendants Hunter, DiCianni, and Stolzberg)

508. Plaintiff incorporates by reference all preceding paragraphs.

509. The Attorney Defendants breached their professional duties by:

A) Failing to disclose conflicts of interest

B) Providing negligent representation

C) Failing to present exculpatory evidence

D) Making strategic errors that harmed Plaintiff

E) Breaching fiduciary duties

**COUNT XVII - Professional Negligence - causing deprivation of civil right under 42 U.S.C. § 1983**

(Against Expert Witness Beck)

510. Plaintiff incorporates by reference all preceding paragraphs.

511. Defendant Beck committed professional negligence by:

A) Failing to investigate critical evidence

B) Rendering invalid expert opinions

C) Disregarding material facts

D) Breaching professional standards

E) Causing foreseeable harm to Plaintiff

**COUNT XVIII - Violation of Civil Rights Under 42 U.S.C. § 1983 - Brady Violations**

(Against BORIM Prosecutors)

512. Plaintiff incorporates by reference all preceding paragraphs.

513. The BORIM Prosecutors violated Plaintiff's constitutional rights by:

A) Withholding material exculpatory evidence

B) Failing to disclose favorable evidence

C) Suppressing evidence of witness tampering

D) Concealing evidence undermining witness credibility

E) Preventing fair adjudication

**COUNT XIX - Title VII Employment Discrimination**

(Against MIT)

514. Plaintiff incorporates by reference all preceding paragraphs.

515. MIT discriminated against Plaintiff in violation of Title VII by:

A) Creating hostile work environment based on sex

B) Discriminating in terms and conditions of employment

C) Retaliating against protected complaints

D) Using sexual history as basis for adverse actions

E) Engaging in pattern of harassment

**COUNT XX - Civil Rights Violations - Anti-Semitic Discrimination**

(Against MIT Police Defendants)

516. Plaintiff incorporates by reference all preceding paragraphs.

517. The MIT Police Defendants engaged in discriminatory conduct through:

    A) Targeted harassment based on Jewish identity

    B) Creation of hostile environment

    C) Discriminatory enforcement of policies

    D) Making anti-Semitic statements

    E) Retaliating against complaints of discrimination

**COUNT XXI - Null and Void Coerced Stipulations - under Duress and Extrinsic Fraud**

(Against Massachusetts State Actor Defendants)

518. Plaintiff incorporates by reference all preceding paragraphs.

519. The stipulations should be declared void because:

    A) Obtained through duress and coercion

    B) Made without knowing and voluntary consent

    C) Procured through extrinsic fraud

    D) Signed under threat of punishment

    E) Executed without due process

**COUNT XXII - Abuse of Process**

(Against Massachusetts State Actor Defendants)

520. Plaintiff incorporates by reference all preceding paragraphs.

521. Defendants abused legal process by:

    A) Using proceedings for improper purpose

    B) Misusing disciplinary authority

    C) Manipulating administrative procedures

    D) Acting with malicious intent

    E) Causing special damages

**COUNT XXIII - Spoliation of Exculpatory Evidence - comprising Extrinsic Fraud**

(Against Defendants Wolfe, Spero and Colon)

522. Plaintiff incorporates by reference all preceding paragraphs.

523. Defendants intentionally destroyed or concealed evidence by:

    A) Removing sections from medical records

    B) Concealing 1992 Express Bilateral Contract

    C) Destroying documentation of contract formation

    D) Preventing access to material evidence

    E) Interfering with fact-finding process

**COUNT XXIV - Insurance Fraud - against ProMutual Medical Malpractice insurer**

(Against Defendants Wolfe, Spero and Colon)

524. Plaintiff incorporates by reference all preceding paragraphs.

525. Defendants committed insurance fraud by:

    A) Obtaining $150,000 settlement through false pretenses

    B) Concealing termination of doctor-patient relationship

    C) Making material misrepresentations to insurer

    D) Submitting false claims

    E) Causing damages through fraudulent conduct

**COUNT XXV - Breach of Fiduciary Duty**

(Against Defendants Wolfe and Attorney Defendants)

526. Plaintiff incorporates by reference all preceding paragraphs.

527. Defendants breached their fiduciary duties by:

    A) Failing to disclose conflicts of interest

    B) Acting against Plaintiff's interests

    C) Concealing material information

    D) Violating duties of loyalty and care

    E) Causing damages through breaches

528. Dr Wolfe breached her fiduciary duties as:

    A) Plaintiff's psychologist during couples therapy in Lexington, MA office

B) Medical professional with knowledge of psychiatric conditions

C) Facilitator, conceiver and drafter of 1992 Express Bilateral Contract

D) Healthcare provider with duty of confidentiality

529. These breaches included:

A) Disclosure of confidential information

B) Concealment of material diagnoses

C) False testimony about therapeutic relationship

D) Concealment of 1992 Express Bilateral Contract

E) Violation of professional ethics

## COUNT XXVI - Violation of Contract Clause - U.S. Constitution Art. I, § 10

(Against Massachusetts State Actor Defendants)

530. Plaintiff incorporates by reference all preceding paragraphs.

531. The Massachusetts State Actor Defendants violated the Contract Clause by:

A) Impairing obligations under the 1992 Express Bilateral Contract

B) Retroactively nullifying valid private contract rights

C) Acting *ultra vires* and Exceeding state authority to regulate contracts - applying BORIM regulations to override private contracts

D) Acting without legitimate state interest

E) Failing to use reasonable and appropriate means

F) Attempting to nullify the 1992 Express Bilateral Contract between two private parties

G) Ignoring the constitutional protection of private contracts stated in Article I, Section 10.

## COUNT XXVII - Malicious Prosecution

(Against Massachusetts State Actor Defendants)

532. Plaintiff incorporates by reference all preceding paragraphs.

533. Defendants engaged in malicious prosecution by:

A) Pursuing charges without probable cause

B) Acting with improper purpose

C) Continuing prosecution despite exculpatory evidence

D) Causing special damages

E) Acting with malice

## COUNT XXVIII - Breach of Implied Covenant of Good Faith and Fair Dealing

### (Against MIT and Research Foundation Defendants)

534. Plaintiff incorporates by reference all preceding paragraphs.

535. Defendants breached the implied covenant by:

 A) Unfairly interfering with contract rights

 B) Acting in bad faith regarding research data

 C) Depriving Plaintiff of contract benefits

 D) Failing to deal fairly and honestly

 E) Using pretextual reasons for termination

## COUNT XXIX - Conversion

### (Against MIT and Research Foundation Defendants)

536. Plaintiff incorporates by reference all preceding paragraphs.

537. Defendants wrongfully converted Plaintiff's property by:

 A) Retaining Plaintiff's research data

 B) Refusing access to intellectual property

 C) Exercising unauthorized control

 D) Depriving Plaintiff of property rights

 E) Causing damages through wrongful retention

## COUNT XXX - Negligent Infliction of Emotional Distress

### (Against All Defendants)

538. Plaintiff incorporates by reference all preceding paragraphs.

539. Defendants' negligent conduct:

 A) Created unreasonable risk of emotional harm

 B) Caused physical symptoms and injury

 C) Was foreseeable to cause distress

 D) Resulted in objective physical manifestations

 E) Met requirements under Massachusetts law

**COUNT XXXI - Judicial Misconduct Under State Law**

(Against Massachusetts State Actor Defendants)

540. Plaintiff incorporates by reference all preceding paragraphs.

541. The judicial defendants engaged in misconduct by:

A) Failing to exercise due diligence

B) Demonstrating actual bias

C) Refusing to investigate exculpatory evidence

D) Abusing judicial authority

E) Acting beyond jurisdiction

**COUNT XXXII - Civil Rights Conspiracy Under 42 U.S.C. § 1985**

(Against All Defendants)

542. Plaintiff incorporates by reference all preceding paragraphs.

543. Defendants conspired to violate Plaintiff's civil rights by:

A) Agreeing to deprive constitutional rights

B) Acting in concert to interfere with rights

C) Taking overt acts in furtherance

D) Causing injury through conspiracy

E) Targeting based on protected status

**COUNT XXXIII - Violation of Massachusetts Civil Rights Act**

(Against All Defendants)

544. Plaintiff incorporates by reference all preceding paragraphs.

545. Defendants violated state civil rights law through:

A) Interference with secured rights

B) Threats, intimidation and coercion

C) Creating hostile environment

D) Discriminatory conduct

E) Retaliatory actions

**COUNT XXXIV - Declaratory Relief: Unconstitutional BORIM regulations and Extrinsic Fraud vitiates and renders Stipulations null and void *ab initio***

(Against All Defendants)

546. Plaintiff incorporates by reference all preceding paragraphs.

547. Plaintiff seeks declarations that:

A) The 1992 Contract was valid and binding Constitution, Art.I, Sect.10; Mass contract law

B) BORIM regulations are unconstitutional

C) Stipulations obtained through fraud are void

D) Defendants violated constitutional rights 42 U.S.C. § 1983

**COUNT XXXV - Violation of Public Records Law**

(Against Massachusetts State Actor Defendants)

548. Plaintiff incorporates by reference all preceding paragraphs.

549. Defendants violated public records law by:

A) Withholding required documents

B) Failing to maintain records

C) Destroying evidence

D) Concealing public records

E) Preventing access to records

**COUNT XXXVI - Unconstitutional Burden on Fundamental Right to Marriage**

(Against Massachusetts State Actor Defendants)

550. Plaintiff incorporates by reference all preceding paragraphs.

551. The BORIM regulations unconstitutionally burden the fundamental right to marry by:

A) Coercing physicians to marry patients to avoid discipline

B) Creating impermissible pressure on marriage decisions

C) Failing strict scrutiny analysis

D) Lacking compelling state interest

E) Using means not narrowly tailored

552. These regulations must be struck down as they:

    A) Violate fundamental rights protected by Due Process Clause

    B) Create unconstitutional conditions on professional licensure

    C) Improperly influence intimate personal choices

    D) Exceed legitimate state authority

    E) Fail constitutional scrutiny

**COUNT XXXVII - Unconstitutional Taking Without Just Compensation**

(Against Massachusetts State Actor Defendants)

553. Plaintiff incorporates by reference all preceding paragraphs.

554. The State Actor Defendants' actions constitute an unconstitutional taking by:

    A) Depriving Plaintiff of property interest in medical license

    B) Causing loss of established economic interests

    C) Failing to provide just compensation

    D) Exceeding legitimate regulatory authority

    E) Destroying economic value without justification

**COUNT XXXVIII - Violation of Constitutional Right to Engage in Chosen Profession**

(Against Massachusetts State Actor Defendants)

555. Plaintiff incorporates by reference all preceding paragraphs.

556. Defendants violated Plaintiff's fundamental right to engage in chosen profession by:

    A) Creating permanent barrier to medical practice

    B) Imposing arbitrary and irrational restrictions

    C) Exceeding legitimate state interests

    D) Failing to provide rational basis

    E) Causing constructive lifetime ban on employment

557. Defendants also violated the Plaintiff's right to engage in gainful employment, through its publication of false, scandalous and defamatory allegations that Plaintiff engaged in sexual misconduct with a patient rendering Plaintiff constructively unemployable by any Employer because Plaintiff's label makes him a socially undesirable employee, in the same category as Sexual Deviants, rapists and Pedophiles.

558. MSA Defendants violated the Plaintiff's right to gainful employment by:

    A) Publishing false, defamatory and scandalous allegations of sexual misconduct

    B) Creating permanent internet stigma preventing Plaintiff's employment

    C) Causing termination from fifty-one (51) jobs and rescission of over one hundred (100) job offers

    D) Constructively rendering Plaintiff permanently unemployable

## COUNT XXXIX - Unconstitutional Bill of Attainder

### (Against Massachusetts State Actor Defendants)

559. Plaintiff incorporates by reference all preceding paragraphs.

560. The BORIM regulations as applied constitute an unconstitutional bill of attainder by:

    A) Imposing punishment without judicial trial

    B) Targeting specific individual for punishment

    C) Creating permanent disabilities

    D) Exceeding legitimate regulatory purpose

    E) Violating separation of powers

## COUNT XL - Violation of Substantive Due Process - Right to Privacy

### (Against Massachusetts State Actor Defendants)

561. Plaintiff incorporates by reference all preceding paragraphs.

562. Defendants violated fundamental right to privacy by:

    A) Intruding into intimate personal relationships   *Lawrence v. Texas*

    B) Regulating private conduct in non-clinical settings

    C) Exceeding legitimate state interests

    D) Failing strict scrutiny analysis

    E) Violating principles of *Lawrence v. Texas*

## COUNT XLI - Unconstitutional Retroactive Legislation

### (Against Massachusetts State Actor Defendants)

563. Plaintiff incorporates by reference all preceding paragraphs.

564. The retroactive application of BORIM regulations is unconstitutional by:

    A) Impairing vested contract rights

    B) Applying new standards to past conduct

    C) Failing to provide fair notice

    D) Creating new obligations retroactively

    E) Violating due process principles

**COUNT XLII - Unconstitutional Violation of Freedom of Association**

    (Against Massachusetts State Actor Defendants)

565. Plaintiff incorporates by reference all preceding paragraphs.

566. Defendants violated First Amendment freedom of association by:

    A) Restricting private relationships

    B) Imposing unconstitutional conditions

    C) Exceeding legitimate regulatory scope

    D) Failing constitutional scrutiny

    E) Infringing protected associational rights

    F) Retaliation for Plaintiff's memo about criminal conspiracy emailed to Attorney General and District Attorney, attempting to initiate a state investigation

**COUNT XLIII - Unconstitutional Excessive Fines - Eighth Amendment**

    (Against Massachusetts State Actor Defendants)

567. Plaintiff incorporates by reference all preceding paragraphs.

568. The economic penalties imposed constitute excessive fines by:

    A) Causing grossly disproportionate economic harm

    B) Exceeding $3 million in lost income

    C) Creating permanent financial disabilities

    D) Lacking proportionality to offense

    E) Violating Eighth Amendment principles

**COUNT XLIV - Violation of Supremacy Clause -  U.S. Constitution**

    (Against Massachusetts State Actor Defendants)

569. Plaintiff incorporates by reference all preceding paragraphs.

570. The state regulations violate the Supremacy Clause by:

    A) Attempting to override constitutionally protected contract rights

    B) Conflicting with federal constitutional protections

    C) Exceeding state authority

    D) Interfering with federal rights

    E) Creating direct conflict with federal law

## COUNT XLV - Unconstitutional Interference with Interstate Commerce

### (Against Massachusetts State Actor Defendants)

571. Plaintiff incorporates by reference all preceding paragraphs.

572. The state regulations unconstitutionally burden interstate commerce by:

    A) Creating barriers to interstate medical practice

    B) Imposing excessive burdens on interstate commerce

    C) Exceeding legitimate local interests

    D) Failing Pike balancing test

    E) Discriminating against interstate commerce

## COUNT XLVI - Criminal Conspiracy to Commit Extrinsic Fraud

### (Against Defendants Wolfe, Spero, and Colon)

576. Plaintiff incorporates by reference all preceding paragraphs.

577. Defendants engaged in criminal conspiracy by:

    A) Agreeing to conceal exculpatory evidence

    B) Taking overt acts to destroy and hide evidence

    C) Acting with intent to deceive tribunals

    D) Coordinating false testimony and statements

    E) Causing substantial harm through conspiracy

## COUNT XLVII - Fraudulent Inducement of Insurance Settlement

### (Against Defendants Wolfe, Spero, and Colon)

578. Plaintiff incorporates by reference all preceding paragraphs.

579. Defendants fraudulently induced $150,000 insurance settlement by:

A) Concealing termination of doctor-patient relationship

B) Making material misrepresentations to insurer

C) Suppressing existence of 1992 Contract

D) Acting with intent to deceive

E) Obtaining settlement through fraud

## COUNT XLVIII - Obstruction of Justice Through Spoliation

### (Against Defendants Wolfe, Spero, and Colon)

580. Plaintiff incorporates by reference all preceding paragraphs.

581. Defendants obstructed justice by:

A) Destroying medical records documenting contract

B) Removing evidence from official files

C) Preventing access to material evidence

D) Interfering with judicial proceedings

E) Acting with intent to obstruct

## COUNT LIX - Subornation of Perjury

### (Against Defendant Spero)

582. Plaintiff incorporates by reference all preceding paragraphs.

583. Defendant Spero suborned perjury by:

A) Procuring false testimony

B) Concealing knowledge of 1992 Contract

C) Facilitating false statements to tribunals

D) Acting as officer of court while concealing truth

E) Causing harm through false testimony

## COUNT LX - Fraudulent Concealment

### (Against Defendants Wolfe, Spero, and Colon)

584. Plaintiff incorporates by reference all preceding paragraphs.

585. Defendants fraudulently concealed material evidence by:

A) Having duty to disclose material facts

B) Deliberately concealing 1992 Contract

C) Acting with intent to deceive

D) Preventing discovery of truth

E) Causing harm through concealment

## COUNT LXI - Abuse of Process Through Fraud

(Against Defendants Wolfe, Spero, and Colon)

586. Plaintiff incorporates by reference all preceding paragraphs.

587. Defendants abused legal process by:

A) Using proceedings to perpetrate fraud

B) Manipulating judicial system through deception

C) Acting with improper purpose

D) Misusing legal procedures

E) Causing special damages

## COUNT LXII - Civil RICO Violations

(Against Defendants Wolfe, Spero, Colon, and MSA)

588. Plaintiff incorporates by reference all preceding paragraphs.

589. Defendants engaged in RICO enterprise through:

A) Pattern of racketeering activity

B) Multiple acts of mail and wire fraud

C) Conspiracy to obstruct justice

D) Use of interstate commerce to defraud

E) Causing injury to business/property

## COUNT LXIII - Common Law Fraud

(Against Defendants Wolfe, Spero, and Colon)

590. Plaintiff incorporates by reference all preceding paragraphs.

591. Defendants committed common law fraud by:

A) Making false representations

B) Acting with knowledge of falsity

C) Intending to induce reliance

D) Causing justifiable reliance

E) Resulting in damages

## COUNT LXIV - Breach of Fiduciary Duty Through Fraud

(Against Defendant Wolfe)

592. Plaintiff incorporates by reference all preceding paragraphs.

593. Defendant Wolfe breached fiduciary duties by:

    A) Concealing material medical information

    B) Failing to disclose known risks

    C) Violating duties of loyalty and care

    D) Acting contrary to patient interests

    E) Causing harm through breaches

## COUNT LXV - Judicial Misconduct Through Denial of Due Process

(Against Massachusetts State Actor Judicial Defendants)

594. Plaintiff incorporates by reference all preceding paragraphs.

595. The judicial defendants engaged in misconduct by:

    A) Deliberately denying constitutional right to hearing

    B) Refusing to allow presentation of exculpatory evidence

    C) Preventing confrontation of adverse witnesses

    D) Acting with knowledge of due process violations

    E) Causing deprivation of fundamental rights

596. This misconduct exceeded judicial immunity because:

    A) It comprised non-judicial acts

    B) It was taken in complete absence of jurisdiction

    C) It violated clearly established rights

    D) It constituted abuse of judicial office

## COUNT LVII - Judicial Complicity in Extrinsic Fraud

(Against Massachusetts State Actor Judicial Defendants)

597. Plaintiff incorporates by reference all preceding paragraphs.

598. The judicial defendants were complicit in fraud by:

    A) Failing to investigate known spoliation of evidence

B) Ignoring evidence of witness tampering

C) Refusing to exercise due diligence

D) Facilitating fraud on court through inaction

E) Acting with knowledge of fraudulent scheme

599. This complicity exceeded judicial immunity because:

A) It comprised administrative rather than judicial acts

B) It facilitated known criminal conduct

C) It corrupted judicial process itself

D) It violated clearly established rights

**COUNT LVIII - Malicious Prosecution Through Judicial Office**

(Against Massachusetts State Actor Judicial Defendants)

600. Plaintiff incorporates by reference all preceding paragraphs.

601. The judicial defendants engaged in malicious prosecution by:

A) Continuing proceedings without probable cause

B) Acting with improper purpose and malice

C) Knowingly relying on false evidence

D) Facilitating wrongful prosecution

E) Causing special damages

602. These actions exceeded judicial immunity because:

A) They were taken in administrative capacity

B) They comprised non-judicial acts

C) They violated clearly established rights

D) They constituted abuse of process

**COUNT LIX - Conspiracy to Violate Civil Rights Through Judicial Office**

(Against Massachusetts State Actor Judicial Defendants)

603. Plaintiff incorporates by reference all preceding paragraphs.

604. The judicial defendants conspired to violate rights by:

A) Agreeing to deprive constitutional rights

B) Coordinating denial of fair hearing

C) Taking overt acts to prevent due process

D) Acting with knowledge of violations

E) Causing constitutional injuries

605. This conspiracy exceeded judicial immunity because:

A) It involved non-judicial acts

B) It corrupted judicial process itself

C) It violated clearly established rights

D) It comprised administrative functions

## COUNT LX - Abuse of Judicial Process

(Against Massachusetts State Actor Judicial Defendants)

606. Plaintiff incorporates by reference all preceding paragraphs.

607. The judicial defendants abused judicial process by:

A) Using proceedings for improper purpose

B) Knowingly facilitating false proceedings

C) Acting outside judicial authority

D) Engaging in administrative misconduct

E) Causing special damages

608. This abuse exceeded judicial immunity because:

A) It comprised non-judicial acts

B) It was taken without jurisdiction

C) It violated clearly established rights

D) It constituted administrative misconduct

## COUNT LXI - Judicial Dereliction of Duty

(Against Massachusetts State Actor Judicial Defendants)

609. Plaintiff incorporates by reference all preceding paragraphs.

610. The judicial defendants abandoned their duties by:

A) Failing to investigate known criminal conduct

B) Refusing to exercise due diligence

C) Ignoring evidence of fraud on court

D) Facilitating miscarriage of justice

E) Acting with deliberate indifference

611. This dereliction exceeded judicial immunity because:

A) It involved administrative functions

B) It comprised non-judicial acts

C) It corrupted judicial process

D) It violated clearly established rights

## COUNT LXII - Misprision of Felony Through Judicial Office

(Against Massachusetts State Actor Judicial Defendants)

612. Plaintiff incorporates by reference all preceding paragraphs.

613. The judicial defendants committed misprision by:

A) Concealing known felonious conduct

B) Failing to report criminal activity

C) Taking steps to prevent discovery

D) Acting with knowledge of crimes

E) Causing continuation of criminal scheme

614. This misconduct exceeded judicial immunity because:

A) It involved non-judicial acts

B) It facilitated criminal conduct

C) It violated clearly established duties

D) It comprised administrative functions

## COUNT LXIII - Deprivation of Rights Through Judicial Misconduct - § 1983

(Against Massachusetts State Actor Judicial Defendants)

615. Plaintiff incorporates by reference all preceding paragraphs.

616. The judicial defendants violated § 1983 by:

A) Acting under color of state law

B) Depriving constitutional rights

C) Engaging in non-judicial misconduct

D) Exceeding judicial authority

E) Causing constitutional injuries

617. These violations justify declaratory and injunctive relief because:

    A) They involve ongoing violations

    B) They exceed judicial immunity

    C) They violate federal rights

    D) They require prospective relief

## COUNT LXIV - Pattern of Judicial Misconduct

### (Against Massachusetts State Actor Judicial Defendants)

618. Plaintiff incorporates by reference all preceding paragraphs.

619. The judicial defendants engaged in pattern of misconduct through:

    A) Repeated due process violations

    B) Systematic denial of rights

    C) Coordinated deprivation of hearings

    D) Ongoing constitutional violations

    E) Causing cumulative injuries

620. This pattern exceeded judicial immunity because:

    A) It involved administrative acts

    B) It comprised non-judicial conduct

    C) It violated clearly established rights

    D) It corrupted judicial process

## COUNT LXV  Thirteenth Amendment violation - Involuntary Servitude

### (Against MSA)

621.  Plaintiff incorporates by reference all preceding paragraphs.

622. BORIM's regulations create unconstitutional involuntary servitude by:

    A) Mandating physician duties 24/7 in the non-clinical world

    B) Nullifying the contractual creation of the non-clinical world

    C) Forcing Plaintiff to practice medicine against his will in non-clinical world

    D) Forcing medical practice against contractual agreement

    E) Imposing mandatory work requirements in private spaces

F) Comprise mandatory conscription of Plaintiff against his will

G) Violates Plaintiff's free will and autonomy to practice medicine when and where he wants

**COUNT LXVI  Anti-Semitic Discrimination and Hate Crimes**
            (Against MIT-lab, MIT-police)

623.  Plaintiff incorporates by reference all preceding paragraphs.

624. Defendants engaged in discriminatory conduct through:

A) Targeted harassment based on Jewish Identity

B) Creation of hostile educational environment during Israel-Hamas conflict

C) Retaliatory actions for Plaintiff's filing a Title IX complaint

D) Coordinated discriminatory enforcement of anti-Semitic, sexually-harassing doctrines implemented by MIT Police Chief Craig Martin

E) History of Sexual Discrimination and Harassment during 10-year period of Plaintiff's employment as a Research Scientist in the laboratory of ChoKyun Rha

# PRAYER FOR RELIEF

The Plaintiff seeks the following relief from this Court

A) Declaratory Relief - Declaratory Judgments that BORIM regulations, actions and sanctions are unconstitutional

B) Injunctive Relief: Injunctive relief enjoining the enforcement of these unconstitutional regulations and actions;

C) Monetary Damages: (1) Compensatory for economic and emotional harms suffered by Plaintiff;
                        (2) Punitive damages to deter future constitutional violations by state actors

D) Any other relief this Court deems just and equitable

WHEREFORE, Plaintiff respectfully requests that this Honorable Court grant the following relief:

## A. Issue declaratory judgments:

1. Declaration that the 1992 Express Bilateral Contract is a valid, lawful and enforceable contract between two private parties which is protected by the Contract clause of the U.S. Constitution

2. Declaration that the BORIM regulations are unconstitutional as applied to the Plaintiff.

3. Declaration that the BORIM regulations and actions described herein are unconstitutional.

4. Declaration that BORIM's regulations, as applied to the Plaintiff, are unconstitutional because they:

    A) Violate Equal Protection

    B) Burden fundamental right to marry

    C) Violate right to privacy

    D) Impair obligation of contracts

    E) Violate right to gainful employment

5. Declaration that the relevant BORIM regulations concerning sexual relations or intimate activities between physicians and patients must be struck down as violating the U.S. Constitution

**6.** Declaration that all stipulations obtained through duress and extrinsic fraud are null and void.

7. Declaration that the Stipulations signed by the Plaintiff in the DALA proceedings under Magistrate Sarah Luick are null and void because they were obtained through coercion, duress and Extrinsic Fraud.

8. Declaration that the Defendants did cause Compensatory damages in excess of $6 million for the economic and emotional harms suffered by Plaintiff.

9. Declaration that the Plaintiff may seek Injunctive relief enjoining the enforcement of these unconstitutional regulations and actions as enunciated by the Supreme Court in *Ex Parte Young*.

10. Declaration that the Plaintiff is entitled to Punitive damages to deter future constitutional violations by state actors;

11. Declaration that the Massachusetts state actor defendants did engage in Judicial Misconduct, resulting in an egregious miscarriage of justice against the Plaintiff.

12. Declaration that for thirty years, defendants Colon, Wolfe and Spero intentionally concealed exculpatory evidence of the 1992 Express Bilateral Contract from multiple tribunals, comprising spoliation of evidence.

13. Declaration that through their concealment of the 1992 Contract, defendants Wolfe, Spero and Colon committed Spoliation of evidence.

14. Declaration that through their concealment of the 1992 Contract, defendants Wolfe, Spero and Colon committed Obstruction of justice.

15. Declaration that through their concealment of the 1992 Contract, defendants Wolfe, Spero and Colon committed Tampering with evidence

16. Declaration that through their concealment of the 1992 Contract, defendants committed Fraud upon the Court

17. Declaration that through their concealment of the 1992 Contract, defendants Wolfe, Spero and Colon committed Insurance fraud through fraudulent $150,000 settlement

18. Declaration that BORIM regulations violate multiple constitutional rights.

19. Declaration that BORIM regulations violate multiple constitutional rights including the Contract Clause protection of 1992 Agreement.

20. Declaration that BORIM regulations violate multiple constitutional rights including Equal Protection by discriminating based on marriage.

21. Declaration that BORIM regulations violate multiple constitutional rights including the Right to privacy under *Lawrence v. Texas.*

22.  Declaration that BORIM regulations violate multiple constitutional rights including its regulations burdening the Fundamental constitutional right to marry.

 23. Declaration that BORIM regulations violate multiple constitutional rights including the Plaintiff's constitutional Right to gainful employment.

24.  Declaration that BORIM regulations violate multiple constitutional rights including Protection against cruel and unusual punishment.

25. Declaration that BORIM sanctions Violate Eighth Amendment prohibition on cruel punishment

26. Declaration that BORIM sanctions Constitute excessive fines.

27. Declaration that BORIM sanctions Create unconstitutional employment barriers.

28. Declaration that BORIM sanctions Impose criminal punishment without authority.

29. Declaration that Magistrate Luick acted *ultra vires* in attempting to rescind the 1992 Contract, exceeding authority to override Contract Clause protections.

30. Declaration that state actor defendants denied Plaintiff's due process rights by Denying the Plaintiff a fair hearing at DALA.

31. Declaration that state actor defendants denied Plaintiff's due process rights by Preventing the Plaintiff's presentation of exculpatory evidence.

32. Declaration that state actor defendants denied Plaintiff's due process rights by Denying the Plaintiff's right to confront adverse witnesses.

33. Declaration that state actor defendants denied Plaintiff's due process rights by Refusing the Plaintiff an opportunity to be heard.

34. Declaration that state actor defendants denied Plaintiff's due process rights by Making determinations without substantial corroborating evidence.

35. Declaration that the DALA proceedings lacked fundamental due process because No hearing was provided on disputed material facts.

36. Declaration that the DALA proceedings lacked fundamental due process because Colon refused to testify

37. Declaration that proceedings lacked fundamental due process because Wolfe refused to testify.

38. Declaration that proceedings lacked fundamental due process because the Plaintiff had No opportunity to present the 1992 Express Bilateral contract evidence.

39. Declaration that proceedings lacked fundamental due process because No cross-examination was permitted for the Plaintiff.

40. Declaration that the 1992 Express Bilateral Contract Lawfully terminated doctor-patient relationship

41. Declaration that the 1992 Express Bilateral Contract Created valid clinical and non-clinical spaces.

42. Declaration that the 1992 Express Bilateral Contract Is protected by Contract Clause.

43. Declaration that the 1992 Express Bilateral Contract Pre-empts and Supercedes conflicting state regulations.

44. Declaration that the 1992 Express Bilateral Contract Exonerates Plaintiff of sexual misconduct claims.

45. Declaration that in the non-clinical world Plaintiff was not functioning as physician nor was the Plaintiff's status in the non-clinical world that of a physician.

46. Declaration that in the non-clinical world no doctor-patient relationship existed.

47. Declaration that in the non-clinical world, No fiduciary duties were owed by the Plaintiff.

48. Declaration that in the non-clinical world, the Medical ethics which applied in the clinical world, did not apply in the non-clinical world.

49. Declaration that in the non-clinical world, Intimate conduct was permissible, lawful and ethical.

50. Declaration that Dr. Wolfe committed malpractice by Concealing Colon's DID/MPD diagnosis.

51. Declaration that Dr. Wolfe committed malpractice by Failing to warn of psychological risks.

52. Declaration that Dr. Wolfe committed malpractice by Recommending termination despite known dangers.

53. Declaration that Dr. Wolfe committed malpractice by Encouraging relationship change despite vulnerabilities.

54. Declaration that Dr. Wolfe committed malpractice by Breaching the standard of care.

55. Declaration that the Massachusetts State actor defendants violated rights through the Denial of hearings.

56. Declaration that Massachusetts State actor defendants violated rights through Refusal to consider exculpatory evidence.

57. Declaration that Massachusetts State actor defendants violated rights through Failure to investigate fraud claims.

58. Declaration that Massachusetts State actor defendants violated rights through Ultra vires actions.

59. Declaration that Massachusetts State actor defendants violated rights through Arbitrary decision-making.

60. Declaration that MIT defendants Created hostile environment.

61. Declaration that MIT defendants Engaged in sexual discrimination and harassment.

62. Declaration that MIT defendants Discriminated based on sex.

63. Declaration that MIT defendants Retaliated against protected activity.

64. Declaration that MIT defendants Breached academic contracts.

65. Declaration that the BORIM's regulations on sexual activity between physicians and patients are unconstitutional.

66. Declaration that Defendant Colon was not Plaintiff's patient at the time of the alleged misconduct.

67. Declaration that the BORIM regulations and Massachusetts state law violate the Contract clause of the U.S Constitution.

68. Declaration that the BORIM regulations and Massachusetts state law violate Equal Protection of the Laws clause of the U.S. Constitution.

69. Declaration that the BORIM regulations and Massachusetts state law burden the Plaintiff's Fundamental constitutional liberty to marry.

70. Declaration that the BORIM regulations and Massachusetts state law impair the Plaintiff's fundamental constitutional liberty to contract.

71. Declaration that the BORIM regulations and Massachusetts state law violate the Plaintiff's fundamental constitutional right to privacy.

72. Declaration that the Massachusetts state actor defendants did deny the Plaintiff Due Process of Law during his judicial proceedings at DALA.

73. Declaration that the Massachusetts state actor defendants did deny the Plaintiff his constitutional right to confront and cross-examine the adverse witnesses against him.

74. Declaration that the Massachusetts state actor defendants did deny the Plaintiff his fundamental constitutional right to a Fair Hearing.

75. Declaration that the Massachusetts state actor defendants did deny the Plaintiff his fundamental constitutional right for an opportunity to be heard.

76. Declaration that the Massachusetts state actor defendants did deny the Plaintiff his fundamental constitutional right to Procedural Due Process while acting under the color of law in violation of 42 USC §1983.

77. Declaration that the MIT defendants engaged in sexual discrimination and sexual harassment in violation of Title IX of the Civil Rights Act.

78. Declaration that the MIT defendants engaged in sexual discrimination and sexual harassment in violation of Title VII of the Civil Rights Act.

79. Declaration that the Nagina Mangal engaged in sexual discrimination and sexual harassment in violation of Title IX of the Civil Rights Act.

80. Declaration that Ann Graybiel engaged in sexual discrimination and sexual harassment in violation of Title IX of the Civil Rights Act.

81. Declaration that The doctor-patient relationship is a contractual relationship at will, where either the doctor or the patient is free to terminate at any time without cause.

82. Declaration that Under the Supremacy clause of the U.S. Constitution, the Contracts clause of Article 1, Section 10, contracts between private parties are pre-eminent to and supercede any state law, statutes or state agency regulations, unless such state law satisfies the Strict Scrutiny standard whereby the state must prove a compelling state interest and show that the state law is most narrowly tailored to meet that interest.

83. Declaration that In September 1992, the doctor-patient relationship, between the Plaintiff and Lourdes Colon, was terminated by mutual agreement and was effected by an Express Bilateral Contract to terminate the doctor-patient relationship between the Plaintiff and Lourdes Colon, and this contract was conceived, formulated, drafted and dictated by Dr Lisa Wolfe (a licensed psychologist) while both the Plaintiff and Lourdes Colon wrote out the dictated contract by hand in ball-point pens, and each signed the other's handwritten contract, whereby the contract was formed and executed in a first-floor consultation room at the Arbour Human Resources Institute in Brookline, Massachusetts, in a medical consultation meeting which was attended by three (3) persons: Dr. Lisa Wolfe, the Plaintiff and defendant Lourdes Colon who were the only three percipient witnesses to the formation and execution of the Express Bilateral Contract terminating the doctor-patient relationship.

84. Declaration that This 1992 Express Bilateral Contract, which terminated the doctor-patient relationship, was material, relevant, essential, vital and exculpatory evidence for the fact-finder to make an accurate and truthful determination of the status of the relationship between the Plaintiff and defendant Lourdes Colon, and whether the Plaintiff was acting as Colon's doctor subsequent to the contractual termination of that relationship and whether the Plaintiff had any duties or obligations as her physician, legally or ethically.

85. Declaration that Only three (3) persons were percipient witnesses to the formation and execution of this 1992 Express Bilateral Contract terminating the doctor-patient relationship: the Plaintiff, defendant Lourdes Colon, and defendant Lisa Wolfe; documentary evidence exists showing (a) Dr Lisa Wolfe was on-duty in HRI on the day in questions, (b) Lourdes Colon was an inpatient at HRI on the day in question, (c) the Plaintiff signed in and registered as a Visitor to HRI on the day in question, (d) the termination meeting was previously discussed with medical director Robert Wesselhoeft, III, M.D. and BEMC administrative director Ruth Taylor, who both approved the Plaintiff's transition from his role as Colon's doctor.

86. Declaration that The 1992 termination contract was subsequently modified, by mutual agreement, to classify times and places into the clinical world and the nonclinical world; in the clinical world the Plaintiff acted and functioned as a physician to Lourdes Colon providing limited medical treatment, and in the nonclinical world the Plaintiff was not a physician and did not provide any treatment to Lourdes Colon and had no fiduciary duty.

87. Declaration that Contracts which classify times and places for a professional to deliver services to select clients are lawful and enforceable.

88. Declaration that The Plaintiff's 1992 Express Bilateral termination contract, which classifies times and places into the clinical world and the nonclinical world, is a valid, lawful and enforceable contract between two private parties which is protected by the Contract clause of Article 1, Section 10 of the U. S. Constitution.

89. Declaration that Through her concealment of the 1992 Express Bilateral Contract terminating the doctor-patient relationship, Lourdes Colon did commit: spoliation of exculpatory evidence; obstruction of justice, tampering with evidence, interference with the fair administration of the law; fraudulent concealment of exculpatory evidence; falsification of business records; insurance fraud; suppression of exculpatory evidence; fraud upon the Court; creating a false judicial record; violation of the Plaintiff's civil rights in violation of 42 U.S.C. § 1983.

90. Declaration that Had the 1992 Express Bilateral Contract terminating the doctor-patient relationship never been formed or executed, then the actions and conduct of the State actor defendants culminating with the revocation of the Plaintiff's medical license might have been reasonable and lawful, but not one of the State actor defendants acknowledged or made any declaration concerning the termination contract and not one of the State actor defendants calculated or adjusted their conclusions and final judgments to account for the 1992 termination of the doctor-patient relationship thus rendering those proceedings to be dubious because an essential and material fact concerning the doctor-patient relationship was ignored or unknown in the genuine issues of material fact essential for the adjudication and abrogating the fairness and justice of their final conclusions of law.

91. Declaration that In 1988, the Board of Registration in Medicine issued two (2) medical licenses to the Plaintiff, but only one of these medical licenses, License No. 60232, was revoked in 2002.

92. Declaration that On or about 1995 - 1996, there was a medical appointment at Dr. Lisa Wolfe's Lexington, Massachusetts office with the attendance of the Plaintiff, Lourdes Colon and Dr. Lisa Wolfe, at which Dr. Wolfe informed the Plaintiff that she was treating both the Plaintiff and Lourdes Colon as part of couples therapy because of the sexual relationship between the Plaintiff and Colon.

93. Declaration that At this Lexington, MA appointment, Dr. Wolfe also informed the Plaintiff that if Colon's health insurance did not cover the couples therapy, then Dr. Wolfe expected that the Plaintiff would make payments for the couples therapy.

94. Declaration that During this couples session in Lexington, MA, Dr. Wolfe asked the Plaintiff to engage in dialogue with Colon about their ongoing relationship, and this confidential information about the couples therapy was disclosed to third persons without the consent or permission of the Plaintiff.

95. Declaration that In 1992 at the time of the formation and execution of the Express Bilateral Contract, which terminated the doctor-patient relationship under the guidance and supervision of Dr. Lisa Wolfe, the Plaintiff had no knowledge of Colon's diagnosis of DID/MPD and Dr. Wolfe did not share the details of her treatment of Colon nor did she share her diagnosis of DID/MPD in Colon.

96. Declaration that In 1997, the Plaintiff had prepared a Demand Letter under M.G.L. c.93A against Dr. Wolfe for the unfair and deceptive trade practices which Dr. Wolfe had perpetrated and had also sent a copy of this Demand Letter via emails to the Board of Registration in Psychology, the Massachusetts District Attorney's office and the Office of the Attorney General.

97. Declaration that Early during the DALA adjudicatory proceedings which transpired between 1997 - 2002, the Plaintiff's counsel John Flym informed that Plaintiff that BORIM was requesting that the Plaintiff waive the claims and allegations against Wolfe in the 93A Demand Letter in order for Wolfe to communicate more freely with BORIM about the facts and circumstances of this case.

98. Declaration that Complying with John Flym's request, the Plaintiff drafted a Waiver in 1997 or 1998, which allegedly comprised a monetary settlement of those claims and the settlement amount was one dollar ($1.00) and the Plaintiff signed this settlement of his claims against Wolfe in consideration of the one dollar, but the validity of this settlement agreement is compromised by the Extrinsic Fraud committed by Wolfe, Spero and Colon.

99. Declaration that The settlement in 1997 or 1998 for the claims against Lisa Wolfe only settled the claims which had arisen during the years before the settlement agreement was signed; during the ensuing years, Dr. Wolfe proximately caused multiple injuries and harms to the Plaintiff following the settlement agreement.

100. Declaration that The harms and injuries caused by Dr. Wolfe following the settlement agreement include: [1] silence on the matter of the 1992 Express Bilateral Contract between the Plaintiff and Colon, [2] omission and silence on her role in conceiving, formulating, drafting and dictating the 1992 termination contract, [3] omission of her role as the treating psychologist for the couples therapy sessions in Lexington, MA; this silence and omissions by Dr. Wolfe comprised spoliation of exculpatory evidence of the 1992 Express Bilateral Contract which Wolfe conceived, formulated, drafted and dictated, thus comprising Extrinsic Fraud and Fraud on the Court.

101. Declaration that Through her concealment of the 1992 Express Bilateral Contract terminating the doctor-patient relationship, Lisa Wolfe did commit: spoliation of exculpatory evidence; obstruction of justice, tampering with evidence, interference with the fair administration of the law; fraudulent concealment of exculpatory evidence; falsification of business records; insurance fraud; suppression of exculpatory evidence; fraud upon the Court; creating a false judicial record; violation of the Plaintiff's civil rights in violation of 42 U.S.C. § 1983.

102. Declaration that Plaintiff's counsel John Flym and BORIM counsel Alice Oliff did draft joint Stipulations of Fact in 2001 which was submitted to Magistrate Sarah Luick as part of the DALA adjudicatory proceedings

103. Declaration that Joint Stipulations only address the undisputed issues of fact and, by their very nature, CAN NEVER resolve disputed issues of fact which usually require a trial or hearing with testimony and evidence produced to help resolve those disputed issues of fact; denying the Plaintiff his fundamental constitutional right to Due Process of Law with a fair hearing for both parties to present their testimony and evidence, the State actor defendants refused to grant the Plaintiff a fair hearing or trial on these disputed issues of fact because Colon refused to testify and Wolfe likewise would not testify under oath.

104. Declaration that BORIM counsel Alice Oliff purposefully and intentionally refused to draft a joint stipulation about the 1992 Express Bilateral Contract which terminated the doctor-patient relationship.

105. Declaration that The 2001 joint stipulations, agreed to by Plaintiff's counsel John Flym and BORIM counsel Alice Oliff, did not have a single statement nor word describing the termination of the doctor-patient relationship in 1992 by an Express Bilateral Contract drafted and dictated by Dr. Lisa Wolfe.

106. Declaration that the 2001 Stipulations were signed under Coercion, Duress and Extrinsic Fraud, while BORIM and the Massachusetts state actor defendants "were holding a gun to the head of the Plaintiff figuratively" and "were offering the Plaintiff - to sign the Stipulations, analogous to confessing to being a witch, or be burned alive at the stake."

106. Declaration that Through his concealment of the 1992 Express Bilateral Contract terminating the doctor-patient relationship, Stanley Spero did commit: spoliation of exculpatory evidence; obstruction of justice, tampering with evidence, interference with the fair administration of the law; fraudulent concealment of exculpatory evidence; falsification of business records; insurance fraud; suppression of exculpatory evidence; fraud upon the Court; creating a false judicial record; violation of the Plaintiff's civil rights in violation of 42 U.S.C. § 1983.

107. Declaration that Martin Crane, then-Chairman of the Massachusetts Board of Registration in Medicine, *in both his official capacity and his personal capacity,* did violate the Plaintiff's' right to procedural Due Process by denying the Plaintiff the right to a Fair Trial and the opportunity to be heard.

108. Declaration that Martin Crane, then-Chairman of the Massachusetts Board of Registration in Medicine, *in both his official capacity and his personal capacity,* did violate the Plaintiff''s right to procedural Due Process by denying the Plaintiff the right to confront adverse witnesses against him for cross-examination, also thereby violating the Fourth and Fifth Amendments which are selectively incorporated to the States via the Fourteenth Amendment.

109. Declaration that Martin Crane, then-Chairman of the Massachusetts Board of Registration in Medicine, *in both his official capacity and his personal capacity,* did violate the Plaintiff's' right to procedural Due Process by denying the Plaintiff the right to present exculpatory evidence which would have exonerated the Plaintiff.

110. Declaration that Martin Crane, then-Chairman of the Massachusetts Board of Registration in Medicine, *in both his official capacity and his personal capacity,* did violate the Plaintiff's' right to procedural Due Process by denying the Plaintiff the right to rebut false or misleading testimony and/or evidence.

111. Declaration that Hon. Sarah Luick, Magistrate in the Division of Administrative Law Appeals, *in both her official capacity and his personal capacity,* did violate the Plaintiff's' right to procedural Due Process by denying the Plaintiff the right to a Fair Trial and the opportunity to be heard.

112. Declaration that Hon. Sarah Luick, Magistrate in the Division of Administrative Law Appeals, *in both her official capacity and his personal capacity,* did violate the Plaintiff''s right to procedural Due Process by denying the Plaintiff the right to confront adverse witnesses against him for cross-examination, also thereby violating the Fourth and Fifth Amendments which are selectively incorporated to the States via the Fourteenth Amendment.

113. Declaration that Hon. Sarah Luick, Magistrate in the Division of Administrative Law Appeals, *in both her official capacity and his personal capacity,* did violate the Plaintiff's' right to procedural Due Process by denying the Plaintiff the right to present exculpatory evidence which would have exonerated the Plaintiff.

114. Declaration that Hon. Sarah Luick, Magistrate in the Division of Administrative Law Appeals, *in both her official capacity and his personal capacity,* did violate the Plaintiff's' right to procedural Due Process by denying the Plaintiff the right to rebut false or misleading testimony and/or evidence.

115. Declaration that Hon. Christopher Connolly, then-Chief Administrative Magistrate in the Division of Administrative Law Appeals, *in both her official capacity and his personal capacity,* did violate the Plaintiff's' right to procedural Due Process by denying the Plaintiff the right to a Fair Trial and the opportunity to be heard.

116. Declaration that Hon. Christopher Connolly, then-Chief Administrative Magistrate in the Division of Administrative Law Appeals, *in both her official capacity and his personal capacity,* did violate the Plaintiff's right to procedural Due Process by denying the Plaintiff the right to confront adverse witnesses against him for cross-examination, also thereby violating the Fourth and Fifth Amendments which are selectively incorporated to the States via the Fourteenth Amendment.

117. Declaration that Hon. Christopher Connolly, then-Chief Administrative Magistrate in the Division of Administrative Law Appeals, *in both her official capacity and his personal capacity,* did violate the Plaintiff's' right to procedural Due Process by denying the Plaintiff the right to present exculpatory evidence which would have exonerated the Plaintiff.

118. Declaration that Hon. Christopher Connolly, then-Chief Administrative Magistrate in the Division of Administrative Law Appeals, *in both her official capacity and his personal capacity,* did violate the Plaintiff's' right to procedural Due Process by denying the Plaintiff the right to rebut false or misleading testimony and/or evidence.

119. Declaration that Hon. Margart Walsh, then-Chief Justice of the Massachusetts Supreme Judicial Court, *in both her official capacity and his personal capacity,* did violate the Plaintiff's' right to procedural Due Process by denying the Plaintiff the right to a Fair Trial and the opportunity to be heard.

120. Declaration that Hon. Margart Walsh, then-Chief Justice of the Massachusetts Supreme Judicial Court,, *in both her official capacity and his personal capacity,* did violate the Plaintiff's' right to procedural Due Process by denying the Plaintiff the right to confront adverse witnesses against him for cross-examination, also thereby violating the Fourth and Fifth Amendments which are selectively incorporated to the States via the Fourteenth Amendment.

121. Declaration that Hon. Margart Walsh, then-Chief Justice of the Massachusetts Supreme Judicial Court,, *in both her official capacity and his personal capacity,* did violate the Plaintiff's' right to procedural Due Process by denying the Plaintiff the right to present exculpatory evidence which would have exonerated the Plaintiff.

122. Declaration that Hon. Margart Walsh, then-Chief Justice of the Massachusetts Supreme Judicial Court,, *in both her official capacity and his personal capacity,* did violate the Plaintiff's' right to procedural Due Process by denying the Plaintiff the right to rebut false or misleading testimony and/or evidence.

123. Declaration that Thomas Reilly, then-Attorney General of the Commonwealth of Massachusetts, *in both his official capacity and his personal capacity,* did violate the Plaintiff's' right to procedural Due Process by denying the Plaintiff : (a) the right to a Fair Trial and the opportunity to be heard; (b) the right to confront adverse witnesses against him for cross-examination, also thereby violating the Fourth and Fifth Amendments which are selectively incorporated to the States via the Fourteenth Amendment; (c) the right to present exculpatory evidence which would have exonerated the Plaintiff; and (d) the right to rebut false or misleading testimony and/or evidence.

124.  Declaration that The precedent of Korper v. Weinstein, 57 Mass. App. Ct. 433, 783 N.E.2d 877 (2003) informs us that sexual relations between a physician and her/his patient, without more, does not comprise sexual misconduct nor medical malpractice; the situation is different if the physician were a psychiatrist or psychotherapist or had deceived the patient into believing that the sexual relations were a form of medical treatment.

125.  Declaration that Even in the absence of the 1992 termination contract, since the Plaintiff has never trained in nor held himself out to be a psychiatrist or psychotherapist nor deceived Lourdes Colon into believing that the sexual relations were any type of medical treatment, the Plaintiff did not commit any type of medical malpractice nor any type of sexual misconduct when he engage in sexual relations with Lourdes Colon in the nonclinical world. ( *Korper v. Weinstein*, 2003).

126.  Declaration that There has never been any findings of fact showing that the Plaintiff acted as or functioned as the psychiatrist or psychotherapist to Lourdes Colon, nor any stipulations to that effect.

127.  Declaration that The Expert Witness James Beck did not have access to all the relevant information, such as the 1992 Express Bilateral Contract which terminated the doctor-patient relationship, because defendants Colon, Wolfe and Spero engaged in spoliation of that exculpatory evidence, and the reasonable person would easily believe that Dr. Beck's Expert Opinion would have changed substantially had he known of the termination of the doctor-patient relationship; thus the Expert Opinion of Dr. Beck is severely compromised and invalid for purposes of convicting the Plaintiff of any type of medical malpractice or sexual misconduct in light of the spoliation of exculpatory evidence.

128.  Declaration that The Plaintiff has never engaged in any type of medical malpractice or sexual misconduct with Lourdes Colon because sexual relations only took place in the nonclinical world where the Plaintiff was not her doctor as defined by the 1992 termination contract, and Magistrate Sarah Luick did make a factual finding that all the medications prescribed by the Plaintiff were appropriate for her medical care and all the medical treatment provide to Lourdes Colon was appropriate for her medical care.

129.  Declaration that This case is a case of FIRST IMPRESSION because since the founding of the Republic in 1776, there has been no precedent in any of the fifty (50) states of the union where: (a) the doctor-patient relationship was terminated, (b) and it was terminated by an Express Bilateral Contract which was memorialized in the handwriting of the Plaintiff and Colon, (c) and the termination contract had been conceived, formulated, drafted and dictated by the patient's psychologist Dr. Lisa Wolfe, (d) the psychologist Dr. Wolfe oversaw, supervised and guided the termination of the doctor-patient relationship, and (e) the termination contract classified times and locations into the clinical world, where the doctor acted as the patient's clinician, and the nonclinical world, where the physician had no obligations nor duties because he was not a physician in those places and times.

130. Declaration that Given the circumstances and facts about the termination of the doctor-patient relationship in 1992, there have been no BORIM regulations nor any state statutes which cover this unique relationship.

131. Declaration that The rescision of the 1992 Express Bilateral Contract by Magistrate Sarah Luick in 2002 was unconstitutional state action, whereby Magistrate Luick was acting *ultra vires,* whereby the judiciary was attempting to pre-empt and supercede the Contract clause of the U.S. Constitution.

132. Declaration that Magistrate Sarah Luick was acting *ultra vires* and without the authority to pre-empt and supercede the Contract clause of the U.S. Constitution.

133. Declaration that The BORIM punishment of the Plaintiff via the revocation of his medical license comprised criminal punisment, for which the BORIM lacks authority, and was effected without Due Process of Law or any of the usual protections of the Fourth and Fifth Amendments, as selective incorporated to the States via the Fourteenth Amendment.

134. Declaration that Given the facts that: (a) BORIM knew about the Plaintiff's sexual relations with Lourdes Colon since 1997 and did not take any action for those five (5) years during which the Plaintiff had approximately 40,000 patient visits, (b) BORIM offered the Plaintiff a voluntary one-year suspension of his license in or about 1998, all point to the conclusion that BORIM was not exercising its police powers to protect the health, safety and welfare of the people, but was really imposing a criminal punishment on the Plaintiff - which would have comprised criminal punishment *ex post facto* and BORIM's attempted rescision of the 1992 termination contract was also tantamount to the creation of a *Bill of Attainder*.

135. Declaration that In the nonclinical world the Plaintiff did not hold himself out to be a physician, did not meet with patients, did not provide medical treatment, and was not known to others as a physician, and did not owe any fiduciary duty to any person because the Plaintiff was not a physician in the nonclinical world.

136. Declaration that The Plaintiff's termination contract is protected by the contracts clause of Article 1, Section 10 of the U.S. Constitution, and is pre-eminent and supercedes state law and regulations, which are subject to judicial review under the Strict Scrutiny standard when those state laws or regulations regulate the fundamental liberty to contract.

137. Declaration that BORIM's regulations concerning sexual relations between physicians and their patients violate the Equal Protection clause of the U.S. Constitution because those regulations discriminate among physicians based on the fundamental constitutional right of marriage; BORIM only disciplines those physicians who do not marry their patients; these regulations place an undue burden on that fundamental constitutional right to marry; in effect, the regulations give physicians only one choice - "Either marry your patient or lose your license"; as such these BORIM regulations which place an undue burden on the fundamental right to marry must be judicially reviewed under the Strict Scrutiny standard.

138. Declaration that The state actor defendants all have acted unconstitutionally by impairing the obligation of contract as declared in Article I, Section 10 of the U.S. Constitution or by judicially endorsing or facilitating that impairment of the obligation of contract by the state agencies involved; the Plaintiff's 1992 Express Bilateral Contract which terminated the doctor-patient relationship and created clinical and nonclinical worlds is protected by the Contract clause and as such pre-empts and supercedes any state statutes or regulations, unless the State can meet the judicial analysis by the Strict Scrutiny standard.

139. Declaration that BORIM sanctions violate the Plaintiff's constitutional right to engage in gainful employment.

140. Declaration that BORIM sanctions violate the Eighth Amendment's prohibition against Cruel and Unusual Punishment

141. Declaration that BORIM sanctions violate the Eighth Amendment's prohibition against excessive fines.

142. Declaration that The state actor defendants all have acted unconstitutionally by enforcing BORIM regulations which violate the Equal Protection clause and place an undue burden on the fundamental constitutional right to marry through the discriminatory regulations of BORIM which differentiate between the married physicians and the unmarried physicians; interference with or impairment of a fundamental constitutional right by the State requires judicial analysis by the Strict Scrutiny standard.

143. Declaration that The state actor defendants all have acted unconstitutionally by placing an undue burden on the fundamental constitutional right to marry through the discriminatory regulations of BORIM which differentiate between the married physicians and the unmarried physicians; interference with or impairment of a fundamental constitutional right by the State requires judicial analysis by the Strict Scrutiny standard.

144. Declaration that The state actor defendants all have unconstitutionally invaded the Plaintiff's fundamental constitutional right to privacy; the Supreme Court precedent of *Lawrence v. Texas*, 539 U.S. 558 (2003) informs us that the State may not regulate nor sanction the private activities of its citizens when they engage in such conduct or activity within the privacy of their home or other private areas; when the Plaintiff met with Colon in the nonclinical world, it took place in private areas not accessible to the public where the Plaintiff had a reasonable expectation of privacy against government intrusion; interference with or impairment of such a fundamental constitutional right as the Plaintiff's right to privacy without intrusion of the government by the State requires judicial analysis by the Strict Scrutiny standard.

145. Declaration that Nagina Mangal did commit the tort of defamation against the Plaintiff.

146. Declaration that Nagina Mangal did commit the tort of slander against the Plaintiff.

147. Declaration that Nagina Mangal did commit the tort of libel against the Plaintiff.

148. Declaration that Nagina Mangal did commit the tort of intentional infliction of severe emotional distress against the Plaintiff.

149. Declaration that Nagina Mangal did commit the tort of invasion of the Plaintiff's right to privacy.

150. Declaration that Nagina Mangal did engage in discussions and conversations about the Plaintiff's past sexual experiences, sexual behavior, and sexual conduct with members of the Graybiel lab which caused a hostile learning environment while the Plaintff was a Visiting Student during 2022-2023, which comprised sexual harassment in violation of the Plaintiff's rights under Title IX of the Civil rights Act; this hostile learning environment resulted in Graybiel ejecting the Plaintiff from the lab, breaching her academic contract with the Plaintiff and caused substantial harms and injuries to the Plaintiff's academic PhD doctoral research disrupting his learning program.

151. Declaration that Nagina Mangal did engage in discussions and conversations about the Plaintiff's past sexual experiences, sexual behavior, and sexual conduct with members of the Graybiel lab which caused a hostile learning environment while the Plaintff was a Visiting Student during 2022-2023, which comprised sexual discriminatioin in violation of the Plaintiff's rights under Title IX of the Civil Rights Act; this hostile learning environment resulted in Graybiel ejecting the Plaintiff from the lab, breaching her academic contract with the Plaintiff and caused substantial harms and injuries to the Plaintiff's academic PhD doctoral research disrupting his learning program.

152. Declaration that Ann Graybiel did commit the tort of defamation against the Plaintiff.

153. Declaration that Ann Graybiel did commit the tort of slander against the Plaintiff.

154. Declaration that Ann Graybiel did commit the tort of libel against the Plaintiff.

155. Declaration that Ann Graybiel did commit the tort of intentional infliction of severe emotional distress against the Plaintiff.

156. Declaration that Ann Graybiel did commit the tort of invasion of the Plaintiff's right to privacy.

157. Declaration that Ann Graybiel did engage in discussions and conversations about the Plaintiff's past sexual experiences, sexual behavior, and sexual conduct with members of the Graybiel lab which caused a hostile learning environment while the Plaintff was a Visiting Student during 2022-2023, which comprised sexual harassment in violation of the Plaintiff's rights under Title IX of the Civil Rights Act; this hostile learning environment resulted in Graybiel ejecting the Plaintiff from the lab, breaching her academic contract with the Plaintiff and caused substantial harms and injuries to the Plaintiff's academic PhD doctoral research disrupting his learning program.

158. Declaration that Ann Graybiel did engage in discussions and conversations about the Plaintiff's past sexual experiences, sexual behavior, and sexual conduct with members of the Graybiel lab which caused a hostile learning environment while the Plaintff was a Visiting Student during 2022-2023, which comprised sexual discriminatioin in violation of the Plaintiff's rights under Title IX of the Civil Rights Act; this hostile learning environment resulted in Graybiel ejecting the Plaintiff from the lab, breaching her academic contract with the Plaintiff and caused substantial harms and injuries to the Plaintiff's academic PhD doctoral research disrupting his learning program.

159. Declaration that MIT did facilitate the tort of defamation against the Plaintiff.

160. Declaration that MIT did facilitate the tort of slander against the Plaintiff.

161. Declaration that MIT did facilitate the tort of libel against the Plaintiff.

162. Declaration that MIT did commit the tort of intentional infliction of severe emotional distress against the Plaintiff.

163. Declaration that MIT did commit the tort of invasion of the Plaintiff's right to privacy.

164. Declaration that MIT did engage in discussions and conversations about the Plaintiff's past sexual experiences, sexual behavior, and sexual conduct with members of the Graybiel lab which caused a hostile learning environment while the Plaintff was a Visiting Student during 2022-2023, which comprised sexual harassment in violation of the Plaintiff's rights under Title IX of the Civil Rights Act; this hostile learning environment resulted in Graybiel ejecting the Plaintiff from the lab, breaching her academic contract with the Plaintiff and caused substantial harms and injuries to the Plaintiff's academic PhD doctoral research disrupting his learning program.

165. Declaration that MIT did engage in and facilitate discussions and conversations about the Plaintiff's past

sexual experiences, sexual behavior, and sexual conduct with members of the Graybiel lab which caused a hostile learning environment while the Plaintff was a Visiting Student during 2022-2023, which comprised sexual discriminatioin in violation of the Plaintiff's rights under Title IX of the Civil Rights Act; this hostile learning environment resulted in Graybiel ejecting the Plaintiff from the lab, breaching her academic contract with the Plaintiff and caused substantial harms and injuries to the Plaintiff's academic PhD doctoral research disrupting his learning program.

166. Declaration that MIT did engage in discussions and conversations about the Plaintiff's past sexual experiences, sexual behavior, and sexual conduct when the Plaintiff was working as a Research Scientist in the lab of ChoKyun Rha and forcibly removed the Plaintiff from several academic projects and committees which were a significant part of his academic career, which comprised sexual harassment in violation of the Plaintiff's rights under Title VII of the Civil Rights Act; this caused substantial harms and injuries to the Plaintiff's academic career.

167. Declaration that MIT did engage in discussions and conversations about the Plaintiff's past sexual experiences, sexual behavior, and sexual conduct when the Plaintiff was working as a Research Scientist in the lab of ChoKyun Rha and forcibly removed the Plaintiff from several academic projects and committees which were a significant part of his academic career, which comprised sexual discrimination in violation of the Plaintiff's rights under Title VII of the Civil Rights Act; this caused substantial harms and injuries to the Plaintiff's academic career.

168. Declaration that Nagina Mangal's actions and conduct did cause deprivation of the Plaintiff's civil rights and civil liberties in violation of the Plaintiff's rights under 42 U.S.C. § 1983.

169. Declaration that Ann Graybiel's actions and conduct did cause deprivation of the Plaintiff's civil rights and civil liberties in violation of the Plaintiff's rights under 42 U.S.C. § 1983.

170. Declaration that MIT's actions and conduct did cause deprivation of the Plaintiff's civil rights and civil liberties in violation of the Plaintiff's rights under 42 U.S.C. § 1983.

171. Declaration that Nagina Mangal did tortiously interfere with the Plaintiff's academic contract with MIT and the Graybiel lab as a Visiting Student during 2022 - 2023, resulting in the breach of the contract, its early termination and disruption of the Plaintiff's academic career.

172. Declaration that Ann Graybiel did tortiously interfere with the Plaintiff's academic contract with MIT and the Graybiel lab as a Visiting Student during 2022 - 2023, resulting in the breach of the contract, its early termination and disruption of the Plaintiff's academic career.

173. Declaration that MIT did tortiously interfere with the Plaintiff's academic contract with MIT and the Graybiel lab as a Visiting Student during 2022 - 2023, resulting in the breach of the contract, its early termination and disruption of the Plaintiff's academic career.

174. Declaration that All the MIT Campus police defendants did violate the Plaintiff's Fourth Amendment rights against unreasonable search and seizure.

175. Declaration that All the MIT Campus police defendants did unlawfully and tortiously falsely imprison or facilitate the imprisonment of the Plaintiff

176. Declaration that All the MIT Campus police defendants did facilitate the unlawful arrest of the Plaintiff by the Cambridge Police.

177. Declaration that The Cambridge Police, the Cambridge Police Department and the City of Cambridge all unlawfully and unconstitutionally participated in the unconstitutional violation of the Plaintiff's Fourth Amendment rights against unreasonable search and seizure without probable cause.

178. Declaration that Dr. Lisa Wolfe did commit gross negligence in her guidance, advice, formulation, dictation, formation and execution of the 1992 Express Bilateral Contract without warning the Plaintiff of Colon's severe psychological problems, including Dissociative Identity Disorder with Multiple Personality, when Expert Opinion strongly advises against and warns of such terminations of the doctor-patient relationship, which resulted in harms and injuries to the Plaintiff and to Lourdes Colon.

179. Declaration that Dr. Lisa Wolfe did commit medical malpractice in her guidance, advice, formulation, dictation, formation and execution of the 1992 Express Bilateral Contract without warning the Plaintiff of Colon's severe psychological problems, including Dissociative Identity Disorder with Multiple Personality, when Expert Opinion strongly advises against and warns of such terminations of the doctor-patient relationship, which resulted in harms and injuries to the Plaintiff and to Lourdes Colon.

180. Declaration that Dr. Lisa Wolfe did commit gross medical misconduct in her guidance, advice, formulation, dictation, formation and execution of the 1992 Express Bilateral Contract without warning the Plaintiff of Colon's severe psychological problems, including Dissociative Identity Disorder with Multiple Personality, when Expert Opinion strongly advises against and warns of such terminations of the doctor-patient relationship, which resulted in harms and injuries to the Plaintiff and to Lourdes Colon.

181. Declaration that Spero and Jorgensson LLP have vicarious liability for the torts and crimes committed by its partner Stanley Spero under the doctrine of *Respondeat superior*.

182. Declaration that Human Resources Institute and its Director Krishnaswamy Gajaraj have vicarious liability for the torts and crimes committed by its Dr. Lisa Wolfe as a member of the medical staff under the doctrine of *Respondeat superior*.

183. Declaration that Vincent DiCianni did commit legal malpractice and ineffective assistance of counsel which caused substantial harms and injuries to the Plaintiff and these actions and/or omissions did deprive the Plaintiff of his civil rights, such as a fair Hearing, while DiCianni was acting under the color of state law in violation of 42 U.S.C. § 1983.

184. Declaration that Claudia Hunter did commit legal malpractice and ineffective assistance of counsel which caused substantial harms and injuries to the Plaintiff and these actions and/or omissions did deprive the Plaintiff of his civil rights, such as a fair Hearing, while Hunter was acting under the color of state law in violation of 42 U.S.C. § 1983, while Hunter did not disclose the conflict of interest between the Plaintiff and ProMutual Medical Malpractice insurer, denying the Plaintiff of his right to a trial to disclose the 1992 contract.

185. Declaration that Robert Stolzberg did commit legal malpractice and ineffective assistance of counsel which caused substantial harms and injuries to the Plaintiff and these actions and/or omissions did deprive the Plaintiff of his civil rights, such as a fair Hearing, while Stolzberg was acting under the color of state law in violation of 42 U.S.C. § 1983, while Stolzberg did not disclose the conflict of interest between the Plaintiff and his concurrent representation of Robert Wesselhoeft and the Boston Evening Medical Center, which substantially led to the denial of the Plaintiff's right to a trial to disclose the 1992 contract.

186. Declaration that ProMutual Medical Insurance company has vicarious liability for the torts committed by Claudia Hunter and failure to warn the Plaintiff of its conflict of interest in settling the suit *Colon v. Weinberg, Wesselhoeft, III, and Boston Evening Medical Center.*

187. Declaration that James Beck did commit gross negligence as an Expert Witness because of his failure to investigate the 1992 Express Bilateral Contract by which he would have learned that the doctor-patient relationship was terminated, which severely compromised his Expert Witness opinion rendering it invalid, null and void.

188. Declaration that James Beck did commit medical malpractice as an Expert Witness because of his failure to investigate the 1992 Express Bilateral Contract by which he would have learned that the doctor-patient relationship was terminated, which severely compromised his Expert Witness opinion rendering it invalid, null and void.

189. Declaration that James Beck did commit medical misconduct as an Expert Witness because of his failure to investigate the 1992 Express Bilateral Contract by which he would have learned that the doctor-patient relationship was terminated, which severely compromised his Expert Witness opinion rendering it invalid, null and void.

190. Declaration that Dr. Lisa Wolfe's medical records corroborate Lourdes Colon having a diagnosis of Dissociative Identity Disorder ("DID"); Multiple Personality Disorder ("MPD") is a clinical variant of Dissociative Identity Disorder.

191. Declaration that Due to the effects of MPD on fragmentation of the psyche with splitting into multiple alter-egos, the memories and perceptions of a person suffering from MPD are often distorted and unreliable and often do not correspond to reality or to the perceptions of third persons; these memories often reveal blacked-out periods of time lasting days to weeks when a separate alter-ego has taken possession of the psyche

192. Declaration that There is a split among the various state and federal jurisdictions on whether criminal liability can be assigned to the alter-egos of MPD; some precedents find the alter-egos to be criminally liable whereas other jurisdictions find the alter-egos to be "not guilty" because of "criminal insanity" and the alter-egos do not know the difference between "right" from "wrong" among the disparate perceptions and memories of the separate alter-egos during blacked-out periods of time.

193. Declaration that This 1992 Express Bilateral Contract terminating the doctor-patient relationship is relevant, material, vital and essential evidence which exonerates the Plaintiff of any wrongdoing, legally or ethically, and absolves the Plaintiff of any allegations of sexual misconduct, and proves that the Plaintiff was wrongfully deprived of his civil rights and civil liberties when BORIM revoked his medical license on the false basis and belief that the Plaintiff owed defendant Lourdes Colon any duties or obligations following the proper and lawful termination of the doctor-patient relationship on the basis of an express bilateral contract

which is constitutionally protected by the *contracts clause* of the U.S. Constitution.

194. Declaration that The 1992 Express Bilateral Contract which terminated the doctor-patient relationship exonerates the Plaintiff of all wrongdoing.

195. Declaration that For thirty (30) years, defendants Lourdes Colon, Lisa Wolfe and Stanley Spero did intentionally, purposefully and willfully conceal the relevant, material and esculpatory evidence of the 1992 Express Bilateral Contract terminating the doctor-patient relationship from multiple tribunals and Courts of law including: Massachusetts Middlesex Superior Court, Massachusetts Suffolk Superior Court, the Massachusetts Division of Administrative Law Appeals, the Massachusetts Board of Registration in Medicine, the Massachusetts Supreme Judicial Court, the Maine Board of Bar Overseers, and the Maine Supreme Judicial Court; this intentional concealment of esculpatory evidence by these three defendants comprised the crime of spoliation of evidence which was a grave injustice to the Plaintiff and proximately caused substantial economic and non-economic injuries to the Plaintiff amounting to over $6,000,000.00 (Six million US dollars) ruination of the Plaintiff's reputation which continued to cause substantial losses of economic opportunities and jobs up to 2024, bankruptcy, divorce, and destroyed the life and world of the Plaintiff.

196. Declaration that Through her conspiratorial concealment of the exculpatory evidence of the 1992 memorialized handwritten Express Bilateral Contract terminating the doctor-patient relationship, Lourdes Colon did commit the evidentiary crimes of: (a) spoliation of evidence, (b) obstruction of justice, (c) interfering with the fair administration of the law, (d) tampering with evidence, (e) fraudulent concealment of evidence, (f) falsification of business records, (g) falsification of official state judicial records, (h) filing a false insurance claim, (i) insurance fraud, (j) perjury, (k) bribery of a witness, (l) judicial misconduct, (m) malicious prosecution, (n) witness coaching, (o) fabricating evidence, (p) subornation of perjury, (q) suppression of evidence, (r) mocking the court, (s) impeding service of process, (t) creating a false judicial record in a court of law, and (u) deprivation of the Plaintiff's civil rights and civil liberties while acting under the color of law in violation of 42 U.S.C. 1983.

197. Declaration that Through her conspiratorial concealment of the exculpatory evidence of the 1992 memorialized handwritten Express Bilateral Contract terminating the doctor-patient relationship, Lisa Wolfe did commit the evidentiary crimes of: (a) spoliation of evidence, (b) obstruction of justice, (c) interfering with the fair administration of the law, (d) tampering with evidence, (e) fraudulent concealment of evidence, (f) falsification of business records, (g) falsification of official state judicial records, (h) filing a false insurance claim, (i) insurance fraud, (j) perjury, (k) bribery of a witness, (l) judicial misconduct, (m) malicious prosecution, (n) witness coaching, (o) fabricating evidence, (p) subornation of perjury, (q) suppression of evidence, (r) mocking the court, (s) impeding service of process, (t) creating a false judicial record in a court of law, and (u) deprivation of the Plaintiff's civil rights and civil liberties while acting under the color of law in violation of 42 U.S.C. 1983.

198. Declaration that Through his conspiratorial concealment of the exculpatory evidence of the 1992 memorialized handwritten Express Bilateral Contract terminating the doctor-patient relationship, Stanley Spero did commit the evidentiary crimes of: (a) spoliation of evidence, (b) obstruction of justice, (c) interfering with the fair administration of the law, (d) tampering with evidence, (e) fraudulent concealment of evidence, (f) falsification of business records, (g) falsification of official state judicial records, (h) filing a false insurance claim, (i) insurance fraud, (j) perjury, (k) bribery of a witness, (l) judicial misconduct, (m) malicious prosecution, (n) witness coaching, (o) fabricating evidence, (p) subornation of perjury, (q) suppression of evidence, (r) mocking the court, (s) impeding service of process, (t) creating a false judicial record in a court

of law, and (u) deprivation of the Plaintiff's civil rights and civil liberties while acting under the color of law in violation of 42 U.S.C. 1983.

199. Declaration that Through their deception and concealment of the 1992 Express Bilateral Contract terminating the doctor-patient relationship from the tribunals, defendants Lourdes Colon, Lisa Wolfe and Stanley Spero did engage in and commit: (a) spoliation of evidence, (b) obstruction of justice, (c) interfering with the fair administration of the law, (d) tampering with evidence, (e) fraudulent concealment of evidence, (f filing a false insurance claim, (g) insurance fraud, (h) perjury, (i) bribery of a witness, (j) judicial misconduct, (k) malicious prosecution, (l) witness coaching, (m) fabricating evidence, (n) subornation of perjury, (o) suppression of evidence, (p) mocking the court, (q) impeding service of process, (r) creating a false judicial record in a court of law, and (s) deprivation of the Plaintiff's civil rights and civil liberties while acting under the color of law in violation of 42 U.S.C. § 1983.

200. Declaration that Through their deception and concealment of the 1992 Express Bilateral Contract terminating the doctor-patient relationship from the tribunals, defendants Lourdes Colon, Lisa Wolfe and Stanley Spero did falsely and fraudulently obtain an insurance settlement of $150,000.00 from the ProMutual Medical Insurance medical malpractice insurer, which settlement in part was based on the false premise that the Plaintiff was acting as Colon's doctor and such conduct comprises insurance fraud.

201. Declaration that The Plaintiff is a U.S. citizen, born in Brooklyn, New York on October 27, 1953, and as such is entitled to all the protections, privileges and immunities guaranteed to all U.S. citizens under the U.S. Constitution.

202. Declaration that The Plaintiff does suffer from and did suffer from multiple neurologic and medical conditions for most of his life including: anoxic encephalopathy at birth, traumatic brain injury, subdural hematoma, s/p craniotomy, elevated intracranial pressure, hypothyroidism and Attention Deficit Disorder, all of which combined shows that the Plaintiff is a member of the statutorily-protected class of disabled Americans under the Americans with Disabilities Act.

203. Declaration that The Plaintiff is an osteopathic physician who earned his Doctor of Osteopathic Medicine degree (D.O.) from the New York College of Osteopathic Medicine in June 1986.

204. Declaration that The Plaintiff did two (2) years of post-graduate training including one (1) year in Anatomic Pathology at Brown University in Providence, RI (1986-87) and one (1) year in Internal Medicine at St. Vincent Medical Center in Worcester, MA (1987-88).

205. Declaration that During these two years of post-graduate training, the Plaintiff did not receive any training in psychiatry or psychotherapy, nor did he receive any training in handling transference or counter-transference, as these skills and knowledge are not usually taught to first-year residents in either Anatomic Pathology or Internal Medicine.

206. Declaration that The Plaintiff has never held himself out to the public as a psychotherapist, psychiatrist, psychologist or any other type of mental health professional.

207. Declaration that At BEMC the Plaintiff was practicing medicine as a Family Medicine physician, treating adult patients of both sexes between the ages of 18 years and 99 years of age, but the Plaintiff never engaged in any type of psychotherapy nor psychiatry with his patients.

208. Declaration that On or about November 1996, Lourdes Colon filed a lawsuit in Middlesex Superior Court entitled *Colon v. Weinberg, Wesselhoeft,III and Boston Evening Medical Center* in which she alleged that the Plaintiff engaged in sexual misconduct but concealed the fact, comprising spoliation of exculpatory evidence, that there was a 1992 Express Bilateral Contract which terminated the doctor-patient relationship; this lawsuit was settled by ProMutual Medical Malpractice insurer in 1998.

209. Declaration that On or about 1998, defendant Chairman, Board of Registration in Medicine, did initiate adjudicatory proceedings against the Plaintiff pursuant to M.G.L.c.112, s.5(c), 243 CMR 1.03(5)(a)3, 243 CMR 1.03(5)(a)18 and Raymond v. Board of Registration in Medicine, 387 Mass. 708 (1982) in order to discipline the Plaintiff – "Board of Registration in Medicine, Petitioner v. Robert P. Weinberg, D.O., Respondent", Docket No. BR-99-074 ("DALA proceedings").

210. Declaration that Defendant Sarah Luick, did adjudicate the proceedings against the Plaintiff pursuant to M.G.L.c.112, s.5(c), 243 CMR 1.03(5)(a)3, 243 CMR 1.03(5)(a)18 and Raymond v. Board of Registration in Medicine, 387 Mass. 708 (1982) in order to discipline the Plaintiff - "Board of Registration in Medicine, Petitioner v. Robert P. Weinberg, D.O., Respondent", Docket No. BR-99-074 ("DALA proceedings").

211. Declaration that These DALA proceedings comprised Formal Adjudication on the record necessitating all the protections and procedures under M.G.L. c. 30A, the State Administrative Procedures Act which under Due Process of Law also necessitates the right to (1) Notice and (2) a Fair Hearing, as guaranteed by both the Massachusetts Constitution and the U.S. Constitution. *Goldberg v. Kelly,* 397 U.S. 254 (1970).

212. Declaration that Three different lawyers were sequentially involved with the representation of the Plaintiff before these adjudicatory proceedings on the record: (1) first was attorney Vincent DiCianni who represented the Plaintiff from 1998 to 2000; (2) second was Robert Stolzberg who represented the Plaintiff from 2000 to 2001; and finally (3) Northeastern University School of Law Professor John Flym who represented the Plaintiff from 2001 through to his appeal to the Massachusetts Supreme Judicial Court in 2005. Alice Oliff did represent the Petitioner Massachusetts Board of Registration in Medicine in these adjudicatory proceedings, after replacing Richard Waring.

213. Declaration that For judicial efficiency in creating a factual record, the Plaintiff, through his attorney John Flym, and BORIM, through their attorney Alice Oliff agreed to collaborate on writing a Joint Stipulation to create the factual record for the undisputed statements of material fact; this Stipulation for the factual record did not resolve factual issues involving material facts in dispute between the parties and as such was silent on any statements of material fact which were in dispute such as the 1992 Express Bilateral Contract terminating the doctor-patient relationship.

214. Declaration that This joint stipulation did not directly address nor include any disputed statements of material fact relevant to the proceedings, even where such disputed statements of material fact were essential to a determination of the status of the relationship between the Plaintiff and Lourdes Colon and comprised exculpatory evidence which would exonerate the Plaintiff of all wrongdoing.

215. Declaration that The Plaintiff never waived his right to a fair hearing to resolve factual issues in dispute, where such a Hearing is guaranteed under Due Process of Law as guaranteed by both the Massachusetts Constitution and the U.S. Constitution. *Goldberg v. Kelly,* 397 U.S. 254 (1970).

216. Declaration that The state actor defendants did violate the Plaintiff's right to Due Process of Law by denying him a fair hearing and the opportunity to be heard and confront government witnesses against him; the exculpatory evidence of the 1992 Express Bilateral Contract terminating the doctor-patient relationship, which exonerates the Plaintiff, was not part of the factual record so that the Plaintiff could not raise new exculpatory evidence and new issues of fact not present in the original factual record.

217. Declaration that These DALA proceedings against the Plaintiff in the Massachusetts Division of Administrative Law Appeals, "Board of Registration in Medicine, Petitioner v. Robert P. Weinberg, D.O., Respondent", Docket No. BR-99-074, did comprise formal adjudication on the record pursuant to M.G.L. c. 30A the Massachusetts Administrative Procedures Act, which provides for the Notice and Fair Hearing requirements of Due Process of Law. *Goldberg v. Kelly,* 397 U.S. 254 (1970).

218. Declaration that In these proceedings against the Plaintiff in the Massachusetts Division of Administrative Law Appeals, "Board of Registration in Medicine, Petitioner v. Robert P. Weinberg, D.O., Respondent", Docket No. BR-99-074, the Plaintiff was guaranteed the right to procedural due process under the Massachusetts Constitution, the U.S. Constitution, and M.G.L. c. 30A before the Commonwealth of Massachusetts could deprive the Plaintiff of his life, liberty or property including but not limited to his license to practice Medicine in the Commonwealth of Massachusetts. *Goldberg v. Kelly,* 397 U.S. 254 (1970).

219. Declaration that The law requires that the Commonwealth of Massachusetts comply with the requirements of Due Process of law before it may suspend, revoke or terminate the Plaintiff's license to practice medicine and Procedural Due Process mandates that the Plaintiff be provided with appropriate Notice and a Fair Hearing. *Goldberg v. Kelly,* 397 U.S. 254 (1970).

220. Declaration that Procedural Due Process mandates that the Plaintiff be provided with a Fair Hearing at which the Plaintiff may: (1) have the opportunity to orally present evidence of exonerating evidence; (2) subpoena percipient witnesses with personal knowledge relevant to the proceedings; (3) confront adverse witnesses who present testimony or evidence against the Plaintiff's interests; (4) cross-examine adverse witnesses who present testimony or evidence against the Plaintiff's interests; (5) be provided with an impartial neutral decisionmaker who will make a decision only on the evidence presented; (7) be provided with an unbiased tribunal; (8) be acknowledged of all potential opposing evidence against the Plaintiff's interests; (9) have the opportunity to be represented by counsel; (10) be provided by the tribunal with a record of the evidence presented; and (11) be provided by the tribunal with written findings of fact and the reasons for its decision. *Goldberg v. Kelly,* 397 U.S. 254 (1970); [Glicksman, Robert L.; Levy, Richard E. (2010) *Administrative Law: Agency Action in Legal Context.* 9781599416106: Foundation Press] [Strauss, Peter. "Due Process" Legal Information Institute]

221. Declaration that Lourdes Colon was the Plaintiff's former patient and is called "Patient A" in court pleadings and in records maintained by the Defendant Massachusetts Board of Registration in Medicine.

222. Declaration that Lourdes Colon was a named party in multiple judicial proceedings involving the Plaintiff including, but not limited to: *Colon v. Weinberg, Wesselhoeft, Boston Evening Medical Center et al.* in Middlesex Superior Court; *Weinberg v. Colon* in Suffolk Superior Court and was the primary adverse witness in Massachusetts Division of Administrative Law Appeals, "Board of Registration in Medicine, Petitioner v. Robert P. Weinberg, D.O., Respondent", Docket No. BR-99-074.

223. Declaration that In all judicial proceedings named herein (and above), Lourdes Colon refused to testify,

was unable to testify, or was unavailable to testify at any scheduled hearing before the tribunals, at any deposition scheduled before these tribunals, or appear at any tribunal hearing at which the Plaintiff would have had the opportunity to confront the adverse witness or cross-examine the adverse witness presenting evidence against the Plaintiff's interests and the failure to provide a hearing substantially prejudiced the factual findings against the Plaintiff and this substantial bias was noted by the fact-finder Magistrate Sarah Luick in her Recommended Decision.

224. Declaration that During the DALA proceedings, the Plaintiff was never provided with the opportunity for a Hearing to resolve issues of material fact in dispute, as was required by Due Process of Law, M.G.L. c. 30A, the Massachusetts Constitution and the U.S. Constitution and the failure to provide a hearing substantially prejudiced the factual findings against the Plaintiff who could not introduce the exculpatory evidence of the 1992 Express Bilateral Contract which terminated the doctor-patient relationship.

225. Declaration that During the DALA proceedings, the Plaintiff was never provided with the opportunity for a Hearing to resolve issues of material and exculpatory fact in dispute, as was required by Due Process of Law M.G.L. c. 30A, the Massachusetts Constitution and the U.S. Constitution, because Lourdes Colon refused to testify, was unable to testify or was unavailable to testify and the failure to provide a hearing substantially prejudiced the factual findings against the Plaintiff.

226. Declaration that During the DALA proceedings, the Plaintiff was never provided with the opportunity for a Hearing to resolve issues of material fact involving exculpatory evidence in dispute, which were essential for the fact-finder to determine accurately the status of the relationship between the Plaintiff and Lourdes Colon and the failure to provide a hearing substantially prejudiced the factual findings against the Plaintiff.

227. Declaration that During the DALA proceedings, the Plaintiff was never provided with the opportunity for a Hearing to resolve issues of material fact involving exculpatory evidence in dispute, or the opportunity to orally present exculpatory evidence on the termination of the doctor-patient relationship which exonerates the Plaintiff and the failure to provide a hearing substantially prejudiced the factual findings against the Plaintiff.

228. Declaration that The Plaintiff was denied the opportunity to orally present the exculpatory evidence on the 1992 memorialized handwritten Express Bilateral Contract which terminated the doctor-patient relationship and exonerates the Plaintiff and the failure to provide a hearing substantially prejudiced the factual findings against the Plaintiff.

229. Declaration that The Plaintiff was denied the opportunity to orally present exculpatory evidence on the 1992 memorialized Express Bilateral Contract, which terminated the doctor-patient relationship, which was drafted and dictated by the Psychologist Lisa Wolfe and the failure to provide a hearing substantially prejudiced the factual findings against the Plaintiff.

230. Declaration that The Plaintiff was denied the opportunity to orally present exculpatory evidence on the 1992 memorialized Express Bilateral Contract, which terminated the doctor-patient relationship, which was drafted and dictated by the Psychologist Lisa Wolfe in a consultation room at the Arbour Human Resources Institute in Brookline, Massachusetts and the failure to provide a hearing substantially prejudiced the factual findings against the Plaintiff.

231. Declaration that The Plaintiff was denied the opportunity to orally present evidence on the spoliation of material exculpatory evidence by Lourdes Colon and the failure to provide a hearing substantially prejudiced

the factual findings against the Plaintiff.

232. Declaration that The Plaintiff was denied the opportunity to orally present evidence on the spoliation of material exculpatory evidence by Lisa Wolfe and the failure to provide a hearing substantially prejudiced the factual findings against the Plaintiff.

233. Declaration that The Plaintiff was denied the opportunity to orally present evidence on the spoliation of material exculpatory evidence by Stanley Spero and the failure to provide a hearing substantially prejudiced the factual findings against the Plaintiff.

234. Declaration that The Plaintiff was denied the opportunity to orally present evidence on the purposeful and intentional concealment of material evidence, comprising the 1992 memorialized Express Bilateral Contract which terminated the doctor-patient relationship, by Lourdes Colon and the failure to provide a hearing substantially prejudiced the factual findings against the Plaintiff.

235. Declaration that The Plaintiff was denied the opportunity to orally present evidence on the purposeful and intentional concealment of material exculpatory evidence, comprising the 1992 memorialized Express Bilateral Contract which terminated the doctor-patient relationship, by Lisa Wolfe and the failure to provide a hearing substantially prejudiced the factual findings against the Plaintiff.

236. Declaration that The Plaintiff was denied the opportunity to orally present evidence on the purposeful and intentional concealment of material exculpatory evidence, comprising the 1992 memorialized Express Bilateral Contract which terminated the doctor-patient relationship, by Stanley Spero and the failure to provide a hearing substantially prejudiced the factual findings against the Plaintiff.

237. Declaration that The Plaintiff was denied the opportunity to orally present evidence on the purposeful and intentional concealment of material exculpatory evidence, comprising the subsequent mutually-agreed upon modification of the 1992 memorialized Express Bilateral Contract, which classified time and location into clinical and nonclinical worlds, by Lourdes Colon and the failure to provide a hearing substantially prejudiced the factual findings against the Plaintiff.

238. Declaration that The Plaintiff was denied the opportunity to orally present evidence on the purposeful and intentional concealment of material evidence, comprising the subsequent mutually-agreed upon modification of the 1992 memorialized Express Bilateral Contract, which classified time and location into clinical and nonclinical worlds, by Lisa Wolfe and the failure to provide a hearing substantially prejudiced the factual findings against the Plaintiff.

239. Declaration that The Plaintiff was denied the opportunity to orally present evidence on the purposeful and intentional concealment of material evidence, comprising the subsequent mutually-agreed upon modification of the 1992 memorialized Express Bilateral Contract, which classified time and location into clinical and nonclinical worlds, by Stanley Spero and the failure to provide a hearing substantially prejudiced the factual findings against the Plaintiff.

240. Declaration that The Plaintiff was denied the opportunity to orally present evidence on the fraudulent concealment of material evidence from the tribunal by Lourdes Colon and the failure to provide a hearing substantially prejudiced the factual findings against the Plaintiff.

241. Declaration that The Plaintiff was denied the opportunity to orally present evidence on the fraudulent concealment of material evidence from the tribunal by Lisa Wolfe and the failure to provide a hearing substantially prejudiced the factual findings against the Plaintiff.

242. Declaration that The Plaintiff was denied the opportunity to orally present evidence on the fraudulent concealment of material evidence from the tribunal by Stanley Spero and the failure to provide a hearing substantially prejudiced the factual findings against the Plaintiff.

243. Declaration that Lourdes Colon did commit spoliation of evidence through her concealment of the material evidence of the 1992 memorialized Expressed Bilateral Contract which terminated the doctor-patient relationship between the Plaintiff and Lourdes Colon and the failure to provide a hearing substantially prejudiced the factual findings against the Plaintiff.

244. Declaration that Lisa Wolfe did commit spoliation of evidence through her concealment of the material evidence of the 1992 memorialized Expressed Bilateral Contract which terminated the doctor-patient relationship between the Plaintiff and Lourdes Colon and the failure to provide a hearing substantially prejudiced the factual findings against the Plaintiff.

245. Declaration that Stanley Spero did commit spoliation of evidence through her concealment of the material evidence of the 1992 memorialized Expressed Bilateral Contract which terminated the doctor-patient relationship between the Plaintiff and Lourdes Colon and the failure to provide a hearing substantially prejudiced the factual findings against the Plaintiff.

246. Declaration that Lourdes Colon did commit fraud upon the Court in the judicial proceedings at the Middlesex Superior Court, Suffolk Superior Court, Division of Administrative Law Appeals and the Massachusetts Supreme Judicial Court through her spoliation of material evidence comprising the 1992 memorialized Express Bilateral Contract which terminated the doctor-patient relationship between the Plaintiff and Lourdes Colon and the failure to provide a hearing substantially prejudiced the factual findings against the Plaintiff.

247. Declaration that Lisa Wolfe did commit fraud upon the Court in the judicial proceedings at the Middlesex Superior Court, Suffolk Superior Court, Division of Administrative Law Appeals and the Massachusetts Supreme Judicial Court through her spoliation of material evidence comprising the 1992 memorialized Express Bilateral Contract which terminated the doctor-patient relationship between the Plaintiff and Lourdes Colon and the failure to provide a hearing substantially prejudiced the factual findings against the Plaintiff.

248. Declaration that Stanley Spero did commit fraud upon the Court in the judicial proceedings at the Middlesex Superior Court, Suffolk Superior Court, Division of Administrative Law Appeals and the Massachusetts Supreme Judicial Court through his spoliation of material evidence comprising the 1992 memorialized Express Bilateral Contract which terminated the doctor-patient relationship between the Plaintiff and Lourdes Colon and the failure to provide a hearing substantially prejudiced the factual findings against the Plaintiff.

249. Declaration that Lourdes Colon did commit obstruction of justice and interference with the fair administration of justice through her withholding material evidence essential for the fact-finder of the tribunal in the judicial proceedings relevant to the Plaintiff's medical license and the failure to provide a hearing substantially prejudiced the factual findings against the Plaintiff.

250. Declaration that Lisa Wolfe did commit obstruction of justice and interference with the fair administration of justice through her withholding material evidence essential for the fact-finder of the tribunal in the judicial proceedings relevant to the Plaintiff's medical license and the failure to provide a hearing substantially prejudiced the factual findings against the Plaintiff.

251. Declaration that Stanley Spero did commit obstruction of justice and interference with the fair administration of justice through her withholding material evidence essential for the fact-finder of the tribunal in the judicial proceedings relevant to the Plaintiff's medical license and the failure to provide a hearing substantially prejudiced the factual findings against the Plaintiff.

252. Declaration that The Plaintiff was denied his right to a fair hearing guaranteed under procedural due process under the Massachusetts Constitution, the U.S. Constitution, and M.G.L. c. 30A before the Commonwealth of Massachusetts could deprive the Plaintiff of his life, liberty or property and the failure to provide a hearing substantially prejudiced the factual findings against the Plaintiff.

253. Declaration that The Plaintiff was denied his right to a Fair Hearing at which the Plaintiff may: (1) have the opportunity to orally present evidence of exonerating evidence; (2) subpoena percipient witnesses with personal knowledge relevant to the proceedings; (3) confront adverse witnesses who present testimony or evidence against the Plaintiff's interests; (4) cross-examine adverse witnesses who present testimony or evidence against the Plaintiff's interests; (5) be provided with an impartial neutral decisionmaker who will make a decision only on the evidence presented; (7) be provided with an unbiased tribunal; (8) be acknowledged of all potential opposing evidence against the Plaintiff's interests; (9) have the opportunity to be represented by counsel; (10) be provided by the tribunal with a record of the evidence presented; and (11) be provided by the tribunal with written findings of fact and the reasons for its decision and the failure to provide a hearing substantially prejudiced the factual findings against the Plaintiff.

254. Declaration that Without a fair hearing and the right to be heard, the Plaintiff was denied his right to procedural due process guaranteed by Selective incorporation of the Bill of Rights of the U.S. Constitution through the Due Process clause of the Fourteenth Amendment.

255. Declaration that Without a fair hearing and the right to be heard, the Plaintiff was denied his right to Due Process of Law as guaranteed by the Massachusetts Constitution and the Fourteenth Amendment of the U.S. Constitution as selectively incorporated to the States under the Due Process clause.

256. Declaration that Without a fair hearing and the right to be heard, the Plaintiff was denied his right to Due Process of Law, guaranteed by the Constitution, by the Massachusetts Board of Registration in Medicine, and by the Massachusetts state actor defendants.

257. Declaration that Without a fair hearing and the right to be heard, the Plaintiff was denied his right to Due Process of Law, guaranteed by the Constitution,  by the Massachusetts Division of Administrative Law Appeals, and by the Massachusetts state actor defendants.

258. Declaration that Without a fair hearing and the right to be heard, the Plaintiff was denied his right to Due Process of Law, guaranteed by the Constitution, by Magistrate Sarah Luick.

259. Declaration that Without a fair hearing and the right to be heard, the Plaintiff was denied his right to Due

Process of Law, guaranteed by the Constitution, by the Massachusetts Supreme Judicial Court, and by the Massachusetts state actor defendants, which depended upon the false factual records from the lower courts.

260. Declaration that Without a fair hearing and the right to be heard, the Plaintiff was denied his right to Due Process of Law, guaranteed by the Constitution, by Middlesex Superior Court.

261. Declaration that Without a fair hearing and the right to be heard, the Plaintiff was denied his right to Due Process of Law, guaranteed by the Constitution, by Suffolk Superior Court.

262. Declaration that Without a fair hearing and the right to be heard, the Plaintiff was denied his right to Due Process of Law, guaranteed by the Constitution, by Justice Ellen Gorman which depended upon the false factual records from the lower courts.

263. Declaration that Without a fair hearing and the right to be heard, the Plaintiff was denied his right to Due Process of Law, guaranteed by the Constitution, by the Maine Supreme Judicial Court which depended upon the false factual records from the lower courts.

264. Declaration that Lourdes Colon, also known as "Patient A", was a patient under the care of the Plaintiff at the Boston Evening Medical Center.

265. Declaration that Lourdes Colon saw a brochure describing the profiles of the doctors practicing at the Boston Evening Medical Center on a table in the patients' front-lobby waiting area.

266. Declaration that The brochure described some of the research which the Plaintiff was engaged in at the Massachusetts Institute of Technology.

267. Declaration that Lourdes Colon expressed her wish to assist the Plaintiff with some research at MIT during the summer of 1992.

268. Declaration that The Plaintiff discussed patient Lourdes Colon's interest in becoming a research assistant with the Medical Director Robert Wesselhoeft, III, M.D. and also with the Executive Director Ruth Taylor at the Boston Evening Medical Center ("BEMC").

269. Declaration that Dr. Robert Wesselhoeft, III and Ruth Taylor approved the Plaintiff going to the meeting at HRI to discuss the possibility of Lourdes Colon becoming a research assistant.

270. Declaration that Lourdes Colon was hospitalized at the Arbour Human Resource Institute ("HRI") on Babcock Street in Brookline, Massachusetts during the summer of 1992.

271. Declaration that While hospitalized at the Arbour Human Resource Institute ("HRI"), Lourdes Colon was under the care of licensed psychologist Lisa Wolfe.

272. Declaration that During a psychotherapy session with Lisa Wolfe on or about September 1992 at HRI, Dr Wolfe encouraged Lourdes Colon to phone the Plaintiff at the Boston Evening Medical Center to ask whether the Plaintiff would like Colon to be his research assistant.

273. Declaration that At that September 1992 psychotherapy session, Lisa Wolfe and Lourdes Colon invited

137

the Plaintiff to come to a meeting at HRI to discuss the possibility of Lourdes Colon working as a research assistant to the Plaintiff at MIT.

274. Declaration that On September 12, 1992, the Plaintiff went to HRI and met with Dr. Lisa Wolfe and Lourdes Colon in a consultation room on the first floor.

275. Declaration that At the 9/12/1992 meeting, Dr. Lisa Wolfe managed the agenda and the meeting. A declaration that At the 9/12/1992 meeting, Dr. Lisa Wolfe discussed Lourdes Colon's interest in becoming a research assistant.

276. Declaration that At the 9/12/1992 meeting, Dr. Lisa Wolfe discussed the Plaintiff's terminating the doctor-patient relationship and assisting with finding a new primary care provider for Lourdes Colon.

277. Declaration that At the 9/12/1992 meeting, Dr. Lisa Wolfe explained that following the termination of the doctor-patient relationship between the Plaintiff and Lourdes Colon, the Plaintiff would no longer need be concerned about any ethical duties or obligations which he had when he was her doctor.

278. Declaration that At the 9/12/1992 meeting, Dr. Lisa Wolfe explained that following the termination of the doctor-patient relationship between the Plaintiff and Lourdes Colon, the Plaintiff would no longer be limited nor restricted in the subsequent relationship while Lourdes Colon worked as his research assistant.

279. Declaration that At the 9/12/1992 meeting, Dr. Lisa Wolfe explained that following the termination of the doctor-patient relationship between the Plaintiff and Lourdes Colon, the Plaintiff would no longer be bound by any of the duties or obligations usually imposed on physicians regarding their relationships with their patients.

280. Declaration that At the 9/12/1992 meeting and all subsequent communications, Dr. Lisa Wolfe did not share with the Plaintiff any information regarding the mental state or psychological diagnoses of Lourdes Colon.

281. Declaration that At the 9/12/1992 meeting and all subsequent communications, Dr. Lisa Wolfe did not share with the Plaintiff any information regarding Dr. Wolfe's diagnosis of Dissociative state, written in her admission note on Lourdes Colon.

282. Declaration that At the 9/12/1992 meeting and all subsequent communications, Dr. Lisa Wolfe did not share with the Plaintiff any information regarding the potential for problems which might arise from the mental state or diagnoses of Lourdes Colon, involving Dissociative Identity Disorder along with her Multiple Personality Syndrome.

283. Declaration that At the 9/12/1992 meeting and all subsequent communications, Dr. Lisa Wolfe did not share with the Plaintiff any information regarding the diagnosis of Lourdes Colon with Dissociative Identity Disorder or Multiple Personality Disorder which Lourdes Colon suffers from or did suffer from.

284. Declaration that At the 9/12/1992 meeting and all subsequent communications, Dr. Lisa Wolfe did not warn the Plaintiff of the need to avoid any specific conduct or behavior regarding the diagnosis of Lourdes Colon with Dissociative Identity Disorder or Multiple Personality Disorder which Lourdes Colon suffers from or did suffer from.

285. Declaration that At the 9/12/1992 meeting and all subsequent communications, Dr. Lisa Wolfe did not warn the Plaintiff of the need to avoid any romantic or sexual involvement between the Plaintiff and Lourdes Colon regarding the diagnosis of Lourdes Colon with Dissociative Identity Disorder or Multiple Personality Disorder which Lourdes Colon suffers from or did suffer from.

286. Declaration that At the 9/12/1992 meeting and all subsequent communications, Dr. Lisa Wolfe did not warn the Plaintiff of the need to avoid any romantic or sexual involvement between the Plaintiff and Lourdes Colon following the termination of the doctor-patient relationship, regarding the diagnosis of Lourdes Colon with Dissociative Identity Disorder or Multiple Personality Disorder which Lourdes Colon suffers from or did suffer from.

287. Declaration that At the 9/12/1992 meeting and all subsequent communications, Dr. Lisa Wolfe did not warn the Plaintiff of the serious risks which might arise from the mental state or psychological diagnoses of Lourdes Colon, regarding the diagnosis of Lourdes Colon with Dissociative Identity Disorder or Multiple Personality Disorder which Lourdes Colon suffers from or did suffer from.

288. Declaration that Plaintiff's Expert Witness will testify that a patient with Lourdes Colon's diagnoses of Dissociative Identity Disorder or Multiple Personality disorder should not transition out from a doctor-patient relationship into a personal relationship.

289. Declaration that Plaintiff's Expert Witness will testify that encouraging a patient with Lourdes Colon's diagnoses of Dissociative Identity Disorder or Multiple Personality disorder to transition out from a doctor-patient relationship into a personal relationship is highly risky.

290. Declaration that Plaintiff's Expert Witness will testify that encouraging a patient with Lourdes Colon's diagnoses of Dissociative Identity Disorder or Multiple Personality disorder to transition out from a doctor-patient relationship into a personal relationship comprises gross negligence in the practice of psychology.

291. Declaration that Plaintiff's Expert Witness will testify that encouraging a patient with Lourdes Colon's diagnoses of Dissociative Identity Disorder or Multiple Personality disorder to transition out from a doctor-patient relationship into a personal relationship comprises medical malpractice and gross negligence.

292. Declaration that Expert Witness testimony confirms that Dr Lisa Wolfe's encouraging a patient with Lourdes Colon's diagnoses of Dissociative Identity Disorder or Multiple Personality disorder to transition out from a doctor-patient relationship into a personal relationship has a foreseeable risk of substantial harm to both the Plaintiff and Lourdes Colon.

293. Declaration that At the September 12, 1992 consultation meeting, Dr. Lisa Wolfe asked the Plaintiff if he would like to have Lourdes Colon work for him as a research assistant.

294. Declaration that At the September 12, 1992 consultation meeting, Dr. Lisa Wolfe suggested that the Plaintiff and Lourdes Colon formalize the agreement to terminate the doctor-patient relationship with a written document.

295. Declaration that At the September 12, 1992 consultation meeting, Dr. Lisa Wolfe informed the Plaintiff and Lourdes Colon that Wolfe would dictate immediately the terms of the agreement which terminated the doctor-patient relationship, which would be written down in a memorialized agreement by both the Plaintiff

and Lourdes Colon.

296. Declaration that As discussed at the September 12, 1992 consultation meeting, the Plaintiff assisted with finding a new primary care provider for Lourdes Colon, who was Dr. William Reichel.

297. Declaration that At the September 12, 1992 consultation meeting, Dr. Lisa Wolfe dictated word-by-word approximately 350 words drafting the agreement to terminate the doctor-patient relationship between the Plaintiff and Lourdes Colon.

298. Declaration that At the September 12, 1992 consultation meeting, Dr. Lisa Wolfe dictated the approximate 350 words which took up about three-quarters of one side of a page measuring 7 x 10 inches.

299. Declaration that At the September 12, 1992 consultation meeting, Dr. Lisa Wolfe dictated this agreement slowly as the Plaintiff and Lourdes Colon copied down Wolfe's words verbatim.

300. Declaration that At the September 12, 1992 consultation meeting, Dr. Lisa Wolfe's dictated agreement clearly terminated the doctor-patient relationship unconditionally.

301. Declaration that At the September 12, 1992 consultation meeting, the agreement which Dr. Lisa Wolfe dictated provided for the transfer of Lourdes Colon's medical care to a new provider at BEMC.

302. Declaration that At the September 12, 1992 consultation meeting, the agreement which Dr. Lisa Wolfe dictated stated that the Plaintiff was no longer the doctor for Lourdes Colon.

303. Declaration that At the September 12, 1992 consultation meeting, as soon as Dr. Lisa Wolfe finished dictating the agreement, both the Plaintiff and Lourdes Colon signed each other's copies of the agreement terminating the doctor-patient relationship.

304. Declaration that At the September 12, 1992 consultation meeting, Dr. Wolfe stated that, at the moment, that both the Plaintiff and Lourdes Colon signed each other's copy of the agreement terminating the doctor-patient relationship dictated by Dr. Lisa Wolfe, the Plaintiff immediately ceased to be the doctor for Lourdes Colon.

305. Declaration that The September 12, 1992 agreement between the Plaintiff and Lourdes Colon comprised an Express Bilateral Contract.

306. Declaration that The September 12, 1992 agreement between the Plaintiff and Lourdes Colon comprised an Express Bilateral Contract which was memorialized in writing.

307. Declaration that The September 12, 1992 agreement between the Plaintiff and Lourdes Colon comprised an Express Bilateral Contract which was encouraged, advised, drafted and dictated by Dr. Lisa Wolfe.

308. Declaration that The September 12, 1992 agreement between the Plaintiff and Lourdes Colon comprised an Express Bilateral Contract which terminated the doctor-patient relationship.

309. Declaration that The September 12, 1992 agreement between the Plaintiff and Lourdes Colon was a lawful and enforceable Express Bilateral Contract which terminated the doctor-patient relationship.

310. Declaration that The September 12, 1992 agreement between the Plaintiff and Lourdes Colon comprised a lawful and enforceable Express Bilateral Contract which terminated the doctor-patient relationship and also terminated all duties and obligations which the Plaintiff formerly had toward Lourdes Colon.

311. Declaration that The mutually-agreed upon modification of the 1992 Express Bilateral Contract comprised a lawful and enforceable contract.

312. Declaration that The September 12, 1992 agreement between the Plaintiff and Lourdes Colon was subsequently modified by the mutual agreement of the Plaintiff and Lourdes Colon.

313. Declaration that The September 12, 1992 agreement between the Plaintiff and Lourdes Colon comprised a memorialized Express Bilateral Contract which the Plaintiff formed and executed lawfully as his guaranteed liberty to contract under Article I, Section 10 of the U.S. Constitution.

314. Declaration that The subsequent modification of the 1992 Express Bilateral Contract which classified time and location into either the clinical world or the nonclinical world was a lawful and enforceable contract.
315. Declaration that It was lawful and proper for the subsequent modification of the 1992 Express Bilateral Contract to classify time and location into the clinical and nonclinical worlds.

316. Declaration that Under the modification of the 1992 Express Bilateral Contract, which terminated the doctor-patient relationship, the Plaintiff functioned as a doctor while in the clinical world.

317. Declaration that Under the modification of the 1992 Express Bilateral Contract, which terminated the doctor-patient relationship, the Plaintiff did not function as a doctor while in the nonclinical world.

318. Declaration that Under the modification of the 1992 Express Bilateral Contract, which terminated the doctor-patient relationship, while the Plaintiff functioned as a doctor in the clinical world, he was bound by the usual and normal medical ethics controlling the doctor-patient relationship.

319. Declaration that Under the modification of the 1992 Express Bilateral Contract, which terminated the doctor-patient relationship, while the Plaintiff did not function as a doctor in the nonclinical world, he was not bound by the usual and normal medical ethics controlling the doctor-patient relationship.

320. Declaration that Under the modification of the 1992 Express Bilateral Contract, which terminated the doctor-patient relationship, while the Plaintiff did not function as a doctor in the nonclinical world, he was not bound by the usual and normal medical ethics controlling the doctor-patient relationship and it was not unethical to engage in sexual activities with Lourdes Colon.

321. Declaration that Under the modification of the 1992 Express Bilateral Contract, which terminated the doctor-patient relationship, while the Plaintiff did not function as a doctor in the nonclinical world, he was not bound by the usual and normal medical ethics controlling the doctor-patient relationship and it was proper and ethical to engage in sexual relations with Lourdes Colon.

322. Declaration that Under the modification of the 1992 Express Bilateral Contract, which terminated the doctor-patient relationship, while the Plaintiff functioned as a doctor in the clinical world, he was bound by the usual and normal medical ethics controlling the doctor-patient relationship.

323. Declaration that At the 9/12/1992 meeting, Dr. Lisa Wolfe provided the Plaintiff with no additional clinical, medical or psychological information about Lourdes Colon which he did not know when he began the meeting of the three of them.

324. Declaration that At the 9/12/1992 meeting, Dr. Lisa Wolfe did not share with the Plaintiff her diagnoses or differential diagnosis Wolfe made on Lourdes Colon during her psychological treatment at HRI.

325. Declaration that At the 9/12/1992 meeting, Dr. Lisa Wolfe did not warn the Plaintiff of the serious risks involved with terminating the doctor-patient relationship.

326. Declaration that At the 9/12/1992 meeting, Dr. Lisa Wolfe did not warn the Plaintiff of the potential for substantial harm to both the Plaintiff and Lourdes Colon.

327. Declaration that At the 9/12/1992 meeting, Dr. Lisa Wolfe did not warn the Plaintiff that a patient like Lourdes Colon, with a sexual abuse history of repeated rapes by her father at gunpoint and the fragmentation of her psyche resulting in Dissociative Identity Disorder, is a vulnerable and volatile patient at high risk for self-harm.

328. Declaration that Lourdes Colon suffers from or did suffer from a Dissociative Identity Disorder with Multiple Personality Syndrome.

329. Declaration that This Dissociative Identity Disorder is characterized by: fragmentation and distortion of memories, distortions of perceptions - such as sights, sounds and smells, disorganization of higher executive cognitive functions, black-outs with unaccountable losses of days or weeks from the patient's memories, convoluted and involuted thought processes, impaired decision making, fragmentation of the psyche into multiple alter-egos with separate personalities.

330. Declaration that Having suffered from substantial childhood trauma including multiple incestual rapes at gunpoint by her Police officer step-father between the ages of 7 years and 18 years, Lourdes Colon had the classic mental trauma experienced by most persons who suffer from Dissociative Identity Disorder; Colon's sisters likewise were raped by their common step-father.

331. Declaration that Lourdes Colon has numerous unidentified medical and psychiatric records under various names because she would seek clinical help in multiple countries and states by her various alter-ego personalities when each would be sequentially in control of her fragmented psyche.

332. Declaration that At the 9/12/1992 meeting, it was reasonable for the Plaintiff to rely on Dr. Lisa Wolfe's advice and encouragement to terminate the doctor-patient relationship because Dr Wolfe had not shared or disclosed Colon's complex psychological and psychiatric diagnoses or conditions or their substantial risk for catastrophic outcomes.

333. Declaration that The Plaintiff did post-graduate residency training with one year of Internal Medicine and one year of Anatomic Pathology.

334. Declaration that The Plaintiff practiced medicine in the specialties of Family Medicine and Emergency Medicine.

335. Declaration that The Plaintiff never received any formal training in psychotherapy, psychology nor psychiatry.

336. Declaration that The Plaintiff never held himself out to the public as a professional capable of performing psychotherapy or psychiatry.

337. Declaration that The Plaintiff never received any formal training in the handling or management of transference or countertransference.

338. Declaration that The Plaintiff never received any formal training in psychology, psychotherapy, psychoanalysis or any other mental health specialty.

339. Declaration that Following the 9/12/1992 meeting which terminated the doctor-patient relationship, the Plaintiff assisted with the transfer of Lourdes Colon's medical care to Dr. William Reichel at the Boston Evening Medical Center.

340. Declaration that Following the 9/12/1992 meeting which terminated the doctor-patient relationship, Lourdes Colon began to meet on a weekly basis at MIT with the Plaintiff to assist him with his research on an acoustic analyzer to diagnose lung diseases.

341. Declaration that Following the 9/12/1992 meeting which terminated the doctor-patient relationship, the Plaintiff brought Lourdes Colon to the Countway National Library of Medicine on Huntington Avenue in Boston, where he signed papers to sponsor Colon as his research assistant and obtained for Colon her own library card for borrowing privileges.

342. Declaration that Following the 9/12/1992 meeting which terminated the doctor-patient relationship, the Plaintiff and Lourdes Colon would occasionally meet for coffee at MIT or in Cambridge to discuss the research.

343. Declaration that Following the 9/12/1992 meeting which terminated the doctor-patient relationship, both the Plaintiff and Lourdes Colon mutually agreed to modify the memorialized handwritten Express Bilateral Contract which terminated the doctor-patient relationship.

344. Declaration that The mutually agreed-upon modified contract, which the Plaintiff and Lourdes Colon agreed upon, provided for a clinical-nonclinical classification scheme which was a binary classifier of time and place.

345. Declaration that the modified contract's clinical-nonclinical binary classification scheme provided a designation for every location and every time.

346. Declaration that The modified contract's clinical-nonclinical binary classification scheme designated specific locations at specific times as either part of the clinical world or part of the nonclinical world.

347. Declaration that The modified contract's clinical-nonclinical binary classification scheme provided that Lourdes Colon may return to BEMC for some of her medical care with the Plaintiff which was designated as the clinical world by the modified contract's binary clinical-nonclinical classification scheme.

348. Declaration that The modified contract's clinical-nonclinical binary classification scheme's designation of locations and times as the clinical world or the nonclinical world according to the subjective expectations of the Plaintiff and Lourdes Colon at that time and place.

346. Declaration that The modified contract's clinical-nonclinical binary classification scheme provided that Lourdes Colon and the Plaintiff would mutually agree upon whether any specific time or place would be designated as the clinical world or the nonclinical world.

347. Declaration that When the Plaintiff and Lourdes Colon had the subjective expectation that Colon was coming to BEMC to receive some medical treatment, the modified contract's clinical-nonclinical binary classification scheme designated such time and place as the clinical world.

348. Declaration that The modified contract's clinical-nonclinical binary classification scheme provided that Lourdes Colon would not receive any medical care or treatment when she was in the nonclinical world, where the subjective expectations of both the Plaintiff and Lourdes Colon was that the Plaintiff was not acting as a physician and that he usually did not practice any medicine in the nonclinical world.

349. Declaration that The modified contract's clinical-nonclinical binary classification scheme provided that there would be no sexual or romantic activity between the Plaintiff and Lourdes Colon when Lourdes Colon came to BEMC for medical care or treatment within the scheme's clinical world.

350. Declaration that The modified contract's clinical-nonclinical binary classification scheme provided that any sexual or romantic activity between the Plaintiff and Lourdes Colon would only occur when both were in the nonclinical world where the Plaintiff was not acting as a physician and not actively engaged in the practice of medicine.

351. Declaration that The modified contract's clinical-nonclinical binary classification scheme provided that BEMC would usually be the primary domain for the clinical world.

352. Declaration that the modified contract's clinical-nonclinical binary classification scheme provided that BEMC would never be designated as the nonclinical world.

353. Declaration that The modified contract's clinical-nonclinical binary classification scheme provided that the 1992 memorialized handwritten Express Bilateral Contract terminating the doctor-patient relationship would be in full force and effect whenever the Plaintiff and Lourdes Colon were located in a place and time designated by the modified contract as the nonclinical world.

354. Declaration that The modified contract's clinical-nonclinical binary classification scheme provided that the terms of the 1992 memorialized handwritten Express Bilateral Contract terminating the doctor-patient relationship would be temporarily suspended while the Plaintiff and Lourdes Colon were located in a time and place designated as the clinical world so that the Plaintiff may be able to provide medical care or treatment to Lourdes Colon.

355. Declaration that The modified contract's clinical-nonclinical binary classification scheme is a valid, lawful and enforceable agreement as an Express Bilateral Contract.

356. Declaration that The modified contract's clinical-nonclinical binary classification scheme provided that

357. Declaration that the September 12, 1992 agreement terminating the doctor-patient relationship was a valid, lawful and enforceable Express Bilateral Contract.

358. Declaration that The September 12, 1992 agreement terminating the doctor-patient relationship was memorialized in a writing handwritten by both the Plaintiff and Lourdes Colon.

359. Declaration that The modification of the September 12, 1992 Express Bilateral Contract was a valid, lawful and enforceable Express Bilateral Contract ("modified contract").

360. Declaration that The modified contract lawfully provided for a clinical-nonclinical binary classification of time and place.

361. Declaration that The modified Express Bilateral Contract designated every place and every time into either the Clinical World or the Nonclinical World.

362. Declaration that The Clinical World, designated by the modified contract, was based on the subjective expectations of the Plaintiff and Lourdes Colon.

363. Declaration that In the Clinical World, classified by the modified contract, the Plaintiff engage in the practice of medicine.

364. Declaration that In the Clinical World, classified by the modified contract, the Plaintiff held himself out to the public as a physician where patients could come to receive medical care and treatment.

365. Declaration that In the nonclinical world, classified by the modified contract, the Plaintiff did not engage in the practice of medicine nor did he meet with any patients.

366. Declaration that Lourdes Colon suffered from or currently suffers from a Dissociative Identity Disorder.

367. Declaration that Lourdes Colon suffered from or currently suffers from a Multiple Personality Disorder.

368. Declaration that In her Admission Note on Lourdes Colon to HRI in 1992, Dr. Lisa Wolfe indicated "rule/out Dissociative disorder NOS."

369. Declaration that Recommending that the Plaintiff terminate the doctor-patient relationship with Lourdes Colon comprised gross negligence and medical malpractice.

370. Declaration that Recommending that the Plaintiff terminate the doctor-patient relationship with Lourdes Colon demonstrated a serious lack of clinical judgment and gross negligence by Dr. Lisa Wolfe.

371. Declaration that The termination of the doctor-patient relationship, which was dictated and encouraged by Dr. Lisa Wolfe, was the direct and proximate cause of substantial injuries and damages to both the Plaintiff and to Lourdes Colon.

372. Declaration that Dr. Lisa Wolfe did conceal her knowledge and role in the formation and execution of the

Express Bilateral Contract, which terminated the doctor-patient relationship between the Plaintiff and Lourdes Colon, from the tribunal in Colon v. Weinberg, Wesselhoeft, Boston Evening Medical Center, et al.

373. Declaration that Dr. Lisa Wolfe did conceal her knowledge and role in the formation and execution of the Express Bilateral Contract, which terminated the doctor-patient relationship between the Plaintiff and Lourdes Colon, from the tribunal in Weinberg v. Colon.

374. Declaration that Dr. Lisa Wolfe did conceal her knowledge and role in the formation and execution of the Express Bilateral Contract, which terminated the doctor-patient relationship between the Plaintiff and Lourdes Colon, from the tribunal in the DALA proceedings In Re Robert P. Weinberg, D.O.

375. Declaration that Dr. Lisa Wolfe did conceal her knowledge and role in the formation and execution of the Express Bilateral Contract, which terminated the doctor-patient relationship between the Plaintiff and Lourdes Colon, from the tribunal in the proceedings by the Massachusetts Board of Registration in Medicine in Robert P. Weinberg v. Massachusetts Board of Registration in Medicine

376. Declaration that Dr. Lisa Wolfe did conceal her knowledge and role in the formation and execution of the Express Bilateral Contract, which terminated the doctor-patient relationship between the Plaintiff and Lourdes Colon, from the appellate tribunal in proceedings before the Massachusetts Supreme Judicial Court during judicial review of Robert P. Weinberg, D.O. v. Massachusetts Board of Registration in Medicine.

377. Declaration that The BORIM regulations on physician-patient sexual engagement are discriminatory and violate the Equal Protection clause of the U.S. Constitution - these regulations burden the fundamental liberty to marry because the regulations allow physicians to engage in sexual relations if the physicians marry their patients but will discipline physicians who do not marry their patients - thus the regulations, in effect say, either marry your patient or lose your medical license; these regulations burdening the fundamental liberty to marry are subject to judicial review under the Strict Scrutin standard.

378. Declaration that Sexual relations between physicians and their patients, without more, do not comprise medical malpractice nor sexual misconduct as declared in the Massachusetts precedent of Korper v. Weinstein.

379. Declaration that When the Plaintiff is in the nonclinical world not acting nor functioning as a physician, as classified by the 1992 termination contract modified, the BORIM regulations violate the Plaintiff's fundamental right to privacy in the privacy of the Plaintiff's bedroom as established by the Supreme Court landmark decision in Lawrence v. Texas; by impairing the fundamental right to privacy such BORIM regulations are subject to judicial review under the Strict Scrutiny standard.

380. Declaration that In summary, the BORIM regulations impair or burden several of the Plaintiff's fundamental constitutional rights including: the right and liberty to contract, the right and liberty to marry, and the right and liberty against state invasion of the Plaintiff's right to privacy.

381. Declaration that one or more of the Massachusetts State actor defendants did commit judicial misconduct which comprised one or more of the following offenses: Judicial Complicity, Failure to exercise Due Diligence, Failure to perform and Breach of statutory judicial duties, Abuse of Discretion, Violations of the Code of Judicial Conduct, Malicious prosecution and/or malicious indifference, Interference with the Fair

Administration of the Law, Abuse of Judicial Process, Dereliction of Judicial Duties, Solicitation to commit a criminal offense, Attempted commission of a criminal offense, Conspiracy to commit a criminal offense, Collusion with co-defendants, Tampering with a Witness, Intimidation of a Witness, Misconduct in Office of Prosecutor, Contempt of Court, Judicial Retaliation, Judicial Bias, Failure to Disclose, Misconduct in Office, Abuse of Power, Conflict of Interest, Tampering with Evidence, Violation of the Judicial Conduct Code, Conspiracy to Obstruct Justice, Obstruction of Justice, Judicial Derelection or *Negligentia Judicis,* Brady violations - Prosecutorial withholding Exculpatory Evidence, Judicial Misconduct or simply Judicial Derelection/Judicial Complicity, Abuse of Judicial Authority, Misprision of a Felony, Conspiracy to commit Misprision of Felony, Attempt to Commit Misprision of Felony, and/or Solicitation to Commit Misprision of Felony.

382. Declaration that the Massachusetts state actor defendants did violate the Plaintiff's fundamental constitutional right to Due Process of Law by denying the Plaintiff a fair hearing at DALA where the Plaintiff was denied the opportunity to be heard, to present exculpatory evidence in his defense, to confront and cross-examine adverse witnesses against him and to present a legal defense.

383. Declaration that the Through their multiple and collective actions and/or omissions, the Massachusetts state actor defendants did deprive the Plaintiff of his civil and constitutional rights while acting under the color of law in violation of 42 U.S.C. § 1983.

384. Declaration that the The 1992 Express Bilateral Contract, initially terminating the doctor patient relationship then creating the clinical and non-clinical worlds, is a valid, lawful and enforceable contract which is constitutionally protected by the contract clause and supercedes and pre-empts state laws and regulations under the Supremacy doctrine.

385. Declaration that the In the clinical world, created by the 1992 Express Bilateral Contract, the Plaintiff was a physician but in the non-clinical world, the Plaintiff was not a physician.

386. Declaration that the In the clinical world the Plaintiff is regulated as a physician by the Board of Registration in Medicine but in the non-clinical world the Plaintiff is not subject to the rules or regulations of BORIM because he was not a physician in the non-clinical world.

387. Declaration that the In the clinical world the Plaintiff never engaged in any intimate activities, as corroborated by the Stipulations, and the intimate activities between the Plaintiff and Lourdes Colon in the non-clinical world did not comprise sexual misconduct; the Plaintiff never committed any sexual misconduct with Lourdes Colon as his status as a non-physician in the non-clinical world was defined by the express terms of the 1992 Express Bilateral Contract.

388. Declaration that the The BORIM sanctions, discipline and revocation of the Plaintiff's medical license lacks statutory authority because BORIM cannot regulate the intimate activity nor discipline non-physicians who are not acting in a physician-patient relationship and the Plaintiff was not a physician in the non-clinical world.

389. Declaration that the The BORIM regulations are unconstitutional as applied to the Plaintiff and deprive the Plaintiff of his civil and constitutional rights acting under the color of law in violation of 42 U.S.C. § 1983.

390. Declaration that the  The 1992 Express Bilateral Contract, and its modification creating the clinical and non-clinical worlds, is a lawful, valid and enforceable contract protected by the contract clause of the Constitution.Declaration that the

391. Declaration that the  The Supreme Court has ruled and held that Extrinsic Fraud with Fraud on the Court vitiates and voids final court judgments in the proceedings which have been tainted by such Extrinsic Fraud.

392. Declaration that the  The Supreme Court has held that Stipulations which were made in the setting of Extrinsic Fraud are null and void, or voidable.

393. Declaration that the  The Stipulations signed by the Plaintiff, under coercion and duress in the setting of Extrinsic Fraud "with a gun held to his head" are null and void or voidable.

394. Declaration that the The defendants' conduct comprised a violation of the Plaintiff's constitutional rights.

395. Declaration that the BORIM's actions, judgments and orders regarding the Plaintiff's intimate activities in the non-clinical world comprised an unconstitutional intrusion into the Plaintiff's privacy as defined by the Supreme Court decision in *Lawrence v. Texas.*

396. Declaration that the  BORIM's judgment and order revoking the Plaintiff's medical license are null and void because they were based on false material facts in the adjudicatory proceedings which arose from the defendants' Wolfe, Spero and Colon engaging in spoliation of exculpatory evidence of the 1992 Express Bilateral Contract, which comprised Extrinsic Fraud and Fraud on the court, thus voiding those final judgments and orders.

397. Declaration that the BORIM regulations intentionally and purposefully discriminate between two groups of physicians, similarly situated with respect to sexual involvement with current or former patients, where the group that marries their patient is favored and approved but the group, including the Plaintiff, who does not marry their patient, is sanctioned and disciplined in violation of the Equal Protection clause

398. Declaration that the BORIM regulations, which approve of physicians who marry their patients but sanction and discipline those physicians who do not marry their patients, burden the Plaintiff's fundamental constitutional right to marry and as such, are subject to strict scrutiny.

399. Declaration that the Publication of the Plaintiff's medical license revocation on the untrue basis of sexual misconduct comprises the state's interference with the Plaintiff's constitutional right to engage in gainful employment and comprises an unconstitutional sanction of the Plaintiff.

400. Declaration that the  Revocation of the Plaintiff's medical license by BORIM comprises Cruel and Unusual Punishment and Excessive fines, costing the Plaintiff in excess of $3M (three million dollars) in lost revenue and lost economic opportunities, in violation of the Eighth Amendment's prohibition against such state activities.

401. Declaration that the  Massachusetts state actor defendants are guilty of judicial misconduct as detailed more thoroughly in the attached exhibits.

402. Declaration that the The Massachusetts state actor defendants did cause deprivation of the Plaintiff's civil and constitutional rights while acting under the color of law in violation of 42 U.S.C. §1983.

403. Declaration that the The Massachusetts state actor defendants did violate the Plaintiff's: (a) constitutional right of liberty to contract, (b) constitutional right to Due Process of Law, (c) constitutional right to Equal Protection of the Laws, (d) constitutional right to privacy in the non-clinical world, (e) constitutional right to engage in gainful employment, (f) constitutional right of protection from Cruel and Unusual Punishment and Excessive fines prohibited by the Eighth Amendment.

404. Declaration that the The Massachusetts state actor defendants did judicially affirm and endorse final court judgments which were based on unconstitutional state laws and BORIM regulations, thus violating the Supreme Court ban on judicial affirmation or endorsement of unconstitutional law via the "facilitation doctrine enunciated in *Shelley v. Kraemer.*

405. Declaration that the Massachusetts state actor defendants did violate the Plaintiff's fundamental constitutional right to Due Process of Law by denying the Plaintiff a fair hearing at DALA where the Plaintiff was denied the opportunity to be heard, to present exculpatory evidence in his defense, to confront and cross-examine adverse witnesses against him and to present a legal defense.

406. Declaration that the Through their multiple and collective actions and/or omissions, the Massachusetts state actor defendants did deprive the Plaintiff of his civil and constitutional rights while acting under the color of law in violation of 42 U.S.C. § 1983.

407. Declaration that the The 1992 Express Bilateral Contract, initially terminating the doctor patient relationship then creating the clinical and non-clinical worlds, is a valid, lawful and enforceable contract which is constitutionally protected by the contract clause and supercedes and pre-empts state laws and regulations under the Supremacy doctrine.

408. Declaration that the In the clinical world, created by the 1992 Express Bilateral Contract, the Plaintiff was a physician but in the non-clinical world, the Plaintiff was not a physician.

409. Declaration that the In the clinical world the Plaintiff is regulated as a physician by the Board of Registration in Medicine but in the non-clinical world the Plaintiff is not subject to the rules or regulations of BORIM because he was not a physician in the non-clinical world.

410. Declaration that the In the clinical world the Plaintiff never engaged in any intimate activities, as corroborated by the Stipulations, and the intimate activities between the Plaintiff and Lourdes Colon in the non-clinical world did not comprise sexual misconduct; the Plaintiff never committed any sexual misconduct with Lourdes Colon as his status as a non-physician in the non-clinical world was defined by the express terms of the 1992 Express Bilateral Contract.

411. Declaration that the The BORIM sanctions, discipline and revocation of the Plaintiff's medical license lacks statutory authority because BORIM cannot regulate the intimate activity nor discipline non-physicians who are not acting in a physician-patient relationship and the Plaintiff was not a physician in the non-clinical world.

412. Declaration that the The BORIM regulations are unconstitutional as applied to the Plaintiff and deprive the Plaintiff of his civil and constitutional rights acting under the color of law in violation of 42 U.S.C. § 1983.

413. Declaration that the The 1992 Express Bilateral Contract, and its modification creating the clinical and non-clinical worlds, is a lawful, valid and enforceable contract protected by the contract clause of the Constitution.

414. Declaration that the The Supreme Court has ruled and held that Extrinsic Fraud with Fraud on the Court vitiates and voids final court judgments in the proceedings which have been tainted by such Extrinsic Fraud.

415. Declaration that the The Supreme Court has held that Stipulations which were made in the setting of Extrinsic Fraud are null and void, or voidable.

416. Declaration that the The Stipulations signed by the Plaintiff, under coercion and duress in the setting of Extrinsic Fraud "with a gun held to his head" are null and void or voidable.

417. Declaration that the The final state court judgments from the Massachusetts Supreme Judicial Court, Division of Administrative Law Appeals, Suffolk Superior Court and Middlesex Superior Court, in the cases of Colon v. Weinberg, Wesselhoeft and Boston Evening Medical Center, Board of Registration in Medicine v. Robert P. Weinberg, Weinberg v. Colon, and Weinberg v. Board of Registration in Medicine, are null and void, or voidable, due to extrinsic fraud and Fraud on the Court committed by defendants Lisa Wolfe, Stanley Spero and Lourdes Colon and the Order revoking the Plaintiff's medical license is null and void, or voidable, because the adjudicatory proceedings were based on false material facts arising from Extrinsic Fraud and Fraud on the court.

418. Declaration that the The defendants' conduct a violation of the Plaintiff's constitutional rights.

419. Declaration that the BORIM's actions, judgments and orders regarding the Plaintiff's intimate activities in the non-clinical world comprise an unconstitutional intrusion into the Plaintiff's privacy as defined by the Supreme Court decision in Lawrence v. Texas.

420. Declaration that the BORIM's judgment and order revoking the Plaintiff's medical license are null and void because they were based on false material facts in the adjudicatory proceedings which arose from the defendants Wolfe, Spero and Colon engaging in spoliation of exculpatory evidence of the 1992 Express Bilateral Contract, which comprised Extrinsic Fraud and Fraud on the court, thus voiding those final judgments and orders.

421. Declaration that the BORIM regulations intentionally and purposefully discriminate between two groups of physicians, similarly situated with respect to sexual involvement with current or former patients, where the group that marries their patient is favored and approved but the group, including the Plaintiff, who does not marry their patient, is sanctioned and disciplined in violation of the Equal Protection clause.

422. Declaration that the BORIM regulations, which approve of physicians who marry their patients but sanction and discipline those physicians who do not marry their patients, burden the Plaintiff's fundamental constitutional right to marry and as such, are subject to strict scrutiny.

423. Declaration that the Publication of the Plaintiff's medical license revocation on the untrue basis of sexual misconduct comprises the state's interference with the Plaintiff's constitutional right to engage in gainful employment and comprises an unconstitutional sanction of the Plaintiff.

424. Declaration that the Revocation of the Plaintiff's medical license by BORIM comprises Cruel and Unusual Punishment and Excessive fines, costing the Plaintiff in excess of $3M (three million dollars) in lost revenue and lost economic opportunities, in violation of the Eighth Amendment's prohibition against such state activities.

425. Declaration that the Massachusetts state actor defendants are guilty of judicial misconduct as detailed more thoroughly in the attached exhibits.

426. Declaration that the The Massachusetts state actor defendants did cause deprivation of the Plaintiff's civil and constitutional rights while acting under the color of law in violation of 42 U.S.C. § 1983.

427. Declaration that the The Massachusetts state actor defendants did violate the Plaintiff's: (a) constitutional right of liberty to contract, (b) constitutional right to Due Process of Law, (c) constitutional right to Equal Protection of the Laws, (d) constitutional right to privacy in the non-clinical world, (e) constitutional right to engage in gainful employment, (f) constitutional right of protection from Cruel and Unusual Punishment and Excessive fines prohibited by the Eighth Amendment.

428. Declaration that the The Massachusetts state actor defendants did judicially affirm and endorse final court judgments which were based on unconstitutional state laws and BORIM regulations, thus violating the Supreme Court ban on judicial affirmation or endorsement of unconstitutional law via the "facilitation doctrine" enunciated in *Shelley v. Kraemer.*

## B.  Grant Injunctive Relief:

1. Reverse order revoking medical license of the Plaintiff because the BORIM proceedings and judgment are null and void due to Extrinsic Fraud and Fraud on the Court;

2. Reinstate Plaintiff's medical license;

3. Order new hearings on the allegations that the Plaintiff engaged in sexual misconduct *de novo;*

4. Refer the relevant Massachusetts State actor defendants to District Attorney for evaluation of judicial misconduct and potential criminal proceedings;

5. Prohibit continued publication of Plaintiff's license revocation on internet;

6. Replace all BORIM opinions, notices and postings with "Robert P. Weinberg currently not licensed;"

7. Require correction of Public Records;

8. Plaintiff requests that this Court enjoin all the State actor defendants from their ongoing and continuing violation of the U.S. Constitution and federal laws including that the State actors be enjoined from:

(i) enforcing BORIM regulations which violate the U.S. Constitution and other federal laws,

(ii) enforcing BORIM regulations which violate the liberty to contract,

(iii) enforcing BORIM regulations which violate the Equal Protection clause,

(iv) enforcing BORIM regulations which burden the fundamental right to marry,

(v) enforcing BORIM regulations which invade the right to privacy,

(vi) enforcing BORIM regulations which violate Due Process of Law,

(vii) continued publication of information which violates the Plaintiff's right to engage in gainful employment on the internet, social media, print media, news media/radio/television,

(viii) continuing sanctions which violate Eighth Amendment prohibition against Cruel and Unusual Punishment,

(ix) continuing sanctions which economically harm the Plaintiff or psychologically, socially or emotionally harm the Plaintff;

9. Grant preliminary and permanent injunctive relief;

10. Award costs and reasonable attorneys' fees;

11. Declare null and void all stipulations obtained through duress and extrinsic fraud;

12. Award damages for Brady violations by BORIM prosecutors;

13. Issue declaratory judgment that Massachusetts State Actor Defendants engaged in judicial misconduct;

14. Award sanctions against defendants who engaged in spoliation of evidence;

15. Enjoin enforcement of unconstitutional BORIM regulations;

16. Require erasure, expungement and  removal of defamatory internet publications;

17. Mandate return of research data by MIT defendants;

18. Prohibit further retaliation;

19. Grant such other relief as the Court deems just and proper.

## C. Award Damages - As a direct and proximate result of Defendants' conduct, Plaintiff has suffered the following damages:

Monetary Damages: Compensatory, Economic, Non-economic, Punitive

1. Economic damages in excess of $4,025,000 (four million twenty-five thousand U.S. dollars), representing lost salary and income [Compensatory    Damages]

2. Irreparable damage to his reputation and professional standing.

3. Severe emotional distress, including pain, suffering, and mental anguish.

4. Loss of his medical license and the ability to practice medicine.

5. Financial insolvency, bankruptcy, and foreclosure on his home.

6. Social ostracism and humiliation, and extreme isolation from the community.

7. Award compensatory damages against the defendants jointly and severally in an amount not less than $3,000,000 (three million U.S. dollars) for:

      A) Lost income and economic opportunities

      B) Professional reputation damage

      C) Emotional distress

      D) Lost research opportunities;

8. Award punitive damages against the defendants jointly and severally in an amount not less than $3,000,000 (three million U.S. dollars).

9. Attorneys' fees and costs

10. Award sanctions against defendants who engaged in:

      A) Spoliation of evidence

      B) Extrinsic fraud

      C) Abuse of process

      D) Malicious prosecution;

# Monetary Damages sought by Plaintiff:

**[1] Defendant Lisa Wolfe**

A. Compensatory damages in an amount to be determined at trial but not less than $1,000,000 (one million) for lost income and other economic losses;

B. Punitive damages in an amount sufficient to punish Defendant and deter similar conduct in the future;

C. Costs of suit incurred herein; and

D. Such other and further relief as this Court deems just and proper.

**[2] Defendant Stanley Spero**

A. Compensatory damages in an amount to be determined at trial but not less than $1,000,000 (one million) for lost income and other economic losses;

B. Punitive damages in an amount sufficient to punish Defendant and deter similar conduct in the future;

C. Costs of suit incurred herein; and

D. Such other and further relief as this Court deems just and proper.

**[3] Spero and Jorgensson, P.C.**

A. Compensatory damages in an amount to be determined at trial but not less than $1,000,000 (one million) for lost income and other economic losses;

B. Punitive damages in an amount sufficient to punish Defendant and deter similar conduct in the future;

C. Costs of suit incurred herein; and

D. Such other and further relief as this Court deems just and proper.

**[4] Defendant Lourdes Colon**

A. Compensatory damages in an amount to be determined at trial but not less than $100,000 for lost income and other economic losses;

B. Punitive damages in an amount sufficient to punish Defendant and deter similar conduct in the future;

C. Costs of suit incurred herein; and

D. Such other and further relief as this Court deems just and proper.

**[5] Defendant Nagina Mangal**

A. Compensatory damages in an amount to be determined at trial but not less than $100,000 for lost income and other economic losses;

B. Punitive damages in an amount sufficient to punish Defendant and deter similar conduct in the future;

C. Costs of suit incurred herein; and

D. Such other and further relief as this Court deems just and proper.

**[6] Defendant Ann Graybiel**

A. Compensatory damages in an amount to be determined at trial but not less than $100,000 for lost income and other economic losses;

B. Punitive damages in an amount sufficient to punish Defendant and deter similar conduct in the future;

C. Costs of suit incurred herein; and

D. Such other and further relief as this Court deems just and proper.

**[7] Sally Kornbluth**

A. Compensatory damages in an amount to be determined at trial but not less than $1,000,000 (one million) for lost income and other economic losses;

B. Punitive damages in an amount sufficient to punish Defendant and deter similar conduct in the future;

C. Costs of suit incurred herein; and

D. Such other and further relief as this Court deems just and proper.

**[8] Defendant Massachusetts Institute of Technology**

A. Compensatory damages in an amount to be determined at trial but not less than $100,000 for lost income and other economic losses;

B. Punitive damages in an amount sufficient to punish Defendant and deter similar conduct in the future;

C. Costs of suit incurred herein; and

D. Such other and further relief as this Court deems just and proper.

**[9] MIT Campus Police Department**

A. Compensatory damages in an amount to be determined at trial but not less than $1,000,000 (one million) for lost income and other economic losses;

B. Punitive damages in an amount sufficient to punish Defendant and deter similar conduct in the future;

C. Costs of suit incurred herein; and

D. Such other and further relief as this Court deems just and proper.

**[10] Craig Martin**

A. Compensatory damages in an amount to be determined at trial but not less than $1,000,000 (one million) for lost income and other economic losses;

B. Punitive damages in an amount sufficient to punish Defendant and deter similar conduct in the future;

C. Costs of suit incurred herein; and

D. Such other and further relief as this Court deems just and proper.

**[11] Coverys [legal successor-in-interest to ProMutual Medical Malpractice Insurer]**

A. Compensatory damages in an amount to be determined at trial but not less than $1,000,000 (one million) for lost income and other economic losses;

B. Punitive damages in an amount sufficient to punish Defendant and deter similar conduct in the future;

C. Costs of suit incurred herein; and

D. Such other and further relief as this Court deems just and proper.

**[12] Killian Casey**

A. Compensatory damages in an amount to be determined at trial but not less than $1,000,000 (one million) for lost income and other economic losses;

B. Punitive damages in an amount sufficient to punish Defendant and deter similar conduct in the future;

C. Costs of suit incurred herein; and

D. Such other and further relief as this Court deems just and proper.

[13] **Panache Flint**

A. Compensatory damages in an amount to be determined at trial but not less than $1,000,000 (one million) for lost income and other economic losses;

B. Punitive damages in an amount sufficient to punish Defendant and deter similar conduct in the future;

C. Costs of suit incurred herein; and

D Such other and further relief as this Court deems just and proper.

[14] **Michael Allen**

A. Compensatory damages in an amount to be determined at trial but not less than $1,000,000 (one million) for lost income and other economic losses;

B. Punitive damages in an amount sufficient to punish Defendant and deter similar conduct in the future;

C. Costs of suit incurred herein; and

D. Such other and further relief as this Court deems just and proper.

[15] **Booker Bush**

A. Compensatory damages in an amount to be determined at trial but not less than $1,000,000 (one million) for lost income and other economic losses;

B. Punitive damages in an amount sufficient to punish Defendant and deter similar conduct in the future;

C. Costs of suit incurred herein; and

D. Such other and further relief as this Court deems just and proper.

[16] **Martin Crane**

A. Compensatory damages in an amount to be determined at trial but not less than $1,000,000 (one million) for lost income and other economic losses;

B. Punitive damages in an amount sufficient to punish Defendant and deter similar conduct in the future;

C. Costs of suit incurred herein; and

D. Such other and further relief as this Court deems just and proper.

[17] **Alice Oliff**

A. Compensatory damages in an amount to be determined at trial but not less than $1,000,000 (one million) for lost income and other economic losses;

B. Punitive damages in an amount sufficient to punish Defendant and deter similar conduct in the future;

C. Costs of suit incurred herein; and

D. Such other and further relief as this Court deems just and proper.

[18] **Richard Waring**

A. Compensatory damages in an amount to be determined at trial but not less than $1,000,000 (one million) for lost income and other economic losses;

B. Punitive damages in an amount sufficient to punish Defendant and deter similar conduct in the future;

C. Costs of suit incurred herein; and

D. Such other and further relief as this Court deems just and proper.

[19] **Thomas Reilly**

A. Compensatory damages in an amount to be determined at trial but not less than $1,000,000 (one million) for lost income and other economic losses;

B. Punitive damages in an amount sufficient to punish Defendant and deter similar conduct in the future;

C. Costs of suit incurred herein; and

D. Such other and further relief as this Court deems just and proper.

[20] **Hon. Kimberly Budd**

A. Compensatory damages in an amount to be determined at trial but not less than $1,000,000 (one million) for lost income and other economic losses;

B. Punitive damages in an amount sufficient to punish Defendant and deter similar conduct in the future;

C. Costs of suit incurred herein; and

D. Such other and further relief as this Court deems just and proper.

[21] **Hon. Margaret Walsh**

A. Compensatory damages in an amount to be determined at trial but not less than $1,000,000 (one million) for lost income and other economic losses;

B. Punitive damages in an amount sufficient to punish Defendant and deter similar conduct in the future;

C. Costs of suit incurred herein; and

D. Such other and further relief as this Court deems just and proper.

[22] **Hon. Sarah Luick**

A. Compensatory damages in an amount to be determined at trial but not less than $1,000,000 (one million) for lost income and other economic losses;

B. Punitive damages in an amount sufficient to punish Defendant and deter similar conduct in the future;

C. Costs of suit incurred herein; and

D. Such other and further relief as this Court deems just and proper.

[23] **Hon. Natalie Monroe**

A. Compensatory damages in an amount to be determined at trial but not less than $1,000,000 (one million) for lost income and other economic losses;

B. Punitive damages in an amount sufficient to punish Defendant and deter similar conduct in the future;

C. Costs of suit incurred herein; and

D. Such other and further relief as this Court deems just and proper.

[24] **Andrea Campbell**

A. Compensatory damages in an amount to be determined at trial but not less than $1,000,000 (one million) for lost income and other economic losses;

B. Punitive damages in an amount sufficient to punish Defendant and deter similar conduct in the future;

C. Costs of suit incurred herein; and

D. Such other and further relief as this Court deems just and proper.

[25] **Hon. Christopher Connolly**

A. Compensatory damages in an amount to be determined at trial but not less than $1,000,000 (one million) for lost income and other economic losses;

B. Punitive damages in an amount sufficient to punish Defendant and deter similar conduct in the future;

C. Costs of suit incurred herein; and

D. Such other and further relief as this Court deems just and proper.

[26] **Hon. Heide Brieger**

A. Compensatory damages in an amount to be determined at trial but not less than $1,000,000 (one million) for lost income and other economic losses;

B. Punitive damages in an amount sufficient to punish Defendant and deter similar conduct in the future;

C. Costs of suit incurred herein; and

D. Such other and further relief as this Court deems just and proper.

[27] **Hon. Peter W. Killborn**

A. Compensatory damages in an amount to be determined at trial but not less than $1,000,000 (one million) for lost income and other economic losses;

B. Punitive damages in an amount sufficient to punish Defendant and deter similar conduct in the future;

C. Costs of suit incurred herein; and

D. Such other and further relief as this Court deems just and proper.

[28] **Andrea Campbell**

A. Compensatory damages in an amount to be determined at trial but not less than $1,000,000 (one million) for lost income and other economic losses;

B. Punitive damages in an amount sufficient to punish Defendant and deter similar conduct in the future;

C. Costs of suit incurred herein; and

D. Such other and further relief as this Court deems just and proper.

[29] **<u>Claudia Hunter</u>**

A. Compensatory damages in an amount to be determined at trial but not less than $1,000,000 (one million) for lost income and other economic losses;

B. Punitive damages in an amount sufficient to punish Defendant and deter similar conduct in the future;

C. Costs of suit incurred herein; and

D. Such other and further relief as this Court deems just and proper.

[30] **<u>Vincent DiCianni</u>**

A. Compensatory damages in an amount to be determined at trial but not less than $1,000,000 (one million) for lost income and other economic losses;

B. Punitive damages in an amount sufficient to punish Defendant and deter similar conduct in the future;

C. Costs of suit incurred herein; and

D. Such other and further relief as this Court deems just and proper.

[31] **<u>Ferriter Scobbo & Rodophele P.C.</u>**

A. Compensatory damages in an amount to be determined at trial but not less than $1,000,000 (one million) for lost income and other economic losses;

B. Punitive damages in an amount sufficient to punish Defendant and deter similar conduct in the future;

C. Costs of suit incurred herein; and

D. Such other and further relief as this Court deems just and proper.

[32] **<u>Robert Stolzberg</u>**

A. Compensatory damages in an amount to be determined at trial but not less than $1,000,000 (one million) for lost income and other economic losses;

B. Punitive damages in an amount sufficient to punish Defendant and deter similar conduct in the future;

C. Costs of suit incurred herein; and

D. Such other and further relief as this Court deems just and proper.

[33] **Sten Lofgren**

A. Compensatory damages in an amount to be determined at trial but not less than $1,000,000 (one million) for lost income and other economic losses;

B. Punitive damages in an amount sufficient to punish Defendant and deter similar conduct in the future;

C. Costs of suit incurred herein; and

D. Such other and further relief as this Court deems just and proper.

[34] **CHDI Foundation**

A. Compensatory damages in an amount to be determined at trial but not less than $1,000,000 (one million) for lost income and other economic losses;

B. Punitive damages in an amount sufficient to punish Defendant and deter similar conduct in the future;

C. Costs of suit incurred herein; and

D. Such other and further relief as this Court deems just and proper.

[35] **Simons Foundation Autism Research Initiative**

A. Compensatory damages in an amount to be determined at trial but not less than $1,000,000 (one million) for lost income and other economic losses;

B. Punitive damages in an amount sufficient to punish Defendant and deter similar conduct in the future;

C. Costs of suit incurred herein; and

D. Such other and further relief as this Court deems just and proper.

[35] **Defendant James Beck**

A. Compensatory damages in an amount to be determined at trial but not less than $100,000 for lost income and other economic losses;

B. Punitive damages in an amount sufficient to punish Defendant and deter similar conduct in the future;

C. Costs of suit incurred herein; and

D. Such other and further relief as this Court deems just and proper.

## D. Grant such other relief as the Court deems just and proper

## <u>JURY DEMAND:</u>

**Plaintiff hereby demands a trial by jury on all issues so triable.**

### CERTIFICATION UNDER RULE 11

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying,, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date: December 9, 2024                    /s/ *Robert P. Weinberg*
                                          Robert P. Weinberg
                                          Plaintiff, Pro Se
                                          P.O. Box 15334
                                          Boston, MA 02215
                                          Tel (781) 661-8207
                                          Email  LawDocBob@gmail.com
                                          Fax (617) 977-0902

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of December, 2024, a true and correct copy of the foregoing Complaint and Demand for Trial by Jury was served upon all parties or their counsel of record via: Electronic Mail for those defendants previously served in Federal Court:

Party:  Lisa Wolfe          Counsel of Record:    Victoria Ranieri  Ranieriv@whiteandwilliams.com

-------------------------------------------------------------------------------------------------------

Party:  Stanley Spero        Counsel of Record:    Christine A. Knipper christine.knipper@wilsonelser.com
        Spero and Jorgensson, P.C.

-------------------------------------------------------------------------------------------------------

Party:  Nagina Mangal        Counsel of Record:    Daryl J. Lapp  daryl.lapp@lockelord.com
                                                    Cynthia Vieno cynthia.vieno@lockelord.com
                                                    Andrea Martin andrea.martin@lockelord.com
                                                        autodocket@lockelord.com
                                                    Jessica Gedallovich jessica.gedallovich@lockelord.com

-------------------------------------------------------------------------------------------------------

Party:  Ann Graybiel         Counsel of Record:    Daryl J. Lapp  daryl.lapp@lockelord.com
                                                    Cynthia Vieno cynthia.vieno@lockelord.com
                                                    Andrea Martin andrea.martin@lockelord.com
                                                        autodocket@lockelord.com
                                                    Jessica Gedallovich jessica.gedallovich@lockelord.com

-------------------------------------------------------------------------------------------------------

Party:  Sally Kornbluth      Counsel of Record:    Daryl J. Lapp  daryl.lapp@lockelord.com
                                                    Cynthia Vieno cynthia.vieno@lockelord.com
                                                    Andrea Martin andrea.martin@lockelord.com
                                                        autodocket@lockelord.com
                                                    Jessica Gedallovich jessica.gedallovich@lockelord.com

-------------------------------------------------------------------------------------------------------

Party:  Massachusetts Institute of Technology
                             Counsel of Record:    Daryl J. Lapp  daryl.lapp@lockelord.com
                                                    Cynthia Vieno cynthia.vieno@lockelord.com
                                                    Andrea Martin andrea.martin@lockelord.com

autodocket@lockelord.com

Jessica Gedallovich jessica.gedallovich@lockelord.com

---

Party:  MIT Campus Police Department

Counsel of Record:  Daryl J. Lapp  daryl.lapp@lockelord.com

Cynthia Vieno cynthia.vieno@lockelord.com

Andrea Martin andrea.martin@lockelord.com

autodocket@lockelord.com

Jessica Gedallovich jessica.gedallovich@lockelord.com

---

Party:  Craig Martin    Counsel of Record:  Daryl J. Lapp  daryl.lapp@lockelord.com

Cynthia Vieno cynthia.vieno@lockelord.com

Andrea Martin andrea.martin@lockelord.com

autodocket@lockelord.com

Jessica Gedallovich jessica.gedallovich@lockelord.com

---

Party:  Killian Casey    Counsel of Record:  Daryl J. Lapp  daryl.lapp@lockelord.com

Cynthia Vieno cynthia.vieno@lockelord.com

Andrea Martin andrea.martin@lockelord.com

autodocket@lockelord.com

Jessica Gedallovich jessica.gedallovich@lockelord.com

---

Party:  Panache Flint    Counsel of Record:  Daryl J. Lapp  daryl.lapp@lockelord.com

Cynthia Vieno cynthia.vieno@lockelord.com

Andrea Martin andrea.martin@lockelord.com

autodocket@lockelord.com

Jessica Gedallovich jessica.gedallovich@lockelord.com

---

Party:  Michael Allen    Counsel of Record:  Daryl J. Lapp  daryl.lapp@lockelord.com

Cynthia Vieno cynthia.vieno@lockelord.com

Andrea Martin andrea.martin@lockelord.com

|  |  |  | Jessica Gedallovich jessica.gedallovich@lockelord.com |
|--|--|--|--|
|  |  |  | autodocket@lockelord.com |
| Party: | Booker Bush | Counsel of Record: | AAG Julie Frohlich julie.frohlich@mass.gov |
|  |  |  | AdLawEFilings@state.ma.us |
|  |  |  | Kathleen.McGrail@mass.gov |

---

| Party: | Martin Crane | Counsel of Record: | AAG Julie Frohlich julie.frohlich@mass.gov |
|--|--|--|--|
|  |  |  | AdLawEFilings@state.ma.us |
|  |  |  | Kathleen.McGrail@mass.gov |

---

| Party: | Alice Oliff | Counsel of Record: | AAG Julie Frohlich julie.frohlich@mass.gov |
|--|--|--|--|
|  |  |  | AdLawEFilings@state.ma.us |
|  |  |  | Kathleen.McGrail@mass.gov |

---

| Party: | Richard Waring | Counsel of Record: | AAG Julie Frohlich julie.frohlich@mass.gov |
|--|--|--|--|
|  |  |  | AdLawEFilings@state.ma.us |
|  |  |  | Kathleen.McGrail@mass.gov |

---

| Party: | Thomas Reilly | Counsel of Record: | AAG Julie Frohlich julie.frohlich@mass.gov |
|--|--|--|--|
|  |  |  | AdLawEFilings@state.ma.us |
|  |  |  | Kathleen.McGrail@mass.gov |

---

| Party: | Hon. Kimberly Budd | Counsel of Record: | AAG Julie Frohlich julie.frohlich@mass.gov |
|--|--|--|--|
|  |  |  | AdLawEFilings@state.ma.us |
|  |  |  | Kathleen.McGrail@mass.gov |

---

| Party: | Hon. Margaret Walsh | Counsel of Record: | AAG Julie Frohlich julie.frohlich@mass.gov |
|--|--|--|--|
|  |  |  | AdLawEFilings@state.ma.us |
|  |  |  | Kathleen.McGrail@mass.gov |

---

| Party: | Hon. Natalie Monroe | Counsel of Record: | AAG Julie Frohlich julie.frohlich@mass.gov |
|--|--|--|--|

AdLawEFilings@state.ma.us

Kathleen.McGrail@mass.gov

Party:    Hon. Christopher Connolly    Counsel of Record:    AAG Julie Frohlich    julie.frohlich@mass.gov

AdLawEFilings@state.ma.us

Kathleen.McGrail@mass.gov

--------------------------------------------------------------------------------------------------------

Party:    Hon. Heide Brieger         Counsel of Record:    AAG Julie Frohlich    julie.frohlich@mass.gov

AdLawEFilings@state.ma.us

Kathleen.McGrail@mass.gov

--------------------------------------------------------------------------------------------------------

Party:    Hon. Peter W. Killborn       Counsel of Record:    AAG Julie Frohlich    julie.frohlich@mass.gov

AdLawEFilings@state.ma.us

Kathleen.McGrail@mass.gov

--------------------------------------------------------------------------------------------------------

Party:    Hon. Sarah Luick           Counsel of Record:    AAG Julie Frohlich    julie.frohlich@mass.gov

AdLawEFilings@state.ma.us

Kathleen.McGrail@mass.gov

--------------------------------------------------------------------------------------------------------

Party:    Andrea Campbell            Counsel of Record:    AAG Julie Frohlich    julie.frohlich@mass.gov

AdLawEFilings@state.ma.us

Kathleen.McGrail@mass.gov

--------------------------------------------------------------------------------------------------------

and will be served upon the following parties by service in-hand within the next 14 days:

Party:    Lourdes Colon       Known Address:      267 Centre Street, Apt. 230

Jamaica Plain, MA

--------------------------------------------------------------------------------------------------------

Party:    Claudia Hunter      Known Address:      83 Atlantic Avenue

Boston, MA 02110

--------------------------------------------------------------------------------------------------------

Party:    Vincent DiCianni    Known Address:    Affiliated Monitors
                                                 P.O. Box 961791
                                                 Boston, MA 02196

Party:    Ferriter Scobbo & Rodophele P.C.    Known Address:    125 High Street
                                                               Suite 2611
                                                               Boston, MA 02110

--------------------------------------------------------------------------------

Party:    Robert Stolzberg    Known Address:    105 Willard Road
                                                Brookline, MA 02445

--------------------------------------------------------------------------------

Party:    James C. Beck    Known Address:    34 Bates Street
                                             Cambridge, MA 02140

--------------------------------------------------------------------------------

Party:    Paula Lazar    Known Address:    15 Boylston Street, #3
                                           Jamaica Plain, MA 02130

--------------------------------------------------------------------------------

Party:    Sten Lofgren    Known Address:    1264 Main Street, #12
                                            Concord, MA 01742

--------------------------------------------------------------------------------

Party:    Amy Banks    Known Address:    114 Waltham Street, Suite #17
                                         Lexington, MA 02421

--------------------------------------------------------------------------------

Party:    Simons Foundation Autism Research Initiative
                        Known Address:    Simons Foundation
                                          160 Fifth Avenue, 7th Floor
                                          New York, NY 10010

--------------------------------------------------------------------------------

Party:    CHDI Foundation    Known Address:    350 Seventh Ave, Suite 200
                                               New York, NY 10001

--------------------------------------------------------------------------------

Date:    December 9, 2024            /s/ *Robert P. Weinberg*

                                     Robert P. Weinberg
                                     Plaintiff, Pro Se
                                     P.O. Box 15334
                                     Boston, MA 02215
                                     Tel (781) 661-8207
                                     Email  LawDocBob@gmail.com
                                     Fax (617) 977-0902